## RICHARDS ET AL. *v.* WILSON ET AL.

[No. 22,283.   Filed May 22, 1916.   Rehearing denied November 10 1916.]

1. TRIAL.—*Venire de Novo.*—The motion for *venire de novo,* though an ancient common-law remedy, applicable to jury trials, has been adopted by common usage as a part of our practice and is applied when either a verdict or finding on its face is so defective in form, ambiguous and uncertain that no judgment could be rendered thereon.   p. 363.
2. TRIAL.—*Findings and Conclusions.—Venire de Novo.*—The contention in support of a motion for *venire de novo* that the finding contain evidentiary facts and conclusions which, if eliminated, makes the finding too uncertain to justify the rendition of a judgment thereon is unavailable, where it is apparent that, where the finding contains evidentiary facts tending to prove essential ultimate facts, such ultimate facts are also found, and there are sufficient facts properly found on which to decide the issues one way or another.   p. 364.

3. TRIAL.—*Venire de Novo.*—*Failure to Find on All Issues.*—The failure of the trial court to find on certain material facts affords no ground for *venire de novo,* but is properly a cause for new trial. p. 364.

4. CHARITIES.—*Acceptances by Trustees.*—*Evidence.*—In a suit by trustees for direction as to their trust, the answer therein by a board of school commissioners of a school city and a resolution passed by such board in relation to the matter expressing its willingness to accept and perform the conditions to the extent that it was authorized by law was sufficient foundation for a finding of the willingness and readiness of the school city to accept the real estate in trust and to establish and maintain a school thereon. p. 364.

5. TRIAL.—*Findings.*—*Effect.*—Where facts found are established by undisputed evidence and are within the issues, the legal force and effect of the facts so found is a matter of law to be determined in applying the law to the facts. p. 365.

6. TRUSTS.—*Issues.*—*Parol Evidence.*—*Admissibility.*—In a suit by trustees for direction as to their trust, where it appeared from the complaint that the trust resulted from a movement for the preservation of a certain tract of land from private ownership which the government then owned and proposed to sell, which movement was surrounded by unusual and complicated circumstances, and the issues raised compelled an inquiry into the common purpose in the minds of the donors of the money used in purchasing the land and the capacity in which the trustees took and held the fund and the title to the real estate purchased with it, and it was generally conceded that the subscription papers used in raising the fund did not show the intent and purpose of any of the donors at the time they paid the money, certain parol evidence to show the object and intent of the donors was not only proper but also inevitable. pp. 365, 369.

7. TRUSTS.—*Statute of Frauds.*—*Parol Evidence.*—The statute of frauds does not extend to express trusts in personalty and they may be created, declared, or admitted verbally when the evidence is clear and unequivocal. p. 368.

8. SUBSCRIPTIONS.—*Construction.*—*Parol Evidence.*—Contracts of subscription by donors to a fund for the purchase and preservation of a tract of land from private ownership, if not fully illuminative, are to be construed with reference to the intent of the parties at the time, and in doing so the court will consider the subject-matter of the agreement, the inducement influencing the subscription and the circumstances under which it was made, and to this end parol evidence is admissible as part of the *res gestae.* p. 368.

9. GIFTS.—*Conditional Gifts.*—*Evidence.*—Where the terms made use of in a gift are obscure, doubtful or equivocal, either in themselves or in their application, it is the duty of the court to ascertain by evidence, as well as it is able, what the intent of the donor was, and in what sense the particular expression was used. p. 369.

10.  TRUSTS.—*Evidence to Establish.*—*Parol Evidence.*—In determining the nature of a trust originating in a public subscription for the purchase and preservation from private ownership of a certain tract of land owned by the government, where the subscription paper was not sufficient to show the intent of the subscribers as to a contingency later arising, other writings and memoranda and parol evidence of circumstances and surroundings of the parties concerned was admissible to show such intent, even on a determination of the rights involved by the rules of law applicable to the creation and trusts in land, rather than on the theory, obvious from the issues, that the primary trust was in the funds donated and that such trust was merely carried into the land.  p. 370.

11.  TRUSTS.—*Evidence to Establish.*—*Parol Evidence.*—Ordinarily the written evidence of an express trust in land which will satisfy the statute may come from the grantor, or from the trustee, but not from the *cestui que trust.*  p. 370.

12.  TRUSTS.—*Evidence to Establish.*—A letter sent to donors who had signed subscription papers for a fund for the purchase and preservation from private ownership of a tract of land owned by the government, which was in connection with the particular subject-matter of the subscription papers, and pursuant to the terms of which they paid their money, must be deemed to have been adopted by them as their own, so that whatever force and effect it had bore on them and their rights and their purposes in parting with their money.  p. 370.

13.  TRUSTS.—*Creation.*—No particular formality is required or is necessary in the creation of a trust, and any agreement or contract in writing made by a person having the power of disposal over property, whereby he agrees or directs that a certain fund or property shall be held or dealt with for the benefit of others, in a court of equity raises a trust in favor of such others against the person making such agreement.  p. 371.

14.  TRUSTS.—*Evidence.*—*Parol Evidence.*—If there is any competent written evidence that a person holding the legal title to property is only a trustee, that will open the door for the admission of parol evidence to explain the position of the parties.  p. 371.

15.  TRUSTS.—*Evidence.*—*Intention of Parties.*—A finding that donors to a fund for the purchase and preservation from private ownership of a certain tract of land owned by the government intended to establish a trust of a public charitable nature was sustained by evidence of speeches, resolutions, newspaper articles, circular letters, etc., made and promulgated from time to time from the inception of the movement to preserve the tract and from which it appeared that, through a group known as the "Winona Group" proposed to endow and manage a technical school on the land to be open to rich and poor alike; that the tract should be preserved intact and used for educational purposes;

that the trustees of the fund donated were to hold the fund, pur-
chase the property and hold the deed until assured that the pro-
posed school could be sufficiently endowed; that no stockholder
was to profit from the school; and that the donors had in mind
that when the deed should be bestowed upon the proposed corpora-
tion it should be coupled with a limitation of the use for educational
purposes, etc.   p. 371.

16.   CHARITIES.—*Survival of Trust.—Enforcement.*—Where a public
charitable trust is found to have been intended, the question of
the survival of the trust and its interpretation and enforcement
are controlled by those essential principles of equity and practices
of courts of chancery which deal with great favor with public
trusts.   p. 380.

17.   EQUITY.—*Scope of Equity Jurisprudence.—Constitutional and
Statutory Provisions.*—Equity jurisprudence in its fullness is in
force in this State except as curtailed by constitutional and statu-
tory provisions.   p. 380.

18.   CHARITIES.—*Purposes of Gift.—Educational Purposes.*—Gifts,
devises and bequests in trust for educational purposes are good
public charitable trusts which receive the support of the principles
of equity.   p. 380.

19.   CHARITIES.—*Purposes of Gift.—Educational Purposes.*—Public
charitable trusts embrace all trusts for founding, endowing and
supporting of schools for the advancement of all useful branches
of learning which are not strictly private.   p. 380.

20.   CHARITIES.—*Educational Institutions.—Payment of Tuition.—
Effect.*—The fact that a private corporation, as a trustee, conduct-
ing a school without profit to the stockholders and open alike to
rich and poor, requires those who receive its benefits to pay tuition
either in money or labor for the purpose of instilling self-respect
and building character in those attending the school, does not
deprive the institution of its character as a charitable institution
in the legal sense.   p. 381.

21.   CHARITIES.—*Acceptance by Trustee.—Evidence.*—In a suit by
trustees for instructions as to their trust, evidence showing that,
after the payment to them of money subscribed by donors for the
purchase of certain land for a public educational use, the trustees
purchased the land, warranted a finding that the trust had been
consummated so as to render the gift irrevocable, there being no
conditions precedent to its consummation.   pp. 383, 385.

22.   GIFTS.—*Inter Vivos.—Delivery and Acceptance.*—In the case of
a private gift *inter vivos*, where there is a purpose on the part of
the donor to make a gift of the thing and it is accepted by the
proposed donee, the gift is irrevocable.   p. 383.

23.   GIFTS.—*Inter Vivos.—Delivery.*—The delivery of a gift *inter
vivos* may be either actual, constructive or symbolical, dependent
on the subject-matter.   p. 383.

24. GIFTS.—*Inter Vivos.*—*Implied Acceptance.*—In case of gifts *inter vivos* the law implies acceptance by a donee incapable of giving an assent, and, if for his benefit, in any case where the delivery is to a third person. p. 384.

25. CHARITIES.—*Validity.*—*Construction.*—Trusts for charity are favored by equity and are construed as valid when possible, even though vaguely expressed and, if the words of a gift are ambiguous or contradictory, they are so constructed as to support the charity if possible. p. 384.

26. CHARITIES.—*Vesting of Gifts.*—*Delivery.*—All charitable gifts, testamentary or *inter vivos*, are completed and vest only constructively or symbolically, and, in cases of charitable gifts *inter vivos* the gift is consummated when the property is actually for a charitable purpose to a third party with the intent on the part of the donor that his dominion over it has thereby ceased. p. 385.

27. CHARITIES.—*Revocation.*—Where the subscription papers signed by the donors of money for a public charitable trust contained no conditions or provisions for reverter, there was an implied condition against recovery of the sum paid. p. 386.

28. CHARITIES.—*Directions.*—*Conditions.*—A provision in a charitable subscription that a corporation is to be formed to carry the purposes of the gift into effect, if a condition at all, was a condition subsequent, a failure of which did not operate to prevent the vesting of the gift to charity; but such conditions are usually deemed as mere expressions of the donors as to matters affecting the administration of the trust rather than as conditions. p. 387.

29. CHARITIES.—*Conditions.*—*Promise of Endowment.*—Where, subsequent to agitation on the part of citizens for the purchase of certain land owned by the government and the preservation of same from private ownership, a group of wealthy persons proposed, if the land were purchased, to establish a technical school thereon and provide a large endowment for same, which proposition was influential in inducing subscriptions to a fund for the purchase of such land, and it thereafter became apparent that the promises of a large endowment were to fail, so that the donors waived same before paying the amount of their subscriptions, and agreed that a deed for the land so purchased should be executed to the corporation proposed by those promising the endowment when the latter should have raised a specified amount much smaller than the amount of endowment originally promised, the agreement relative to the deed was no more than a condition subsequent. p. 387.

30. CHARITIES.—*"Endowment With Money."*—An "endowment with money" means the bestowment of it as a permanent fund, the income of which is to be used in the administration of the proposed work. p. 388.

31. *Gifts.*—*Conditions Precedent.*—If the act to be done does not necessarily precede the vesting of the estate, but may accompany or follow it, and this can be collected from the circumstances of the gift, the condition is subsequent. p. 390.

Richards *v.* Wilson—185 Ind. 335.

32. CHARITIES.—*Purposes of Gift.*—*Education.*—The purchase by public subscription of a tract of land with intent by the donors that it be used for educational purposes completed and vested the gift in the public for such educational purposes.　p. 390.

33. CHARITIES.—*Implication of Character of Gift.*—The general charitable purpose of a gift may be implied in the name or object of the institution to which the gift is made, or in the publicly avowed purpose of its organization and action.　p. 392.

34. GIFTS.—*Gifts to Charity.*—*Construction.*—Gifts to charitable uses are highly favored and are to be construed by the most liberal rules that the nature of each case, as presented, will permit of, rather than that the gift should fail and the purpose of the donor be not accomplished.　p. 392.

35. CHARITIES.—*Cy Pres Doctrine.*—Where a gift is for an ascertainable charitable purpose, the trust will survive the failure of the particular trustee and particular method of administration designated, if the court can secure a trustee to carry into effect, as nearly as may be, the dominant purpose of the donor, and in the application of the doctrine it is immaterial whether the gift is testamentary or *inter vivos.*　p. 393.

36. CHARITIES.—*Capacity of Trustee.*—*School City.*—A school city is qualified to receive title to property purchased for specific educational purposes with funds raised by subscription and to hold it for the educational uses specified.　p. 397.

37. CHARITIES.—*Disposition of Property.*—*Sale.*—Gifts of land to charity, because of their public purpose, are regarded as practically inalienable at the hands of the person or body intrusted with the offices of giving them effect, except under authority of the chancery court in the interest of the trust.　p. 399.

38. RECEIVERS.—*Actions.*—*Party.*—Where a receiver has been appointed, he represents the creditors, and they cannot proceed directly against the debtor's property, but their claims must be worked out through him.　p. 401.

From Hendricks Circuit Court; *James L. Clark,* Judge.

Suit by Medford B. Wilson and others, as trustees, against the Winona Agricultural and Technical Institute and others. From an adverse judgment, William J. Richards and others appeal. *Affirmed.*

*Samuel Ashby, Scott & Scott, Charles A. Dryer, George C. Harvey, L. C. Walker, Miller, Shirley, Miller & Thompson* and *George W. Brill,* for appellants.

*F. Winter, A. C. Harris, Albert Baker, William Bosson* and *Gavin, Gavin & Davis*, for appellees.

Cox, C. J.—This action was brought by appellees Medford B. Wilson, John Perrin, Alfred A. Barnes, Charles Latham and Frank E. Gavin as trustees against the Winona Agricultural and Technical Institute, The Winona Technical Institute, Charles A. Bookwalter, receiver, and many others, to have determined the character and purpose of the trust under which they had, as such trustees, acquired and then held title to a tract of land in the city of Indianapolis known as the "United States Arsenal Grounds". The purpose to buy the ground from the Federal government to preserve it intact as a site for a manual labor school, and to raise a fund by popular subscription to cover the purchase price was averred in the complaint. The proposal of a certain group of men known as the "Winona Group" to establish, liberally endow, and maintain a school for the education of boys and girls in trades and handicrafts on the site, if the public would so buy it, was shown. They were to incorporate the Winona Agricultural and Technical Institute to conduct the school. The raising of the amount necessary for the purchase by popular donations and subscriptions from many persons for the purpose of keeping the grounds intact as a site for such a school was set forth at length. It was then averred that when the donations and subscriptions had reached the amount necessary to make the purchase it was learned that the "Winona Group" had failed to provide any endowment; that then the appellees named, as trustees of the fund, called a meeting on January 8, 1903, of the larger subscribers, representatives of the proposed Winona corporation, and others interested to consider the matter of making the pur-

chase from the Federal government at the sale which was to occur shortly. At this meeting it was arranged that the trustees should buy the tract, take the title to themselves and hold it until an endowment of at least $154,000, a sum equal to the probable purchase price, should be provided by the Winona corporation; and it was then determined that the grounds should be forever devoted to and held in trust for educational purposes in the city of Indianapolis, and that no conveyance should be made to the institute until such endowment should be provided. Pursuant to the conclusion reached at that meeting the trustees on January 15, 1903, sent a letter through the mails, which subsequently became known as the "blue letter," to each subscriber stating substantially the arrangement made at that meeting and requesting payment. The collection of the money, the purchase of the tract, the conveyance by the Federal government to appellee's trustees, as trustees of the Winona Agricultural and Technical Institute, were all averred in detail. It was then shown that the promised endowment failed but that the trustees granted to the institute permission to occupy the premises, but to have no title and to surrender possession upon the demand of the trustees; that it went into possession and had so continued, but was insolvent and in the hands of a receiver for that reason, owing debts to many people in a large sum. It was further shown in the complaint that the number of donors to the purchase fund was so great that it would be impossible to make them all parties to the suit; that the number of creditors to the institute was so great that it was impracticable to make them all defendants. Finally it was stated in the complaint that the trustees, without desiring to espouse the cause of anybody making claims to

any interest in the property, the title to which was held by them as trustees, did desire to maintain and uphold the trust and to see that its purpose was carried out. And they prayed the court to ascertain and determine the trust, the rights of all the parties, and the duty of the trustees with reference to the property so held by them; and, in case a deed should be made to any one, the provisions to be stated therein for the protection of the trust and its preservation for educational purposes in the city of Indianapolis.

Many others than those named in the complaint came in as parties and many pleadings of great length were filed, mainly in the nature of answers to the complaint, and cross-complaints between the many parties defendant. Three of the donors of large sums, Fletcher S. Hines, William E. Hayward and Edward C. Fletcher, by their answers and cross-complaints, took the position that, as the "Winona Group" had failed to raise either a promised endowment of $2,000,000 and provide an annual income of $50,000 as originally contemplated when the subscriptions were made, or to raise $154,000 as provided when the subscriptions were paid in response to the "blue letter," the trust was never consummated but had failed and that the property held by the trustees should be sold by the court and the proceeds divided among the donors who were about 4,000 in number, to the exclusion of the creditors of the institute, in the ratio that the gift of each should bear to any sum for which the property might sell. The creditors of the Winona Technical Institute, made up in the main of those who had loaned it money to fit the buildings and carry on the schools, after it had entered into possession claimed, through that corporation as their common debtor, that the property stood charged in equity with their several demands

and they asked that it be sold and the proceeds applied to the payment of their several debts against the insolvent corporation. Mr. Addison C. Harris, a donor to the fund of a large sum, in behalf of himself and those like him desiring to establish the trust as a public charitable trust and to protect and preserve it against all those parties who were antagonistic, filed an answer and a cross-complaint in which facts were averred on which it was maintained that the purpose in securing the donations to the fund and the purchase of the tract from the Federal government was to keep those grounds intact like a public park to be used as a site for a trade school for boys and girls and held for uses in Indianapolis as a public educational charity. Other attorneys in the case, among them Mr. Ferdinand Winter, representing Hugh McGowan and other large donors, and Mr. William Bosson, representing Dr. R. C. Light, appeared and adopted the pleadings of Mr. Harris. And Andrew J. Brunt, a contributor of a large sum, personally appeared and did the same. The board of school commissioners of the city of Indianapolis was made a party and answered. As no question is made in this appeal as to the sufficiency of any pleading none need be more particularly set out than as above stated.

The court found the facts specially and stated conclusions of law thereon favorably to the position taken by Mr. Harris and others and against the contentions of the donors Hines, Fletcher and Hayward, and the creditors of the institute; and, following motions for a new trial, rendered judgment accordingly. From that judgment the three donors last mentioned and the creditors have brought this appeal. The errors assigned and relied on for reversal by the donors who have appealed and also the creditors are: (1) That the court erred

in overruling their respective motions for a *venire de novo*; (2) in overruling their motions for a new trial; and (3) that it erred in its conclusions of law.

The vital questions in the case make it essential to set out the facts, in substance, as the court found them to be established by the evidence to the extent that they are involved in the questions raised by the assignments of error. In 1902, the United States Government owned, and for many years theretofore had owned, a tract of land, much of it wooded and substantially in a primeval state, which comprised slightly less than eighty acres in the city of Indianapolis. It had been devoted to use by the government as an arsenal site and small military post and, at the time named, there were on it a small number of old but substantial buildings which had been erected for that use. During the years of the government's ownership, the city in its growth had completely surrounded the tract so that in 1902 it lay near the heart of the city. It then became known that the government proposed selling the tract. Thereupon a concerted movement was initiated by the press, civic and educational organizations, public officials and public-spirited citizens to procure the tract by purchase from the government and to hold and preserve it intact for park and educational uses in the city. While this movement was gathering force and taking shape, a group of men of large means who were connected with or interested in the Winona Assembly and Summer School Association, a corporation conducting a chautauqua and summer school at Winona Lake, Indiana, proposed that they would endow and manage a technical institute to be located on the arsenal grounds, if the citizens of Indianapolis and vicinity would secure for them those grounds and buildings, the management of

the proposed technical institute to be largely in
the hands of a local committee of the citizens of
Indianapolis. These men possessed large fortunes
and were well able to endow such a school in a
manner to insure its success which fact was well
known to the citizens of Indianapolis. This pro-
posal from them was made at a public meeting in
the city of Indianapolis by an agent of the group
of men who called themselves the Winona Agri-
cultural and Technical Institute, but who were
not then constituted a corporate entity. This
agent, one Dr. S. C. Dickey, was empowered by
this group to act for them in connection with the
citizens of Indianapolis to secure donations from
the citizens of Indianapolis and others interested,
of sufficient money to purchase the arsenal grounds
and buildings for a technical school as a department
of the Winona Agricultural and Technical Institute.
At the public meeting at which this proposal was
made, which was held April 22, 1902, which was
made up of representative citizens, members of
various civic bodies and representatives of the press
of the city, it was determined to abandon all other
efforts to purchase the property for other purposes,
and to unite in an effort to raise a fund to purchase
it as a site on which such technical school might
be permanently located. Other meetings looking
to this purpose were held, at which representatives
of the "Winona Group" were present and at one of
them a committee was appointed which was to have
charge and direction of the effort to secure a fund
for the purchase, as were, also, solicitors to secure
subscriptions and trustees to hold the funds. Mr.
Harris was made chairman of this committee and
Dr. Dickey was a member of it. At the latter's
suggestion George W. Brown and Albert Sahm
were selected as special solicitors for subscriptions

to the purchase fund. The canvass for subscriptions
to the fund was prosecuted during several months
by the solicitors and their verbal statements were
supplemented and aided by printed matter of the
nature, purpose and progress of the movement
consisting in the main of matter printed in the local
and in the editorial columns of the newspapers,
prospectuses and subscription blanks. The news-
paper matter urged the public to subscribe to the
fund, to the end that if a sum sufficient to purchase
the site was raised, the men of large wealth before
mentioned would endow a national technical school
thereon, and that a sum was then in sight sufficient
to erect necessary buildings and to pay the expenses
of the operation of the school for a period of ten
years, and that an ample endowment was assured
to continue its operation permanently as a national
school, which would bring large numbers of students
from all parts of the country. Many of these news-
paper articles and items were furnished by Dr.
Dickey and the solicitors, some of which purported
to be interviews with them and some were signed
by them. None of this newspaper aid was re-
pudiated, denied or criticized. Among the publica-
tions appearing in one of the newspapers was the
following, which was authorized by Dr. Dickey
as representative of the Winona people and without
consultation with the committee or the chairman
thereof, to-wit:

"This is to be a national school, national as
to its officers, its teachers, and the territory
from which it will draw its students.

"This directory is a unit in regarding Chris-
tian character as the foundation for all real
success in life, non-sectarian, but strictly evan-
gelical, religious teaching will be impressed
upon the heart and conscience of every pupil,

and the Bible will be given its proper place as the most important text-book.

"There will be no charity students and no free tuition. The most precious possession any boy has or can have is his manhood, and we believe that no boy can retain his manhood unimpaired and obtain and accept things for nothing. We do not believe that the state of society or the church owes any man or boy either a living or education. But every boy is entitled to a chance to obtain an education, and also that which is just as important, the chance to pay for it either in money or in labor.

"If a boy's parents or friends want to pay in full for his education, he will be paid in cash for his physical labor, but he must work just as many hours as the boy who pays for his education by labor alone.

"The statement, endowment and place of collection of subscriptions will be made by the trustees as soon as they can hold a meeting. The Technical Institute will be dedicated with a fixed annual income of not less than $50,000 aside from the money received from tuition.

"As ample security to the subscribers, trustees will not only hold the collected funds, but also a deed to the property until they and the subscribers are thoroughly satisfied that the school can have a sufficient inauguration and maintenance through a fixed and ample endowment."

A prospectus was prepared for use in the canvass for donations to the fund to purchase the real estate which prospectus was approved by Dr. S. C. Dickey and the chairman of the canvassing committee. The prospectus was printed and used by the solicitors canvassing, and by them presented to each person solicited. It contained a statement of the plans and purposes in which was this sentence:

"One thing we may assure—the men who compose the board of the Winona Agricultural

and Technical Institute will be satisfied with nothing less than the best faculty that can be secured, and that we will not rely upon tuition of the students for means with which to meet the salaries of the teachers.  Men who are heart and soul in this movement will supply such expenses by generous contributions.  They have already taken up the work and signified their intention, so we are not building a fabric of plans on a foundation lacking substantial qualities.''

The name S. C. Dickey was printed at the close of the statement containing the foregoing sentence. It also contained a list of the men constituting the officers and directors of the Winona Agricultural and Technical Institute.  The following statement also appeared in it:

"The press of Indianapolis has unanimously endorsed and favored the purchase of the Arsenal site and the establishment of a technical institute, and at the conference on July 8th of the joint committees representing the press, Commercial Club, Board of Trade, University of Indianapolis, Woodruff Place, Winona Assembly, and the citizens of Indianapolis Hon. A. C. Harris, presiding, the following resolutions were adopted unanimously:

" 'Believing that the United States Arsenal grounds of this city should be preserved intact and used for educational purposes, we, as members of a conference committee, representing the board of trade, Commercial Club, University of Indianapolis, The Winona Agricultural and Technical Institute, the press and citizens of Indianapolis, and Woodruff Place, endorse the project of the Winona Agricultural Institute to purchase the grounds for the purpose of establishing thereon a National Technical Institute.  We commend the plan proposed for raising the necessary funds by subscription,

the money thus secured to be held by five trus-
tees, citizens of Indianapolis, in trust for the
object named, it being understood that the
grounds when purchased will be deeded to
The Agricultural Institute, which has, by reso-
lution, pledged itself to manage and endow
the institute.    It is further understood that
the detailed management of the school shall
be placed in the hands of a local committee,
who shall work in conjunction with the execu-
tive committee of the Winona Agricultural
and Technical Institute.

" 'We recommend the appointment of an
executive committee of five members to have
full power in the conduct of the canvass for
funds and in the negotiations with the Govern-
ment for the purchase of the grounds.

" '*Resolved*, that we commend to the atten-
tion of the people of the city of Indianapolis
the opportunity here offered to secure not
only the national technical institute, but an
Army Post, the site for which by Act of Con-
gress may be purchased at the option of the
Secretary of War, with the funds realized
from the sale of the Arsenal Grounds.'

"The committee as called for in the resolu-
tions was agreed upon as follows:   Addison C.
Harris, Hilton U. Brown, representing the
University of Indianapolis, Frank E. Gavin,
President Commercial Club, John J. Appel,
President of Indianapolis Board of Trade,
Dr. Sol C. Dickey, representing Winona
Agricultural and Technical Institute, Mayor
Bookwalter, representing the City of Indianap-
olis.

"The following were named as Trustees to
hold the fund that may be subscribed:  Medford
B. Wilson, President Capitol National Bank;
Charles Latham, Cashier Fletcher National
Bank; John Perrin, President American Na-
tional Bank; A. A. Barnes, Director Columbia
National Bank, and Judge Frank E. Gavin,
President Commercial Club.

"The special solicitors with the knowledge

and approval of said canvassing committee prepared a blank form for those who made donations to sign, in form following:

" 'Winona Agricultural and Technical Institute.

Indianapolis, Indiana,————1902.

" 'In consideration of the promise of the proposed organizers of the Winona Agricultural and Technical Institute to duly incorporate said institute under the laws of Indiana and to establish the technical department of said institute upon the United States Arsenal site at Indianapolis, Indiana, if the amount hereinafter mentioned, my subscription included, shall be subscribed thereto and said arsenal site can be purchased, I promise upon demand to pay to Medford B. Wilson, John Perrin, Charles Latham, A. A. Barnes and Frank E. Gavin, Trustees, or their successors or order, the sum of ———— dollars, to be used in the purchase of said arsenal site for said Winona Institute's technical department and the establishment of said department, provided that, and this subscription is subject to the condition that, valid bona fide subscriptions of like purport with this subscription to the amount of $150,000.00 shall have been made, and provided further that the sum by me hereby subscribed shall not be demanded or payable until such aggregate amount shall be subscribed.

————————————————. ' "

The trustees whose names appear in said subscription blank were selected pursuant to the resolution set forth above at one of the public meetings held at the inception of the movement to raise said funds, and the fact of their selection as said trustees was, at the time, published in the Indianapolis News, and a copy of said blank was published daily in said paper for a long period of time, with a request to its readers to make their subscriptions on such blank and forward the same to the In-

dianapolis News, or to the soliciting committee. And a number of subscriptions were made in that way without any other solicitation than that appearing in the columns of the News. Other subscriptions were taken on a blank in the following form:

"Technical Institute Fund.
Indianapolis, Indiana,————, 1903.
I promise to pay upon demand to Medford B. Wilson, John Perrin, Charles Latham, A. A. Barnes and Frank E. Gavin, Trustees, or their successors or order the sum of ———— dollars for the purpose of the purchase of the Arsenal Site for the Technical Institute (the amount paid hereon to said trustees to be returned to the undersigned in case the said Technical Institute shall not be located on said Arsenal Site)."

About 4,000 different persons, some of whose names were at the time unknown to the solicitors, made contributions to the fund in sums ranging from five cents to $15,000. Of the sum thus donated by parties whose names were known about three-fourths thereof was donated by parties who signed one or the other of the foregoing forms of subscription blanks, only a comparatively small number of them signing the second form, it being used near the close of the canvass. About one-fourth of the fund was paid in by donors who did not sign any form of subscription blank. In addition to those whose names were known a great number of individuals donated small sums by contributing to collections taken in large manufacturing plants and business houses employing large numbers of men and women, in which cases the total collection for each house or manufacturing plant was turned in to the soliciting committee in the name of some one of the contributors and the names of

the others so contributing were never known to the soliciting committee or any one connected with the collection of the fund or the promotion of the enterprise. Of the 4,000 persons contributing to the fund of $154,000, the names of about 2,600 of them were in evidence, and the amount contributed by them, including $15,000 paid in by the Winona Assembly and Summer School Association, amounted to about $150,000. Appellant Fletcher S. Hines subscribed $5,000 to the fund on a subscription blank of the form first above set out. Appellant Edward C. Fletcher subscribed $2,500 on a blank of the same form, which he had cut out of the Indianapolis News and mailed, and he had no other information at the time of the effort and purpose of raising the fund than that which he obtained from the columns of that paper. Appellant William E. Hayward first subscribed $500 on a blank of the first form and later $100 on a blank of the second form. Still later, about March 12, 1903, he sent a letter to the trustees of the fund, when the sale of the tract was drawing near, and it seemed that the enterprise might fail, in which he pledged $3,400 more, and two days later he sent a check for $4,400, thus raising his total subscription to $5,000, he having paid his $500 subscription January 14, 1903, and the $100 on March 13, 1903. August 6, 1902, certain things were done towards incorporating the Winona Agricultural and Technical Institute. About the first of the year 1903, when it was believed that a sum practically sufficient to purchase the property had been subscribed, it began to be considered among some of the subscribers of the larger sums and the trustees of the fund and others that some definite understanding should be reached before the money was

paid in, as to the exact nature of the trust to be created. Some of the subscribers were contending that there should be a more definite and substantial step taken by the parties who had proposed to establish and endow the school towards the accomplishment of that purpose before the contributors should be asked to pay their several pledges. This resulted in a meeting in the city of Indianapolis January 8, 1903, which was attended by a majority of the trustees of the fund, Mr. Harris, the chairman, and a majority of the canvassing committee of citizens, Dr. Dickey and his attorney representing the Winona people and a number of subscribers of amounts aggregating $40,000 or $50,000. As a result of this meeting and embodying the essential judgment of it as expressed in a resolution then passed, a circular letter known as the "blue letter" was prepared by the trustees and mailed to all of the known subscribers. The resolution was as follows:

"Resolved, that it is the belief of the Board of Trustees that the deed of conveyance for the arsenal grounds to the Winona Agricultural and Technical Institute, should contain clauses limiting the property to educational uses, prohibiting its being mortgaged and providing that it might be sold should the Institute deem it wise only on condition that the proceeds should form a trust fund to be forever invested in real estate in Indianapolis to be used for educational purposes in said city; with a provision of reversion to the city of Indianapolis should said real estate or the proceeds of the same at any time cease to be used for educational purposes in said city of Indianapolis.

"Resolved, further, that the deed should not be delivered to said Institute until it shall have obtained in cash or in bona fide collectible subscriptions, an amount equal to the purchase

price of the real estate to be used for Institute at Indianapolis.

"Resolved, further, that upon said Institute's having secured such sum for such purpose in cash or subscriptions as above it shall be deemed entitled to such conveyance and the same shall be accordingly made."

Appellants Hines, Fletcher and Hayward had no knowledge of the meeting or of this resolution. Omitting the date, which was January 13, 1903, the "blue letter" reads as follows:

"The undersigned trustees for the Technical Institute fund hereby inform you that valid and bona fide subscriptions to the full amount of $150,000 have been secured for the purchase of the Arsenal Site from the Government for the purpose of establishment of the proposed Technical Institute thereon.

"That the object may be certainly fulfilled it has been determined by your trustees and agreed to by the representatives of the Institute that the deed of conveyance to the institute limit the property and all its proceeds to educational uses in the city of Indianapolis, and the deed to the Arsenal Site property shall not be delivered by the trustees to the Institute corporation until it shall have in cash or bona fide collectible subscriptions a sum at least equal to the purchase price of the real estate. In order, therefore, that the Trustees may be in position to promptly submit their offer for the property, you are kindly requested to co-operate by making immediate payment of your subscription at the bank designated in the enclosed notice."

After the subscribers had been thus specifically advised of the limitations and conditions upon which a deed would be made to the Institute, payments were made by the subscribers, and on these terms some additional donations were secured.

On March 16, 1903, the trustees bought the Arsenal property from the government for $154,000, paid for it, and received a deed running to them as trustees of the Winona Agricultural and Technical Institute fund and to their successors as such trustees. April 15, 1903, the trustees executed the following written agreement which was signed by them and by the institute by Dickey, its president:

"This article of agreement between Medford B. Wilson, John Perrin, A. A. Barnes, Chas. Latham, and Frank E. Gavin, Trustees, as parties of the first part and the Winona Agricultural and Technical Institute, parties of the second part witnesseth, that:

"Whereas, Said Trustees have purchased and paid for the land near Indianapolis, Marion County, Indiana, known as the Arsenal Grounds, being the east one-half of the northwest quarter of section six (6) township fifteen, Range four and as such trustees now hold the title thereto, and

"Now, therefore, it is hereby agreed that said Technical Institute shall take possession of, care for and manage said property at its own expense and without any power to make or create any charge therefor, or open any account against said Trustees and shall hold the same until possession thereof may be demanded by said Trustees upon the order of the majority thereof. It is further expressly stipulated that upon such demand being at any time made, all right of said Technical Institute under this contract, and all persons holding through or under them, shall at once cease and be at an end, and said Institute shall deliver and surrender possession thereof to such trustees.

"It is further expressly understood and agreed that any possession of said property which said Institute may take and hold is under and by virtue of this contract, and not otherwise, and until it shall obtain a deed therefor from said Trustees."

Thereupon Dr. Dickey acting for the Winona Agricultural and Technical Institute entered into possession of the property under the agreement which continued in full force and effect, and the trustees never authorized any one to occupy the premises or become possessed of any part thereof under any other agreement or arrangement whatever. In the fall of 1903, a school, consisting of two or three departments, was opened upon the premises and managed by the Winona Agricultural and Technical Institute until the incorporation or attempted incorporation of the Winona Technical Institute at Indianapolis in April, 1904, at which time the Winona Technical Institute at Indianapolis, by S. C. Dickey, its president, assumed the control and management of the school and conducted the same until a receiver was appointed for the institute and school on March 28, 1910. In the fall of 1904, additional departments were added to the school, the faculty was enlarged, and repairs and improvements were made from time to time thereafter on the buildings and equipments of the school, and the same was kept open through the entire school year, each year, and attended by a considerable body of students from all parts of the country; and during the time from the opening of the school until the appointment of the receiver there were about 2,000 different students in attendance at the school; and about 1,000 graduated from the several departments in courses covering from four weeks to two years. The Winona Agricultural and Technical Institute had no connection with the school or the property after April, 1904, and in no way exercised any control or supervision over the same. The Winona Agricultural and Technical Institute has had no property or assets of any kind since that date, and has at all times

since been and now is wholly insolvent and unable
to establish and maintain a technical institute on
the site, never having had any endowment. The
Winona Technical Institute at Indianapolis is now,
and for more than five years has been, wholly in-
solvent and is not financially able and will not be
able to manage, conduct and support said Technical
Institute nor any technical institute on the site.
It never had any endowment subscribed or paid
to it except as herein otherwise found. The tuition
received by it has never equaled the amount paid
to instructors in the conducting of the various
departments of said school. In the meantime no
request had been made of the trustees to make a
deed to the institute until in 1908, when Dr. Dickey
informed them that the $154,000 had been raised
and requested that a deed be made. A deed to the
Winona Technical Institute in trust was prepared,
which limited the property, and all of its proceeds,
to educational uses in the city of Indianapolis.
The delivery of this deed was deferred until an
audit of the books of the institute could be made
and a report entered, showing that the money had
been raised. This audit showed that the Winona
Technical Institute was insolvent. Later, in 1909,
another deed was agreed upon between the trustees
and the institute by which the property was to be
conveyed to the institute in trust for educational
uses in the city of Indianapolis, and whereby it was
provided that, in the event the institute as trustee
or any successor of it should fail to use the site for
educational purposes, it should be conveyed to the
school city of Indianapolis, as trustees, to be held
upon the same terms and conditions as were im-
posed by the deed on the institute. This deed was
not finally executed but, while it was under con-
sideration, a receiver was appointed March 28,

1910, to take charge of the Winona Technical Institute, the property and the school conducted thereon. Appellees, trustees, were not made parties to the action in which the receiver was appointed until long after this action was begun. The receiver, upon order of the court appointing him, in order to carry on the school and preserve the property, issued and sold receivers' certificates to a large amount. Prior to the appointment of the receiver the Winona Technical Institute, out of donations and borrowed money, had expended $62,000 in repairing, remodeling and equipping the premises for the school. It had paid out $2,685.19 on municipal assessments for street improvements, $6,176.13 for insurance on buildings and $2,258.73 for insurance on equipment. It had received cash donations from various persons for use in maintaining the school the sum of $73,892.47; and it had also received donations in the nature of equipment and supplies, such as machinery, to the value of $48,869.48. It had also received cash as scholarship donations, which was paid in to be used in paying the tuition of boys who could not themselves pay, in the aggregate sum of $33,722.12. The findings stated in detail the specific sums due to various general creditors of the Winona Technical Institute at Indianapolis, most of them for borrowed money, and all amounting in the aggregate to more than $200,000; and that these various debts were created by that concern in the establishment and maintenance of a technical or trade school on the Arsenal site.

Certain of the court's findings are specifically assailed in certain errors assigned by the donors who have appealed. These are the eighth finding, relating to the meeting of January 8, 1903, preceding the sending out of the "blue letter," set

out in substance above, and the tenth and twenty-second findings.

The tenth finding, so far as is material, is as follows: "And at the time said donations were pledged, and at the time they were paid in, the donors understood and intended that said fund so donated and paid should and would be used by said trustees in purchasing such real estate to be held in trust by said trustees or some corporation or persons selected by them in perpetuity as a site for a National Technical School, and that the said real estate should be retained intact for such purpose. And said trustees when they accepted such trust and received said funds and said conveyance to said lands so understood the intentions of said donors. The principal object and purpose in the minds of the various donors in making their subscriptions, payments and donations to said fund, were the establishment and maintenance upon said arsenal grounds of trade schools, the preservation of said grounds intact and its permanent dedication to educational uses in said city of Indianapolis."

The twenty-second finding is as follows: "The School City of Indianapolis is ready and willing to accept the real estate in controversy in trust and establish and maintain a technical school thereon, open to all students residing in said school city, as students are admitted to other schools in said city."

Those of the conclusions of law stated by the court which are assailed in this appeal are, in substance, as follows:

(1) The real estate described in the complaint and the findings herein and known as the arsenal grounds in Indianapolis, Indiana, is held by the plaintiffs as trustees of a public charitable trust, in trust to be forever kept intact and dedicated to

educational uses in the city of Indianapolis and to be forever used as a site for the purpose of the maintenance thereon of an industrial or trade school or schools for education and instruction and training of both males and females in the various mechanical and manual trades, arts, and sciences, and of such other educational institutions as may be established and maintained thereon, together with all the machinery, buildings and appliances which may be used in connection therewith, the right of attendance not to be limited to pupils residing in Indianapolis but to be open to pupils resident elsewhere under proper rules and regulations to be made by the trustees from time to time to effectuate the purposes of this trust. (2) That the Winona Agricultural and Technical Institute and the Winona Technical Institute at Indianapolis are each insolvent and incapable of executing such trust or of maintaining a technical or trade school thereon, and are not entitled to have said real estate conveyed to them, or either of them, as trustees, or otherwise. (3) That neither the Winona Agricultural and Technical Institute, nor the Winona Technical Institute at Indianapolis, has any right, title or interest in or to said real estate, or any claim or lien thereon. (4) That none of the creditors of the Winona Technical Institute at Indianapolis, to whom the court found large sums to be due, has any right or title to, or any interest or claim or lien upon, the real estate involved or any part thereof. (5) That the trust under which appellees, trustees, held the real estate in question has not failed, so as to create a resulting trust in favor of the donors, and that none of them have any interest in the real estate involved or right to have it partitioned and sold or conveyed in any portion to them. (6) That the receiver of

the Winona Technical Institute has only such right to, interest in, or claim on the property as stated and about which no question is raised in this appeal. (7) That the trustees are entitled to an order of this court ascertaining and determining the character and scope of said trust and directing them as to the disposition of such trust property and to be exempted from any personal liability of any kind in connection with the property, or said trust, or with the administration of said trust. (8) That the board of school commissioners of the city of Indianapolis is a proper trustee to execute said trust and is willing and able to do so. (9) That the plaintiffs shall convey the said real estate to the board of school commissioners of the city of Indianapolis as trustees to be by it held in trust to be forever kept intact and dedicated to educational uses in the city of Indianapolis, and to be forever used as a site for the purpose of maintaining, or causing to be maintained, thereon such school, or schools, for the education, training and instruction of both males and females in the various manual and mechanical trades, arts and sciences and such other educational institutions, as such trustees may establish or cause to be established and maintained thereon to effectuate the trust, together with all the machinery, buildings and appliances which may be used in connection therewith, and for the furnishing of places of residence for the instructors and students in such schools and as a campus or yard, to be used in connection therewith, with a provision in said deed that the said grantee shall have no power in any manner to create a lien or to incumber or create any debt, charge, or lien against said real estate, and with the further provision that in the event the said grantee

should, for a period of five years from this date, fail to put in operation on said real estate, such a school for such instruction in the mechanical trades, or arts, and sciences, or in case it should at any time thereafter, for a period of twelve consecutive months, fail to maintain or cause to be maintained thereon such a school, then its rights in such real estate and its services as trustee thereof shall cease and terminate upon the decree of any court having jurisdiction of the proper parties and the subject-matter of the trust, said conveyance to the board of school commissioners to be made subject to the liens and charges herein declared against said real estate.

The assignments that the court erred in overruling the motion of the appellants for a *venire de novo* are not urged with much confidence. On the part of the appellant donors, it is claimed that the finding is defective in that it contains evidentiary facts and conclusions and not ultimate facts and that, eliminating this improper matter, it is too uncertain and ambiguous to justify the rendition of a judgment thereon. The appellant creditors seem to suggest, rather than urge, that their motion should have been granted for a failure of the court to find material facts favorable to them. The motion for a *venire de novo* is an ancient

1. common-law remedy which was, technically speaking, applicable only to jury trials. It is not a part of our code but, by common usage, has been adopted as a part of our practice, and it is applied when either a verdict or finding on its face is so defective in form, ambiguous and uncertain that no judgment could be rendered thereon. *Delaney* v. *Gubbins* (1914), 181 Ind. 188, 197, 104 N. E. 13; *Bartley* v. *Phillips* (1888), 114 Ind. 189, 16 N. E. 508; *Geiger* v. *Town of Churubusco* (1912),

50 Ind. App. 685, 98 N. E. 77; *Ginther* v. *Rochester, etc., Co.* (1910), 46 Ind. App. 378, 92 N. E. 698, and cases there cited; 38 Cyc 1990. It seems quite apparent that the finding contains no evidentiary facts tending to prove essential ultimate facts except such ultimate facts as are also found. And so ignoring such evidentiary facts and conclusions as are found in the findings, as we may do, the findings contain facts properly found sufficient to decide the issues one way or the other between the parties. *Hawkins, Receiver,* v. *Fourth Nat. Bank* (1898), 150 Ind. 117, 127, 49 N. E. 957; *Major* v. *Miller* (1905), 165 Ind. 275, 75 N. E. 159; *Smith* v. *Barber* (1899), 153 Ind. 322, 53 N. E. 1014; *Ginther* v. *Rochester, etc., Co., supra,* and cases cited. As to the suggestion in behalf of the creditors that the *venire de novo* should have been awarded for the failure of the court to find material facts favorable to them, it may be said that the settled rule makes this cause for a new trial and not for a *venire de novo. Deeter* v. *Sellers* (1885), 102 Ind. 458, 1 N. E. 854; *Smith* v. *Barber, supra; Maxwell* v. *Wright* (1902), 160 Ind. 515, 520, 67 N. E. 267, and cases cited; *Bower* v. *Bower* (1896), 146 Ind. 393, 45 N. E. 595.

In behalf of appellant donors it was assigned as cause for a new trial that the evidence was insufficient in fact and in law to sustain the trial court's finding. In urging the error assigned on the action of the court in overruling their motions for a new trial, the only specific claim made in behalf of donors that this cause is well laid is directed to findings eight, ten and twenty-two hereinbefore set out. It is contended that there was no evidence of the readiness and willingness of the school city of Indianapolis to accept the real estate in trust as stated in the twenty-

second finding. The answer of the board of school commissioners and a resolution passed by it in relation to the matter, expressed its willingness to accept the property subject to the conditions of its conducting thereon trade schools to the extent that it was "authorized by law to accept such donation and perform such conditions". This was sufficient foundation for the finding.

The contention as to the eighth finding relative to the meeting of January 9, 1903, and the resolution passed at that meeting is not that it was not 5. sustained by the evidence, but that it was not binding on appellant donors for the reason that they were not present and had no knowledge of the meeting or resolution. Whether the action at that meeting, being taken with the consent of the citizens' committee as agents and representatives of the donors, was binding on appellant donors, or whether it was ratified by them by their paying of the subscriptions upon receipt of the "blue letter" sent out pursuant to such action, as claimed by appellees, we need not determine at this point. It is sufficient to say that the facts found as to that meeting were established by undisputed evidence, and they were within the issues and so were properly found. The legal force and effect of the facts so found is a matter of law to be determined in applying the law to the facts.

The claim of counsel for appellant donors that the tenth finding is not supported by the evidence seems to rest upon the fact that an express 6. trust in land was involved which could, under the provisions of the statute, only be proved by writing signed by the donors. §4012 Burns 1914, §2969 R. S. 1881. And upon this the contention is made that there is a lack of proof for the reason

that only the subscription papers signed can be looked to to sustain the finding; that they "constitute the only competent and sufficient evidence of the object and intent of the donors"; that these papers express no purpose to create a public charity; that "the object and intent of the donors is material and vital and is to be gathered from what they have expressed in the subscription blanks and not from extrinsic parol evidence such as "promotion representations, newspaper articles and proceedings and resolutions of town meetings." The circumstances of the movement for the preservation of the arsenal tract from private ownership and the saving of it for public purposes were unusual and complicated. The theory of the complaint, in so far as the appellee trustees took sides in the controversy presented to a court of equity for solution, was that the primary trust was in the fund collected; that this trust to which the donations of money were given was a public charitable trust which was fully created when the trustees had discharged the primary executory duty which had been imposed on them of consummating the purchase from the government; that thereafter they held the title to the land impressed with the same charitable use as that to which the donations were given; and that the failure of the trustee, who as the donors contemplated, was to carry out the educational object of the trust, to qualify as such administrator did not work a failure of the trust itself. The answer of Mr. Harris to the complaint and his cross-complaint against appellants and others, which was adopted by other large donors, only more positively and particularly asserted substantially the same theory.

On the other hand appellant donors assert in their pleadings that no public trust was within the

purpose of the subscribers to the fund, but only a proposed gift of the money subscribed to a particular corporation for a particular purpose on precedent conditions, which had not been performed, and that thereby the object had failed; that therefore the fund in the hands of the trustees was the money of the donors, and that a trust had resulted to them in the land in the hands of the trustees.

The issues thus raised compelled an inquiry into the common purpose in the minds of the donors in making gifts to the fund, and the capacity in which appellee trustees took and held the fund and the title to the real estate purchased with it. It seems to have been assumed and conceded by all who tendered these issues that the subscription blanks did not fully illuminate the intent and purpose of the donors or any of them at the time they actually paid their money. The cross-complaints of appellant donors did not, and manifestly could not, rely solely on the terms of the subscription blank. They based their claims on the "blue letter" and on "representations, publications, statements, conditions, agreements and understandings both oral and written." The cross-complaint of the only one of them who signed the subscription blank of the second form (for $100 only) showed that he thereafter subscribed and paid $4,400 additional without signing any kind of a subscription form, and his letter accompanying this gift is full of the purest charitable spirit. And it appears and is found by the court that many contributed to the fund who subscribed to no paper. So it was assumed that resort must be had to parol testimony to uncover the common purpose of all who contributed to the fund. Much of such evidence was given. Much of it by appellant donors, and some of it by appellee trustees at the request of appellant donors. It is

not now claimed by the latter that at the time it was given they objected to any of it, or asked that its consideration be limited in any way. Under such circumstances, whatever limitations on the right to resort to parol evidence to ascertain the intent and purpose of the donors of the fund might have been insisted on at the time, it is now too late to press objection to the consideration of it in support of the court's finding. But in any event in view of the issues tendered and the theory upon which the trial proceeded, certain parol evidence was not only proper but also inevitable.

It cannot be and is not denied that the primary trust involved was in the fund, the money which was to be, and was, given and which was personal property, and that this trust was merely carried into the land. The statute of frauds does not extend to express trusts in personalty and they may, therefore, be created, declared, or admitted verbally when the evidence is clear and unequivocal. 3 Pomeroy, Eq. Jurisp. (3d ed.) §1008; 1 Perry, Trusts (6th ed.) §86; 39 Cyc 51, 82; 13 Ency. Ev. 120, 127. And on the theory that the primary subject of inquiry was embodied in the subscription papers, the rule against the admissibility of parol evidence to vary the terms of a writing could not be interposed to exclude all parol evidence in such a case as this. For the rule is that a contract of subscription such as that here involved will be construed with reference to the intent of the parties at the time, and the court will consider the subject-matter of the agreement, the inducement which influenced the subscription and the circumstances under which it was made. 37 Cyc 495, note 73. Parol evidence as to the circumstances under which a subscription was made and even of the intent and

purpose of the donors has been held to be admissible as part of the res gestae. 37 Cyc 504, note 53. *First M. E., etc., Church* v. *Sweney* (1892), 85 Iowa 627, 52 N. W. 546; *Hodges* v. *Nalty* (1902), 113 Wis. 567, 89 N. W. 535; *Brokaw* v. *McElroy* (1913), 162 Iowa 288, 143 N.W. 1087, 50 L. R. A. (N.S.) 835; *Downes* v. *Union Congregational Society, etc.* (1884), 63 N. H. 151; *Commercial Travelers' Home Assn., etc.* v. *McNamara* (1904), 95 App. Div. (N. Y.) 1, 88 N. Y. Supp. 443. If the terms made use of in a gift are obscure, doubtful, or equivocal, 9. either in themselves or in their application, it becomes the duty of the court to ascertain by evidence, as well as it is able, what was the intent of the donor, and in what sense the particular expression was used. 5 R. C. L. 370, 371. "Evidence of a prior or a contemporaneous parol 6. agreement * * * is frequently received, where it is consistent with the writing in question and it is apparent that the instrument was not intended as a complete embodiment of the undertaking. Evidence of such a character is not in conflict with the parol evidence rule, which, it is said, presupposes that the instrument is a complete and full expression of the undertaking of the parties. If it was their intention that only a part of the terms should be embraced in the writing, then the instrument is not one which is brought within the protection of the rule, and, consequently, evidence of the remainder of the agreement, consistent with the part which has been reduced to writing, is in no way a contradiction, varying or altering the instrument. If the court is satisfied that it was the intention of the parties that some of the terms should remain in parol, then evidence to supplement the writing and show the entire agreement will be received, even though the evidence

may be in reference to a different subject than that contained in the writing  *  *  *  . Similarly, in the case of an agreement which is expressed in two or more writings, evidence will be received to connect them, for the purpose of showing the completed and full undertaking." ˙5 Chamberlayne, Modern Law of Ev. §3553. In the °case before us there is no claim that in fact the subscription papers fully embodied the understanding of the parties concerned, or the purposes and intent of the subscribers. Even appellant donors claimed in their pleadings that, to disclose these fully, resort must. be had to promotion, representations, resolutions, prospectuses and the "blue letter" with other connecting parol evidence. But even were we required to measure and determine the rights here involved by the rules of law applicable to the creation and trusts in land, we would not be confined exclusively to the subscription paper. On the contrary, other writings and memoranda, including the "blue letter", would be competent, together with evidence of the position, situation, circumstances and surroundings of the parties concerned. *Ransdel* v. *Moore* (1899), 153 Ind. 393, 53 N. E. 767, 53 L. R. A. 753; *Nesbitt* v. *Stevens* (1903), 161 Ind. 519, 69 N. E. 256; 39 Cyc 53. Ordinarily the written evidence of an express trust in land which will satisfy the statute may come from the grantor, the one who intends that a trust shall be created for a certain beneficiary, or from the trustee, the grantee to whom the land is conveyed for the purpose of the trust, but not from the *cestui que trust.* 3 Pomeroy, Eq. Jurisp. (3d ed.) §1007. Whether the rule just stated has application in any case other than where a *cestui que trust* is seeking to enforce a trust against property in the hands of a trustee is of no particular importance here, for in any event the

"blue letter" was in connection with the particular subject-matter of the subscription papers. It was sent to these donors and upon its terms they paid their money. They adopted it as their own, and whatever force and effect it had bore on them and their rights and their purposes in parting with their money. No particular formality is required or is necessary in the creation of a trust. Any agreement or contract in writing made by the person having the power of disposal over property, whereby such person agrees or directs that a certain fund or particular parcel of property shall be held or dealt with for the benefit of others, in a court of equity, raises a trust in favor of such others against the person making such agreement. And if there is any competent written evidence that the person holding the legal title is only a trustee, that will open the door for the admission of parol evidence to explain the position of the parties. 1 Perry, Trusts (6th ed.) §82.

In any view of the matter, the findings were supported by competent evidence. The tenth finding is the finding of the inferential or ultimate fact directly involved in the issues, whether an outright gift to a corporation to be formed by the Winona group was contemplated, or a trust of a public charitable nature. From the great mass of evidence the trial court, as it devolved on it to do, drew the inference embodied in the tenth finding and stated it against the claims of appellant donors. That the subscribers contemplated the creation of a trust and not an untrammeled gift to a proposed corporation, and impressed that purpose on the fund to be carried into the land, is the conclusion stated in the tenth finding, and it is supported by the evidence. When measured by the

rules of law applicable, this inferential or ultimate fact is justified by the evidence even without the support of the "blue letter." It is not practicable to refer to more than a few of the more influential and salient parts of the evidence bearing on the question involved. Following close upon the public movement to secure the arsenal grounds for park or educational purposes, with no more particular or definite object then existing than the preservation of the tract for future utilization for one or the other of such purposes, there came the intervention of the "Winona Group" through the resolution of March 2, 1902, at Pittsburgh, wherein they proposed to "endow and manage a technical institute in Indianapolis provided the citizens of Indianapolis and vicinity will secure for us the U. S. Arsenal grounds." This school they then proposed should be managed and conducted largely through a local committee composed of the citizens of Indianapolis. At that time they empowered Dr. Dickey to act for them in securing donations of money to purchase the tract as a site for the school. He came to Indianapolis and announced that "this institution is designed to help boys to a practical business life in all lines * * *. The school will be open to rich and poor alike, but provision will be made for the poor boys unable to pay their admission." At a public meeting April 23, 1902, and at others about that time, it appeared that the representatives of civic bodies and the press united in co-operation with the "Winona Group" to raise a fund to purchase the tract as a site for the proposed technical or trade schools. Much use was made of the newspapers in forwarding the project. Full reports of the meetings and the progress of the subsequent canvass for subscriptions for the fund were published daily, together with arguments for

the cause. At a citizens' meeting July 8, 1902, a resolution was adopted which was subsequently incorporated into a printed prospectus and presented to all who were solicited for subscriptions to the fund. This resolution, which appears elsewhere in this opinion based the indorsement of the Winona proposition on the expressed belief *"that the United States Arsenal grounds in this city should be preserved intact and used for educational purposes."* And it was there stated that "we commend the plan proposed for raising the necessary funds by subscription, the money thus secured to be held by five trustees, citizens of Indianapolis, in trust for the object named, it being understood that the grounds, when purchased, will be deeded to the Winona Agricultural Institute which has, by resolution, pledged itself to manage and endow the institute. It is further understood that the detailed management of the school shall be placed in the hands of a local committee, who shall work in conjunction with the executive committee of the Winona Agricultural and Technical Institute." At that meeting a committee, whose membership was made up of all interests, was elected to have charge of the solicitation and collection of the necessary funds. And trustees of the funds (appellee trustees) were also then selected. They were to hold the fund, purchase the property, and hold the deed until assured "that the school can have a sufficient inauguration and maintenance through a fixed and ample endowment." The school was not to rely on tuition of students for means with which to meet the salaries of teachers. Men "who are heart and soul in the movement will provide such expenses by generous contributions." Following this meeting the first subscription blank was prepared which pledged the signer to pay his sub-

scription to the trustees above named as such "to be used in the purchase of said arsenal site for said Winona Institute technical department." During the progress of the canvass for funds in a statement in the papers by Dr. Dickey it was said: "The people of Indianapolis would not only have the most beautiful plot of ground within the city's borders preserved in its integrity for all times to come but would gain an institution that would begin on a large scale." In a circular to solicit subscriptions sent out by the canvassing committee it was said: "The beautiful Arsenal grounds will be kept intact. Worthy youth will be provided with opportunity for practical training."

The evidence shows without contradiction that no stockholder of the proposed corporation was to profit from the school. It was to be established and maintained by men of large means who were actuated solely by motives of good works towards the boys and girls and the public generally in the form of education in trade and technical schools. While tuition would not be free, yet provision was to be made for those lacking money to go through the schools to work their way through; and provision was to be made for night schools for those whose necessity compelled them to work in the day time. It was recognized, and several times expressly stated by Dr. Dickey, that the Winona people were to hold the tract in trust for this proposed school. In addition to evidence of the character here detailed there was much direct testimony of donors of their intent and purpose in giving their money all going to support the tenth finding.

There is no doubt from all this and other evidence that the donors, when they made their subscriptions, had it in mind that, when the legal title to the land

in question should be bestowed on the proposed corporation, it should be coupled with a limitation of the use for educational purposes. The "blue letter" only expresses directly what was circumstantially evident before. From these circumstances in connection with the incompleteness and indefiniteness of the subscription paper the court properly found the inferential fact involved in the tenth finding that a trust was intended and created. "There is another important class of express trusts, which are not directly and expressly declared by the terms of the instrument, but which are inferred by a construction of all the terms and dispositions. They are all cases where the court infers that it was the intention of the party to create an express trust for some purpose, although he has not expressed that intention in unequivocal and direct terms, and the court is forced to gather it from his general expressions, or from the objects and purposes of his gift. When such a trust is found by the court to have been intended by the party, it is in every respect an express active trust. * * * It is, in fact, an express trust which the donor did not unmistakably declare, but which the court has helped out by interpretation and inference. * * * These trusts ordinarily arise from a construction of the language of wills; but there is no reason, on principle, why they may not also arise from conveyances and agreements *inter vivos.*" 3 Pomeroy, Eq. Jurisp. (3d ed.) §1010.

Even if it be conceded that the original purpose was to make an absolute gift to the institute, it is nevertheless evident that at any time before the subscriptions were completed by payment the donors could have restricted the purpose by limiting the use. And if it were necessary to avoid appellant donors' contentions that they purposed making a

gift, the "blue letter," pursuant to which each of them paid his money and on which each of them relied in his pleadings, clearly evinces an intention to create a trust, limited to educational uses in the city of Indianapolis. The evidence shows that new, additional subscriptions were made by reason of the specific limitation of the use contained in the "blue letter." There is no room for doubt under the evidence and facts found that if the "Winona Group" through the proposed corporation had fully qualified itself to administer the trust and had been invested by deed with the legal title to the real estate in question, such corporation would have held the title merely in trust that the tract should be held intact for educational purposes in the city of Indianapolis. It was never intended that it should have title except with this limitation on it. Perhaps the very narrowest claim that could be made upon either the evidence, or the facts found, would be that the gift was not to be absolute upon the performance of conditions, for that would leave the corporation a free hand in dealing with the property as it pleased after acquiring the legal title. It could not have diverted the property to other or private uses, for such obviously was never in the minds of any donor or any one concerned in the movement. If the corporation so formed had then failed as an administrator of the trust property, it could not have divided the land into small lots for a residence district and sold them, for that would have been a manifest violation of a fundamental purpose of every donor to have the tract preserved as a whole. It could not have sold the tract entire and devoted the proceeds to the support of the Winona Assembly, or any elsewhere, for the tract would have been theirs only that they might preserve it intact and devote it to educational

uses in the city of Indianapolis. The tract was to be kept for its beauty, and for utility it was to bear on its bosom technical schools for the education of youth. It could not well have been in the mind of any one that an untrammeled gift to the proposed corporation was to be made. Under no reasonable view of the evidence or the facts found can a purpose be found to give the fund to acquire the tract for the proposed corporation that is not bound up with an enduring and underlying purpose that it should be preserved for educational purposes of a public character. Even working through the proposed corporation, that corporation was not to be the beneficiary in any sense, except that it was to be given, with the legal title, the use of the site in a co-operative way for the purpose of benefiting an undesignated and unknown number of boys and girls who were to be educated in a school of a public, and, in the legal sense as will hereafter appear, of a charitable character.

The thing that gave rise to the desire in the minds of the public to secure and preserve this tract was the beauty and situation of it, its parklike nature and its adaptability for public educational purposes. The desire of the public to possess it and its willingness to contribute to a fund for its purchase was not raised in the first instance by the proposal of the "Winona Group." The latter did not come to the city of Indianapolis merely to present to its people as something entirely new a proposition to establish a great technical school if the citizens would give *a* site, but they came offering themselves as instruments to aid in carrying into effect a broadly charitable purpose already existing to secure and devote to educational purposes this particular site and keep it parklike as a campus. This they did, it is obvious, with knowledge that the public interest

in the acquisition of the tract then existing would aid their efforts to establish such a school. The proposed corporation was presented as an instrument only to execute and carry out the unique and beautiful charity with a dual object which was then in the minds of the people and which remained patently primary and fundamental considerations in the minds of the donors as a common purpose. That such a corporation never qualified as the administering trustee cannot affect this fundamental purpose. The fact that the fund was given to acquire the land from the government for this purpose would persist over any failure whether it might occur before or after any effort to carry out the particular or secondary purpose which existed to use the proposed corporation as the instrument for preserving the tract and using it as a site for technical schools after the purchase from the government had been made.

The donors gave their money into the hands of appellee trustees to execute a charitable purpose then in their minds. And with it they charged the trustees with the duty to purchase the arsenal site for a general charitable purpose of devoting it to educational uses in the city of Indianapolis and coupled with this was the further duty to convey in trust, when it should qualify as contemplated, to the corporation which proposed to carry out the particular object of the gift. The trust was then created. There was nothing more for the donors to do and certainly they could not revoke the gift or demand a return of the money before the day of the sale. Of course, if the government had withdrawn the property from sale or if some other interest had outbid the trustees, or, if for any such reason they could not accomplish the purchase, in such case the whole purpose, general and particular, would have

failed and the trustees would have been bound to return the fund to the donors. But once the purchase was made the object was accomplished, and the trustees took the title from the government for the beneficiaries, who were not only that unnamed and indefinite body of youth in being and yet to be born who were to be educated in the trade and technical schools which were contemplated, but the existing and future generations of citizens of Indianapolis who were to take joy and benefit from the schools, the woods and open spaces of the tract, which were to serve always as a campus. That it does not appear that the appellee trustees were to be the very instruments for establishing and conducting the schools does not deprive them of the character of trustees of an express trust. And it is of no particular moment that they were not specifically given authority to find such instrument. That authority they must impliedly have, or at least authority to apply to a court of equity for aid in such a function, where it has never been doubted such authority does exist. That they did have express authority to convey to the particular corporation then in contemplation' for carrying out the particular purpose, when it should qualify in the manner proposed, is not denied; and under the rules of law hereafter to be explained, on the failure of that administering trustee, another might be appointed by a court of equity. After the acquisition of the tract with the charitable purpose impressed upon it there could be no failure of the trust created so as to cause a reverter to the donors so long as a court of equity could find means to carry out the purpose of using the site as one for technical or manual schools, as near as possible like the particular purpose—to establish and conduct the particular school contemplated.

The contention of counsel for appellant donors that the trial court erred in applying the law to the evidence and the facts found is dependent on the claims, which, as seen, have been pressed at all times in the progress of the case: that the donors either contemplated a gift outright to the proposed Winona corporation on the performance of conditions, or, at most, that it was a gift in trust to the corporation alone, and that the latter constituted a private and not a public trust. And the principles of law on which they have relied, and on which they now rely, to sustain their claim that the funds or the land reverts to them on the failure of the "Winona Group" to comply with conditions have application only to such cases. Once found that the trust involved is a public charitable trust, these rules fail in their application, and the questions of the survival of the trust, its interpretation and enforcement are controlled by those essential principles of equity and practices of courts of chancery which deal with great favor with public trusts and which, so far as they are applicable, must be looked to in the determination of the questions involved. It has been long recognized that equity jurisprudence in its fullness is in force in this state except as curtailed by constitutional and statutory provisions. *Union Trust Co.* v. *Curtis* (1914), 182 Ind. 61, 105 N. E. 562, L. R. A. 1915A 699.

The donation of money to purchase the tract as a site was in the nature of a foundation for schools for technical and manual education. That gifts, devises and bequests in trust for educational purposes are good public charitable trusts which receive the support of the principles of equity is beyond contention. And this class of public trusts embraces all trusts for the founding, endowing and supporting of

schools for the advancement of all useful branches of learning which are not strictly private. 5 R. C. L. 330; 3 Pomeroy, Eq. Jurisp. (3d ed.) §1023; 2 Perry, Trusts (6th ed.) §700; 1 Beach, Trusts §315; *Sweeney* v. *Sampson* (1854), 5 Ind. 465; *Skinner* v. *Harrison Tp.* (1888), 116 Ind. 139, 18 N. E. 529, 2 L. R. A. 137; *American Academy, etc.* v. *Harvard College* (1832), 12 Gray (Mass.) 582; *Kinnaird* v. *Miller* (1874), 25 Grat. (Va.) 107; *People* v. *Cogswell* (1896), 113 Cal. 129, 45 Pac. 270, 35 L. R. A. 269; *Dexter* v. *Harvard College* (1900), 176 Mass. 192, 57 N. E. 371; *Minns* v. *Billings* (1903), 183 Mass. 126, 66 N. E. 593, 5 L. R. A. (N. S.) 686, 97 Am. St. 420; *Parks* v. *Northwestern University* (1905), 218 Ill. 381, 2 L. R. A. (N. S.) 556 note; *Matter of Robinson* (1911), 203 N. Y. 380, 96 N. E. 925, 37 L. R. A. (N. S.) 1023; *Russell* v. *Allen* (1882), 107 U. S. 163, 2 Sup. Ct. 327, 27 L. Ed. 397; *Tincher* v. *Arnold* (1906), 147 Fed. 665, 8 Ann. Cas. 917, note, p. 925; *Grand Prairie Seminary* v. *Morgan* (1898), 171 Ill. 444, 49 N. E. 516; *Webster* v. *Morris* (1886), 66 Wis. 366; 57 Am. Rep. 278; *Hatheway* v. *Sackett* (1875), 32 Mich. 97; *Cresson's Appeal* (1858), 30 Pa. St. 437; *Almy* v. *Jones* (1891), 17 R. I. 265, 21 Atl. 616, 12 L. R. A. 414.

That the school or schools within the purpose of the donors were of public character, and in no sense of that strictly and essentially private character which would exclude them from inclusion in the class comprising public charities is obvious from the evidence and the facts found as hereinbefore discussed. The fact that a private corporation, as trustee, conducting a school of the character here involved, requires those who receive its benefits to pay tuition either in money or labor, does not take away the public benefit which flows from its work without profit to it, or change its

character as a charitable institution in the legal sense. The tuition was in no aspect of the matter to be full compensation for the benefits bestowed on those who were to resort to the school for its advantages, and whatever it was to receive for it went to the partial support only of the school. No one was to receive pecuniary profit from it. The real expressed purpose in exacting tuition of any kind was to instill self-respect and build character in those who profited from the bounty of those whose good will toward man and solicitude for the public welfare were to make the school possible. That the gift was to a public and not a private charity cannot be doubted. The authorities are numerous and practically in accord. 5 R. C. L. 331; 2 Perry, Trusts (6th ed.) §710, note (a); 6 Cyc 947; 5 Am. and Eng. Ency. Law (2d ed.) 897; *People* v. *Cogswell, supra; Parks* v. *Northwestern University, supra; Dexter* v. *Harvard College, supra; Santa Clara, etc., Academy* v. *Sullivan* (1886), 116 Ill. 375, 6 N. E. 183, 56 Am. Rep. 776; *Alfred University* v. *Hancock* (1905), 69 N. J. Eq. 470, 46 Atl. 178; *Gooch* v. *Association, etc.* (1872), 109 Mass. 558; *Philadelphia* v. *Women's, etc., Assn.* (1889), 125 Pa. St. 572, 17 Atl. 475; *Miller* v. *Porter* (1866), 53 Pa. St. 292; *Powers* v. *Massachusetts, etc., Hospital* (1901), 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372; *Andrews* v. *Andrews* (1884), 110 Ill. 223; *McDonald* v. *Massachusetts, etc., Hospital* (1876), 120 Mass. 432, 21 Am. Rep. 529; *Episcopal Academy* v. *Philadelphia* (1892), 150 Pa. St. 565, 25 Atl. 55; *Phillips* v. *Harrow* (1894), 93 Iowa 92, 61 N. W. 434; *Thornton* v. *Franklin Square House* (1909), 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 486; *Donohugh's Appeal* (1878), 86 Pa. St. 306; *Northampton County* v. *Lafayette College* (1889), 128 Pa. St. 132, 147, 18 Atl. 516.

In *Winona Technical Institute, etc.* v. *Stolte* (1909), 173 Ind. 39, 89 N. E. 393, there is a dictum, based

on *Thiel College* v. *County of Mercer* (1882), 101 Pa.
St. 530, suggesting, but not deciding, that the
Winona Technical Institute, then conducting trade
schools on the tract in question, was not strictly
a charitable institute. It is enough to say that this
mere suggestion so supported is without force
when it is found that the Thiel case was sub-
sequently practically overruled by *Northampton
County* v. *Lafayette College, supra; Philadelphia* v.
*Women's, etc., Assn., supra;* and *Episcopal Academy*
v. *Philadelphia, supra.* In the latter case it was
said of *Philadelphia* v. *Women's, etc., Assn.:* "In
that case it was said that the character of the as-
sociation as a charity was not destroyed if to some
extent it received a revenue from the recipients of
its bounty. We are now disposed to go further,
and say that an institution that is in its nature and
purposes a purely public charity does not lose
its character as such under the tax laws if it receives
a revenue from the recipients of its bounty sufficient
to keep it in operation."

But again it is contended that the trust, if one
was purposed, was not consummated, and that until
consummated the trustees were the agents of
the donors. The trial court concluded from
the facts found that it was, and the evidence
supports the finding. The donors, after receiving
the "blue letter," paid their respective subscriptions
to the trustees who bought the title. This made the
gift irrevocable in the absence of conditions pre-
cedent to the consummation of the gift. Even in
the case of a private gift *inter vivos*, where
there is a purpose on the part of the donors
to make a gift of the thing and it is delivered
and accepted by the proposed donee, the
gift is irrevocable. And such delivery may
be either actual, constructive, or symbolical,
dependent on the subject-matter. 20 Cyc 1192,

1196, 1198, 1199; *Grant Trust, etc., Co.* v. *Tucker* (1911), 49 Ind. App. 345, 96 N. E. 487; *Gammon, etc., Seminary* v. *Robbins* (1891), 128 Ind. 85, 27 N. E. 341, 12 L. R. A. 506. The law implies an acceptance by a donee incapable of giving an assent, and, if for his benefit, in *any* case, where the delivery is to a third person. *Goelz* v. *People's Sav. Bank* (1902), 31 Ind. App. 67, 75, 67 N. E. 232; *Martin* v. *McCullough* (1894), 136 Ind. 331, 34 N. E. 819; *Henderson* v. *McDonald* (1882), 84 Ind. 149; *Devol* v. *Dye* (1890), 123 Ind. 321, 24 N. E. 246, 7 L. R. A. 439.

In *Martin* v. *McCullough, supra,* this court quoted approvingly the following: "Where one 'clearly * * * manifests an intention to make a present gift * * * to another, and in consummation of his intention makes a delivery to a third person for the use of the intended donee, as he is then capable of making, considering the character and situation of the property, the person to whom delivery is thus made will be presumed, * * * to take the property as trustee for the intended donee, and not merely as agent of the donor' ". In *Grant Trust etc., Co.* v. *Tucker, supra,* it was said: "The ultimate question as to whether the bank occupied the position of agent or trustee is one of fact to be determined from the intentions of the donor, the writing on the envelope containing the bonds, the situation and relation of the parties, the kind and character of the property, and the things said and done in regard thereto, all as disclosed by the evidence."

A more liberal rule obtains as to gifts to charity, for trusts for charity are favored by equity, and are to be construed as valid when possible and are often upheld where private trusts fail. In consequence of such favor gifts of this character are sustained though vaguely expressed.

6 Cyc 903, 904; *Dykeman* v. *Jenkines* (1913), 179 Ind. 549, 555, 101 N. E. 1013, Ann. Cas. 1915D 1011, and cases cited. Courts look with favor upon all such donations, and endeavor to carry them into effect, if it can be done consistently with the rules of law. If the words of a gift are ambiguous or contradictory, they are so construed as to support the charity if possible. 2 Perry, Trusts (6th ed.) §709. And the liberality of equity to carry into effect a charitable purpose once it is discovered is particularly applicable to delivery and acceptance, for, in the nature of things, the beneficiary unknown and unborn, cannot actually receive the proposed gift. Even in testamentary gifts to public charities the legacy cannot be actually delivered to or accepted by the beneficiaries completely, until time shall be no more. Consequently all charitable gifts, testamentary or *inter vivos*, are completed and vest only constructively or symbolically, and, in cases of charitable gifts *inter vivos* the gift is consummated when the property is actually delivered, for a charitable purpose, to a third party, with the intent on the part of the donor that the latter's dominion over it has thereby ceased. The money was here fully delivered to the trustees. Nothing more was to be done by the donors. The trust, if not then fully consummated, was in any event so fully entered into that a donor could not demand the return of the money given before the sale of the arsenal grounds. When the land was bought the gift was completed and the trust in the personalty, carried into the realty, vested in the beneficiaries. It is true that the land might revert to the donors thereafter because of the subsequent impossibility of administering the proposed trust within the limits of the judicial *cy*

*pres* doctrine, but this contingency cannot affect the delivery and acceptance of the gift; and this is so, whether the possibility of reversion might arise from operation of law or by reservation in the deed of gift. But it is contended that there were conditions precedent which were not complied with, and that therefore the trust was never consummated and that the gift reverts. It is claimed that one such condition is to be found in the clause of the second subscription blank which provided for a return of the money paid, in case the technical institute should not be located on the site. If a condition at all, it must obviously be held to be a condition subsequent which is ever strictly construed to prevent forfeiture. It would but be just in the circumstances of this case to construe it to be no more than a rule of common law as declared in this state, where the *prerogative cy pres* doctrine does not obtain, to the effect that where the object of the trust wholly fails, or where the trust cannot be administered because of the failure of the designated trustee, and it is impossible to find another to administer the trust within the limits of the *judicial cy pres* doctrine, the gift must revert to the donor. But whatever may be the effect of this provision it is not important for the reason that the only appellant donor who signed that form was Hayward, and he for only $100. Subsequently he gave large sums without signing any form and paid all subsequent to the receiving of the "blue letter." Neither the principal subscription form nor the "blue letter" contains conditions or provisions for reverter and the rule applying to such subscriptions is that there can be no recovery back where there is an implied condition against recovery of the sum paid. A gift to charity raises such an implication. 37 Cyc 501, note 15; *Locke* v. *Bel-*

*mont Congregational Society* (1893), 157 Mass. 589, 32 N. E. 949; *Langdon* v. *Plymouth Congregational Society* (1837), 12 Conn. 113.

Again it is contended that the formation of a corporation by the "Winona Group" to establish and conduct the school was a condition precedent to the vesting of the gift to charity and that the findings and the evidence show that a corporation had not been created. Irregularities appear in the matter of the incorporation, but, notwithstanding this, it was doubtless a *de facto* corporation in a sense sufficient to satisfy the condition, if it be one precedent; but that fact we need not determine, for if the promise to incorporate was a condition at all it was a condition subsequent which might be performed within a reasonable time and did not operate to prevent the vesting of the gift to charity. *Franklin* v. *Hastings* (1912), 253 Ill. 46, 97 N. E. 265, Ann. Cas. 1913A 135; *Crerar* v. *Williams* (1893), 145 Ill. 625, 34 N. E. 467, 21 L. R. A. 454; *Russell* v. *Allen* (1882), 107 U. S. 163, 2 Sup. Ct. 327, 27 L. Ed. 397; *Codman* v. *Brigham* (1905), 187 Mass. 309, 72 N. E. 1008, 105 Am. St. 394; *Brigham* v. *Peter Bent Brigham Hospital* (1903), 126 Fed. 796. Such provisions are not usually deemed conditions at all but expressions of donors as to matters affecting the administration of the trust.

There is no doubt from the evidence that promises of the "Winona Group" to establish a national technical institute of a high order and to largely endow it—it is claimed with the sum of $2,000,000 and to give to it a fixed annual income of $50,000—were influential in inducing subscriptions. But it was patent to all before the money was paid to the trustees that these promises were to fail. The "blue letter"

and the facts averred in the pleadings of appellant donors show that the performance of all these endowment promises was *waived* before payment of money subscribed was made in response to the "blue letter," and it was agreed that a deed should be executed to the institute when the latter should have raised $154,000 only. The latter was no more than a subsequent condition. *Dykeman* v. *Jenkines*, *supra*, and cases there cited; *Franklin* v. *Hastings*, *supra*. All the circumstances and the subject-matter of the case here show that it was not contemplated that a school could be opened on the tract the day the purchase was made. No time was fixed for the raising of the $154,000. The law fixes a reasonable time. No donor raised any question in relation thereto for six years, and then only when sued. The $154,000 condition, if subsequent, would not affect the consummation of the gift of charity. It would only affect the legal title of the trust estate in the proposed trustee—the institute. The appellant donors, and every other donor who received a copy of the "blue letter" knew then that the Winona group had failed utterly to raise any $2,000,000 endowment, and knew that it had failed to raise as much as $154,000, and yet determined that the site should be bought to carry out the common purpose to secure it and dedicate it to educational uses, even if the proposed administering trustee, the institute, failed to raise the sum last in view. This sum, considered in relation to the subject-matter, could not be considered an endowment. It was not so named in the "blue letter."

An endowment with money means the bestowment of it as a permanent fund, the income of which is to be used in the administration of the proposed work. Webster's Dictionary; *Wagner Institute's Appeal* (1887), 116 Pa. St. 555,

11 Atl. 402. The donors knew that at six per cent. interest $154,000 would yield but little over $9,000 per annum, a sum wholly insufficient to sustain any school that might be in view. They must have known that it would take more than the principal sum to prepare the site for the school.

There is no word of evidence that would warrant the inference that a single donor ever thought that the incorporators of the proposed corporation would derive any gain from it. It was intended that its resources should spring entirely from the gifts of the charitable; and each donor knew that the proposed institute might never qualify financially, as promised, to administer the trust in the first place, or that, if at first able, it might afterwards fail. Of such facts the donors are necessarily charged with constructive knowledge. Yet there is no provision for a reverter, nor is there other evidence fairly warranting the inference that any donor actually contemplated a division *of this land* among the four thousand contributors to the fund for its purchase in case the institute should fail to raise the $154,000, or should otherwise fail to carry out the trust. The very method pursued in raising the fund—"passing the hat" on the street and in the factories and stores, receiving cash contributions without the solicitor knowing or taking note of the names of the givers, collecting in bulk from factories and stores the donations of working men and women, boys and girls, the employes, newsboys and many others, all making it impossible for a court even the next day to have determined the identity of the givers—precludes the theory of the existence of any condition precedent to the vesting of the gift to the public use after the purchase. The factory operatives, clerks, newsboys and others who so contributed are as much entitled

to a portion of the land as are donor appellants, yet, every one must know that if these donors succeed, the modest gifts of these modest unknown givers must escheat to the state. If the act to 31. be done does not necessarily precede the vesting of the estate, but may accompany or follow it, and this can be collected from the circumstances of the gift, the condition is subsequent. *Dykeman* v. *Jenkines, supra.*

When the money of the donors was paid to the trustees, and when the latter bought the tract, there was a limitation of the use to a particular 32. charitable purpose, the preservation and devotion of the tract to educational purposes in the city of Indianapolis. The gift was then complete and vested in the public for no conditions precedent or provisions for a reverter to the donors in case of the failure of the promises of the "Winona Group" accompanied the gift. The gift was to the public and not to the "Winona Group." No doubt, the donors at the time the subscriptions were made, hoped and expected that the Winona corporation would establish and conduct on the site then purchased just such schools as the promises of the latter had brought in prospect; but, surely, with only the sum of $154,000 contemplated at the time the donations were paid, that hope and expectation must have been materially modified. But it was doubtless still in their minds when they paid their money pursuant to the "blue letter" that the Winona corporation would administer the trust in some adequate way; that is, that it would establish and conduct technical or trade schools thereon and so carry out the general charitable purpose which induced the gift. There being then the general charitable purpose to give the fund and the land to charity—that is, for educational purposes—

under the favorable rules of equity, which almost universally prevail, the condition, if a condition at all, of raising $154,000 was one to be interposed only against the proposed corporation's taking the legal title and its investiture with the use in carrying the benefits of the charity directly to the youths who were to receive them. Where a general purpose is discovered by the court to make a gift to charity and this general purpose is accompanied by a purpose and by directions to have the general purpose carried into effect in a particular way by a particular corporation, the latter are usually construed to be not conditions at all which affect the validity or completion of the trust, but expressions of desire by the donors as to matters affecting the administration. The substance of the gift was that it was a gift to buy property to be held and used for educational purposes. That the school was to be established and maintained by the Winona people rather than by someone else was not the essence of the gift. *Ashuelot Nat. Bank* v. *Keene* (1907), 74 N. H. 148, 65 Atl. 826, 9 L. R. A. (N. S.) 758; *Codman* v. *Brigham, supra; Franklin* v. *Hastings, supra; Brigham* v. *Peter Bent Brigham Hospital, supra; Dykeman* v. *Jenkines, supra; Crerar* v. *Williams, supra; Hubbard* v. *Worcester Art Museum* (1907), 194 Mass. 280; *Russell* v. *Allen, supra; Maxcy* v. *City of Oshkosh* (1910), 144 Wis. 238, 128 N. W. 899, 1136, 31 L. R. A. (N. S.) 787; *Raley* v. *Umatilla County* (1887), 15 Ore. 172, 13 Pac. 890, 3 Am. St. 142; 5 R. C. L. 299.

Counsel for the donors cite a number of cases to the effect that a charitable gift to a particular institution or for a particular purpose, but under circumstances which neither directly nor inferentially show a general charitable intent, must fail if the particular institution ceases to exist, or the particular

object fails before the gift takes effect and in some cases after it has taken effect, and in such cases the gift reverts to the donor or next of kin. No objection to the rule declared in these cases can be found, but they do not control here. A giver's heart may be so fixed on the welfare of a particular institution that his gift could only be deemed to be for its welfare and not for the sake of those whom it served or was to serve. The court found no such case before it and the facts sustained it in so doing.

It has been held that the general charitable 33. purpose may be implied in the name or object of the institution to which the gift is made, or to state the proposition in other language an implication to create a public charity may arise from the character of the body to which the gift is made or the publicly avowed purposes of its organization and action. *Hubbard* v. *Worcester Art Museum, supra.* That gifts to charitable uses are highly favored and are to be construed by 34. the most liberal rules that the nature of each case, as presented, will permit of, rather than that the gift should fail and the charitable purpose of the donor be not accomplished is a settled rule of equity long recognized in this state. *Dykeman* v. *Jenkines, supra,* and cases there cited; *Ackerman* v. *Fichter* (1912), 179 Ind. 392, 101 N. E. 493, 46 L. R. A. (N. S.) 221, Ann. Cas. 1915D 1117; *Erskine* v. *Whitehead* (1882), 84 Ind. 357; *Board* v. *Dinwiddie* (1894), 139 Ind. 128, 37 N. E. 795; *Sweeney* v. *Sampson, supra; Russell* v. *Allen, supra; Matter of Robinson, supra; Harrington* v. *Pier* (1900), 105 Wis. 485, 82 N. W. 345, 50 L. R. A. 307, 76 Am. St. 924; *Ould* v. *Washington Hospital* (1877), 95 U. S. 303, 24 L. Ed. 450; *Jackson* v. *Phillips* (1867), 14 Allen (Mass.) 539; *American Academy, etc.* v. *Harvard College, supra;*

3 Pomeroy, Eq. Jurisp. (3d ed.) §1028 *et seq.;* 6 Cyc 903, 904, 949, 959; 2 Perry, Trusts (6th ed.) §§687, 709; 1 Beach, Trusts §319 *et seq.;* Story, Eq. Jurisp. §§1165, 1169; 5 R. C. L. 352; note, 14 L. R. A. (N. S.) 49. So courts of equity go to the length of their judicial power rather than that such a trust should fail, applying the maxim, "*ut res magis valeat quam pereat.*" They are construed so as to give them effect if possible, and to carry out the general intention of the donor, when clearly manifest, even if the particular form and manner pointed out by him cannot be followed. The statute against perpetuities alone would require these liberal rules of construction. Not many charitable gifts by devise can be accepted at once for administration by the proposed trustee, and this is particularly true where the latter is a municipal corporation, or where the proposed trustee is a corporation not organized. Suspension of ownership for a day violates the rule against perpetuities, which recognizes no suspension except during lives in being. *Tilden* v. *Green* (1891), 130 N. Y. 29, 28 N.E. 880, 14 L.R.A. 33, 27 Am. St. 487 (involving the will of Samuel J. Tilden and decided under former New York rule, prior to act of 1893, which recognized no difference between public and private charities).

So the principles of construction applied to public charities have evolved the judicial *cy pres* doctrine and under its application in circumstances like those here, the courts are required to look beyond the institution, or trustee, particularly designated to administer the property given and the particular manner in which it is to be administered, to those for whose benefit it is to be administered. And if it appears that the latter were the real objects of the donor's bounty, the trust

will survive the failure of the particular trustee and the particular method of administering the trust if the court can secure a trustee to carry into effect as near as may be the dominant purpose of the donor. And so in many cases it has been held that, notwithstanding the corporation to which the gift was to go and by whom it was to be administered was not incorporated or would not or could not administer the trust, nevertheless, the trust did not fail, but only the machinery for carrying it into effect, and that in such cases the court would supply not only the trustee but devise a mode of administration akin to that intended. 5 R. C. L. 364, §§104-113, and cases there cited; 2 Perry, Trusts (6th ed.) §709; Story, Eq. Jurisp. §1169; *Erskine* v. *Whitehead, supra; Dykeman* v. *Jenkines, supra,* and cases there cited; *American Academy of Arts* v. *Harvard College, supra; Amory* v. *Attorney-General* (1901), 179 Mass. 89, 60 N. E. 391; *Adams Female Academy* v. *Adams* (1889), 65 N. H. 225, 18 Atl. 777, 23 Atl. 430, 6 L. R. A..785; *Attorney-General* v. *Goodell* (1902), 180 Mass. 538, 62 N. E. 962; *Academy, etc.* v. *Clemens* (1872), 50 Mo. 167; *Commonwealth* v. *Pauline Temporary Home* (1891), 141 Pa. 537, 21 Atl. 661; *Adams* v. *Page* (1911), 76 N. H. 96, 79 Atl. 837; *Barkley* v. *Donnelly* (1892), 112 Mo. 561, 19 S. W. 305; *Birchard* v. *Scott* (1872), 39 Conn. 63; *Bliss* v. *American Bible Society* (1861), 2 Allen (Mass.) 334; *Hubbard* v. *Worcester Art Museum, supra; Tincher* v. *Arnold* (1906), 147 Fed. 665, 77 C. C. A. 649, 7 L. R. A. (N. S.) 471, 8 Ann. Cas. 917; *Crerar* v. *Williams, supra; Winslow* v. *Cummings* (1849), 3 Cush. (Mass.) 358; *Hadley* v. *Hopkins Academy* (1833), 14 Pick. (Mass.) 240; *Richardson* v. *Mullery* (1908), 200 Mass. 247, 86 N. E. 319; *City of Philadelphia* v. *Girard's Heirs* (1863), 45 Pa. St. 9, 84 Am. Dec.

470; *Minot* v. *Baker* (1888), 147 Mass. 348, 17 N. E. 839, 9 Am. St. 713; *Fellows* v. *Miner* (1876), 119 Mass. 541; *Darcy* v. *Kelley* (1891), 153 Mass. 433, 26 N. E. 1110; *Penick* v. *Thom's Trustee* (1890), 90 Ky. 665, 14 S. W. 830; *Bridgeport Pub. Library, etc.* v. *Burroughs Home* (1912), 85 Conn. 309; *Boston* v. *Doyle* (1903), 184 Mass. 373, 68 N. E. 851; *Crow, ex rel.* v. *Clay County* (1906), 196 Mo. 234, 95 S. W. 369; *Keene* v. *Eastman* (1909), 75 N. H. 191, 72 Atl. 213; *Fordyce* v. *Woman's, etc., Library Assn.* (1906), 79 Ark. 550, 96 S. W. 155, 7 L. R. A. (N. S.) 485; *Ingraham* v. *Ingraham* (1897), 169 Ill. 432, 48 N. E. 561, 49 N. E. 320; *Inglish* v. *Johnson* (1906), 42 Tex. Civ. App. 118, 95 S. W. 558; *Jackson* v. *Phillips, supra*; *Jones* v. *Habersham* (1882), 107 U. S. 174, 2 Sup. Ct. 336, 27 L. Ed. 401; *Russell* v. *Allen, supra; Pennington* v. *Metropolitan Museum, etc.* (1903), 65 N. J. Eq. 11, 55 Atl. 468; *Sanderson* v. *White* (1836), 18 Pick. (Mass.) 328, 29 Am. Dec. 591; *St. Peter's Church* v. *Brown* (1899), 21 R. I. 367, 43 Atl. 642; *Pennoyer* v. *Wadhams* (1891), 20 Ore. 274, 25 Pac. 720, 11 L. R. A. 210; *Vidal* v. *Girard's Executors* (1844), 2 How. (U. S.) 127, 11 L. Ed. 205; *Taylor* v. *Byrn Mawr College* (1881), 34 N. J. Eq. 101; *Osgood* v. *Rogers* (1904), 186 Mass. 238, 71 N. E. 306; *Lackland* v. *Walker* (1899), 151 Mo. 210, 52 S. W. 414; *Missouri Hist. Society* v. *Academy, etc.* (1887), 94 Mo. 459, 8 S. W. 346; *Inglis* v. *Trustees, etc.* (1830), 3 Peters (U. S.) 99, 7 L. Ed. 617; *Mormon Church* v. *United States* (1889), 136 U. S. 1, 51, 10 Sup. Ct. 792, 34 L. Ed. 481. But it is contended that this doctrine does not apply to gifts *inter vivos* but is limited to testamentary ones. Two authorities are cited in support of the claim: Bouvier's Law Dict. and *Jenkins* v. *Jenkins University* (1897), 17 Wash. 160, 49 Pac. 247, 50 Pac. 785. In the case cited no particular

reason is stated for the rule there declared. No distinction is obvious and the fact that the institute never qualified, or that it failed, is irrelevant to the question of the creation of the trust. If it be assumed that a charitable gift *inter vivos* may be created, the acceptance of the trust by the proposed administering trustee does not seem important. The great weight of authority recognizes no distinction between testamentary gifts and those *inter vivos* in the application of the judicial *cy pres* doctrine. *American Academy, etc.* v. *Harvard College, supra; Russell* v. *Allen, supra; Missouri Hist. Society* v. *Academy, etc., supra; Inglish* v. *Johnson, supra; Barnard* v. *Adams* (1893), 58 Fed. 313; *People* v. *Cogswell, supra; Fordyce* v. *Woman's, etc., Library Assn., supra; In re Centennial, etc., Assn.* (1912), 235 Pa. 206, 83 Atl. 683; *Keene* v. *Eastman, supra; Commonwealth* v. *Pauline Temporary Home, supra; Book Depository, etc.* v. *Trustees, etc.,* 117 Md. 86, 83 Atl. 50; *Hadley* v. *Hopkins Academy, supra; Raley* v. *Umatilla County, supra.* In *Russell* v. *Allen, supra,* a leading authority on charitable trusts, the donor, for the purpose of founding an educational institute in St. Louis, conveyed lands to Horner to sell and turn over the proceeds to one Allen, president of the Russell Institute at St. Louis. There never was such a corporation as the Russell Institute. Twenty-three years afterward, the donor and trustee having died, the heirs sought a recovery of the property. The facts there were much more favorable to the donor than here, but it was held a completed trust, notwithstanding the lapse of time without any corporation, or even organization, and though Allen never acknowledged any trust. The opinion was by Justice Gray, who, on the same day, March 5, 1883, delivered the opinion in another leading case on charitable trusts—*Jones* v. *Habersham, supra.* It

will be noted that in *Russell* v. *Allen, supra,* the test applied to the question of the completion of the gift was that "the donor did not contemplate or intend doing any further act to perfect the gift." What further act did the donors here intend to perform after the purchase of the arsenal site? In *American Academy, etc.* v. *Harvard College, supra,* it was held that "even if the academy (trustee) had not thus accepted this donation, instead of reverting to the donor's heirs or residuary legatees, it would be applied to the general purposes of the charity, etc." Count Rumford had made, or attempted to make, a charitable gift, *inter vivos.* In *Inglish* v. *Johnson, supra,* a donor made a deed to a lodge for a site for a female school. After running the school for some time the lodge failed, and was unable to execute the trust. The local school corporation agreed to accept it, but on condition of maintaining a general school. It was held that the *cy pres* doctrine applied and a school corporation might execute the trust. In *Barnard* v. *Adams, supra,* a donation was made for charity. The trustee failed. It was ordered administrated *cy pres.* See, also, 3 Pomeroy, Eq. Jurisp. (3d ed.) §1023; Lewin, Trusts (9th ed.) 169. "A charity established or supported by voluntary contributions stands in the same position as any other charity, so long as there is a fund or property impressed with a charitable trust." Tudor, Charitable Trusts (3d ed.) 97; 6 Cyc 935.

The school city of Indianapolis was qualified to receive title to the property and to hold it for the educational uses specified. And in directing the board of school commissioners to have use of the site under the trust, the court regarded the purpose of keeping it as a campus and its site for trade and technical schools, if not

exactly as originally intended, surely in a way which will work out the purpose of the donors along the same lines. The competency of municipalities in this state to serve as administering trustees of trusts for public educational and other purposes germane to their organization has long been recognized. *Craig* v. *Secrist* (1876), 54 Ind. 419; *Skinner* v. *Harrison Tp., supra; Board* v. *Dinwiddie, supra; Dykeman* v. *Jenkines, supra.* Since the act of March 7, 1891 (Acts 1891 p. 348, §655 *et seq.* Burns 1914), the board of school commissioners of the city of Indianapolis has had power to establish and maintain as a part of its school system "industrial or manual training and education wherein shall be taught the practical use of tools * * * and * * * mechanical construction and mechanical drawing." Since then the scope of vocational education generally in the public schools of the state has been widely extended. Acts 1913 p. 37, §6641a *et seq.* Burns 1914; *State, ex rel.* v. *Meeker* (1914), 182 Ind. 240, 105 N. E. 906. It may be noted, furthermore, that the general assembly has sought expressly to bestow such authority in circumstances such as are here involved. Acts 1911 p. 96, §6549a *et seq.* Burns 1914. See, also, *Perin* v. *Carey* (1860), 24 How. (U. S.) 465, 16 L. Ed. 701; *Vidal* v. *Girard's Executors, supra; Piper* v. *Moulton* (1881), 72 Me. 155; *Barkley* v. *Donnelly, supra; Kinnaird* v. *Miller, supra, Raley* v. *Umatilla County, supra; Adams Female Academy* v. *Adams, supra; Inglish* v. *Johnson, supra; Maxcy* v. *City of Oshkosh, supra;* 5 R. C. L. 320, §§41, 42; note, 8 Ann. Cas. 1182.

The court's findings and the application of the law thereto are in the broad spirit of the rule of equity that where a charitable purpose, as here

indicated, is the very essence of what the donors intended, a court of equity will see to it that such purpose shall prevail rather than be destroyed, and will lend its aid to carry out that purpose, if not with exactness as to details as outlined, then as near as may be.

What has been said necessarily answers much of the brief of appellant creditors. Their reliance was placed first on the proposition that the Winona Technical Institute of Indianapolis, their debtor, was the beneficiary of the donations and, as such, was the owner of the property purchased with the donations and, as such owner, is liable for the debts due appellants as any other debtor is liable. This contention fails with the conclusion reached as to the relation of their debtor, the Winona Technical Institute, to the property. The gift was not to that corporation, but to those whom its use of the property was designed to benefit.

The second proposition relied on is that, if a trust was created for educational purposes generally, the property of the trust is nevertheless liable 37. for the expenses of administering the trust and therefore subject to the equitable liens of these appellants. This is on the assumption that the possession of the Winona corporation was that of trustee, and that the money furnished and loaned was for the establishment and maintenance of the school in carrying out the trust. One reason for the denial of this claim is that the Winona corporation was not a trustee in possession. It was not even a trustee. It might have become such by receiving a deed after qualifying itself. Until that time, it held under the appellees who were the trustees, holding the legal title for the purposes of the trust. By the contract with the trustees which the Winona corporation made and under which it was in pos-

session of the tract, it was expressly without power to charge the trustees, in their trust capacity of course, with debts. That contract was obviously made for the protection of the trust estate. The careful guarding of the grant of possession and making it terminable on demand of the trustees, the explicit provision that the institute had no other right except under the trustees until a deed was made, all combine to show that the preservation and protection of the trust estate was the true meaning of the clause that the institute was to hold the tract *"at its own expense and without any power to make or create any charge* therefor, or open any account against said trustees." It was in legal effect no more than a precautionary expression of a legal rule which (the property being the estate of a public charity) would have saved it from destruction for debts even if the institute had indeed been its administering trustee. Gifts of land to charity, because of their public purpose, are regarded as practically inalienable at the hands of the person or body intrusted with the offices of giving them effect (except under authority of the chancery court in the interest of the trust). Note, 12 Ann. Cas. 816; *Mills* v. *Davison* (1896), 54 N. J. Eq. 659, 35 Atl. 1072, 35 L. R. A. 113, 55 Am. St. 594; *Perin* v. *Carey, supra; Fordyce* v. *Woman's, etc., Library Assn., supra;* In *Mills* v. *Davison, supra,* it was said: " 'Such gifts, from the purposes to which they were to be applied and the ownership to which they are subjected, have had the protection of courts of equity to prevent any alienation of them on the part of the person or body entrusted with the offices of giving them effect; and that in all such cases land has been decreed by courts of equity to be practically inalienable, or that a perpetuity of them exists in corporations when they are

charitable gifts.' * * * The distinction is between the purchase of lands by a corporation created for charitable purposes and a donation or gift of lands to such a corporation for uses that are charitable."

That the creditors should lose their debts because their debtor has failed is, of course, regretted by every one, but the creditors loaned their money (it is nearly all simply money loaned) to this institute, many of them with actual notice and all chargeable with notice that the institute had no title on record to this property. An examination of the record and an inquiry of the holders of the legal title would have disclosed to them the lack of any basis for credit, because of this real estate. The findings do not show that the creditors were ignorant of the true condition of this title, or that they even believed this realty to be in any way chargeable with their debts. It is doubtful, if these creditors of the institute had any rights against the property, that they have any standing to maintain them personally, for the rule is that where a receiver has been appointed, he represents the creditors, and their claims must be worked out through him. They cannot proceed directly against the debtor's property. *Nat. State Bank, etc.* v. *Vigo County Nat. Bank* (1895), 141 Ind. 352, 356, 40 N. E. 799, 50 Am. St. 330; *First Nat. Bank, etc.* v. *Dovetail, etc., Co.* (1896), 143 Ind. 534, 539, 42 N. E. 924; *Hutchinson* v. *First Nat., etc., Bank* (1892), 133 Ind. 271, 30 N. E. 952, 36 Am. St. 537. Judgment affirmed.

DISSENTING OPINION.

SPENCER, J.—In presenting the views of the writer it will serve no good purpose to set out in

this dissenting opinion the lengthy assignments of error made in this court, but the same can best be shown by setting out the special finding of facts and the conclusions of law thereon, together with a concise statement of each of the several contentions made, as they appear from the pleadings and from the briefs filed herein.

The special finding of facts is as follows:

"First. In the year 1902 and for a long time prior thereto the United States Government owned the following described real estate in Marion County, in the State of Indiana, to-wit: The East Half of the Northwest Quarter of Section Six, in Township Fifteen North and Range Four West, and occupied and used the same as an Arsenal site and military post.

"In the year 1902 it became known, in the City of Indianapolis, that a sale of said tract of land was contemplated by the Government authorities, with the view of purchasing another and larger site entirely outside of the city of Indianapolis on which to establish a larger military post. The City of Indianapolis had grown and extended so that at said time and at the present time, said tract of land was, and is, within the corporate limits of said City, and said city is built up compactly on all sides of said tract and for many blocks distant therefrom in all directions.

"Second. There were, and are now, a number of substantial buildings on said tract of land, which were and are now suitable to be used for educational purposes, and particularly in connection with a Technical School for the teaching of mechanical arts, and said tract of land was well adapted to be used as a public park or for educational purposes. And when it became known to the citizens of Indianapolis that a sale of said tract was contemplated, a movement was started by public spirited citizens, the press, civic bodies and mayor of said city to

purchase said tract for some park or educational purpose, which would result in preserving it in substantially its then condition as an open place in the midst of a closely built portion of said city and which would add to the beauty and healthfulness thereof.

"While said movement was taking shape a group of men of large means, who were connected with or interested in the Winona Assembly and Summer School Association, a corporation conducting a chautauqua and summer school at Winona Lake, Indiana, determined to establish an agricultural and technical school, the agricultural department of which should be at Winona Lake and the technical department at Indianapolis, provided the citizens of Indianapolis would purchase said tract of land from the United States Government as a site on which to locate said technical department. Said group of gentlemen representing said Winona interests held a meeting in Pittsburgh, Pa., on the 2d day of March, 1902, and adopted the following resolution, to-wit:

" 'That we will endow and manage a technical institute in Indianapolis provided the citizens of Indianapolis and vicinity will secure for us the United States Arsenal grounds and buildings, free of cost of encumbrance, or provided they will secure grounds and buildings of equal suitability or value, and our executive committee is empowered to make all contracts in the matter.

" 'That the management of this technical institute should, in our judgment, be conducted largely through a local committee composed of the citizens of Indianapolis.'

"Said men adopted said resolution and acted in said matter as the Winona Agricultural and Technical Institute, but at that time no corporation of that name existed. They authorized and empowered Dr. S. C. Dickey to act for them in connection with the citizens of Indianapolis in securing donations of money by

said citizens, sufficient to purchase said tract of land as a site for said technical department of said school.

"Said men so adopting said resolution were men of large fortunes and well able to endow said school in a manner to insure its success and perpetuity, and such fact was well known to many of the citizens of Indianapolis.

"Third.  On or about the 23rd day of April, 1902, a meeting was held in the city of Indianapolis attended by representative citizens, members of various civic bodies, representatives of the press of the city at which the said Dr. S. C. Dickey appeared on behalf of said Winona people and presented said resolution and the plans of said people to establish said proposed technical school, and represented that men of great wealth were ready to and would establish and endow such a school if the citizens of Indianapolis would by donations purchase said tract of land as a site on which to establish such a school.

"It was then determined by those present at said meeting to abandon all other efforts to purchase said tract of land for other purposes, and to unite in an effort to raise a fund with which to purchase said tract of land as a site on which such Technical School might be permanently located.  Other and similar meetings were held near the same time at which other representatives of said Winona people were present and urged the purchase of said tract for said Technical School, and made similar representations as to the ability and the purposes and intentions of said men to establish and permanently endow such a school if the citizens of Indianapolis would purchase such a site.

"At one of said meetings a committee was appointed under a resolution which is set out in full in finding No. 4, to have the charge and oversight of the effort to solicit and collect a fund with which to buy said tract of land. The defendant, Addison C. Harris, was chair-

man of said committee and said Dr. S. C. Dickey was a member thereof. George W. Brown and Albert Sahm were selected as special canvassers to solicit subscriptions for said fund and they were so selected on the suggestion of said Dr. S. C. Dickey, and he reported their selection to said Winona people who approved the same, without, however, reporting such approval to the said chairman of such committee.

"Fourth. Said canvassers at once entered upon an active canvass among the citizens of Indianapolis, soliciting funds to the amount of one hundred and fifty thousand dollars which it was then supposed would be sufficient for the purchase of said land. Said solicitors kept in close touch with the said Dr. Dickey, and kept him informed as to the progress of the canvass, the nature of the literature which they were placing before the public, and of the efforts of the committee and all the parties interested in collecting said fund. The said Dr. Dickey and said solicitors furnished information of the nature, purposes, and progress of the canvass to the press of the city of Indianapolis, and especially to the Indianapolis News, a paper published daily in said city, of wide circulation throughout said city, and the State of Indiana, and which was very generally read by the people of said city and state. The said Indianapolis News tendered the use of its columns for the purpose of aiding in said enterprise and articles, some of them signed by the said Dr. Dickey or said canvassers, many of them editorials, and many of them news items, and purported interviews with the said Dr. Dickey or said solicitors appeared almost daily in said paper during the summer, fall and winter of 1902, while said canvass was being made. The whole tenor and effect of said articles and publications was that if the people of Indianapolis would donate a sum sufficient to purchase said site that said men of wealth

would establish and endow a National Technical School thereon, and that a sum was already in sight sufficient to erect necessary buildings and pay the expenses of the operation of said school for a period of ten years, and that an ample endowment was assured to continue its operation permanently as a national school, which would bring large numbers of students from all parts of the country. Said articles and statements were never publicly repudiated, denied or criticised. And were read by and known to said Dr. Dickey as the same were published.

"Among said publications appearing in said Indianapolis News were the following which were authorized by said Dr. Dickey as representative of said Winona people and without consultation with said committee or the chairman thereof, to-wit:

" 'This is to be a national school, national as to its officers, its teachers, and the territory from which it will draw its students.

" 'This Directory is a unit in regarding Christian character as the foundation for all real success in life, non-sectarian, but strictly evangelical, religious teaching will be impressed upon the heart and conscience of every pupil, and the Bible will be given its proper place as the most important text-book.

" 'There will be no charity students and no free tuition. The most precious possession any boy has or can have is his manhood, and we believe that no boy can retain his manhood unimpaired and obtain and accept something for nothing. We do not believe that the state or society or the church owes any man or boy either a living or an education. But every boy is entitled to a chance to obtain an education, and also that which is just as important, the chance to pay for it either in money or in labor.

" 'If a boy's parents or friends want to pay in full for his education, he will be paid in cash for his physical labor, but he must work just as

many hours as the boy who pays for his education by labor alone.

" 'The statement, endowment and place of collection of subscriptions will be made by the trustees as soon as they can hold a meeting. The Technical Institute will be dedicated with a fixed annual income of not less than $50,000 aside from the money received from tuition.

" 'As ample security to the subscribers, trustees will not only hold the collected funds, but also a deed to the property until they and the subscribers are thoroughly satisfied that the school can have a sufficient inauguration and maintenance through a fixed and ample endowment.'

"A prospectus was prepared for use in the canvass for donations to the fund to purchase said real estate, which prospectus was approved by the said Dr. S. C. Dickey and the chairman of said canvassing committee. Said prospectus was printed and used by the solicitors canvassing, and by them presented to each person solicited. It contained a copy of the 'Pittsburgh resolution.' A statement of the plans and purposes and in said statement was this sentence: 'One thing we may assure—the men who compose the board of the Winona Agricultural and Technical Institute will be satisfied with nothing less than the best faculty that can be secured, and that we will not rely upon tuition of the students for means with which to meet the salaries of the teachers. Men who are heart and soul in this movement will provide such expenses by generous contributions. They have already taken up the work and signified their intentions, so we are not building a fabric of plans on a foundation lacking substantial qualities.' The name S. C. Dickey was printed at the close of the statement containing the foregoing sentences.

"Said prospectus also contained a list of the names of the men constituting the officers and directors of the Winona Agricultural and Tech-

nical Institute. The following statement also appeared in said prospectus:

" 'The press of Indianapolis has unanimously endorsed and favored the purchase of the Arsenal Site and the establishment of a technical institute, and at the conference on July 8th of the joint committees representing the press, Commercial Club, Board of Trade, University of Indianapolis, Woodruff Place, Winona Assembly, and the citizens of Indianapolis, Hon. A. C. Harris, presiding, the following resolutions were adopted unanimously:

" ' " RESOLUTIONS.

" ' ' "Believing that the United States Arsenal grounds of this city should be preserved intact and used for educational purposes, we, as members of a conference committee, representing the Board of Trade, Commercial Club, University of Indianapolis, The Winona Agricultural and Technical Institute, the press and citizens of Indianapolis, and Woodruff Place, endorse the project of the Winona Agricultural Institute to purchase the grounds for the purpose of establishing thereon a National Technical Institute. We commend the plan proposed for raising the necessary fund by subscription, the money thus secured to be held by five trustees, citizens of Indianapolis, in trust for the object named, it being understood that the grounds when purchased will be deeded to the Agricultural Institute, which has, by resolution, pledged itself to manage and endow the institute. It is further understood that the detailed management of the school shall be placed in the hands of a local committee, who shall work in conjunction with the executive committee of the Winona Agricultural and Technical Institute.

" ' "We recommend the appointment of an executive committee of five members to have full power in the conduct of the canvass for funds and in the negotiations with the Government for the purchase of the Grounds.

" ' "Resolved, That we commend to the attention of the people of Indianapolis the opportunity here offered to secure not only the national technical institute, but an Army Post, the site for which by Act of Congress may be purchased at the option of the Secretary of War with the funds realized from the sale of the Arsenal grounds." '

"The committee as called for in the resolutions was agreed upon as follows: Addison C. Harris, Hilton U. Brown, representing the University of Indianapolis, Frank E. Gavin, President Commercial Club; John J. Appel, President Indianapolis Board of Trade; Dr. Sol C. Dickey, representing Winona Agricultural and Technical Institute; Mayor Bookwalter, representing the city of Indianapolis.

" 'The following were named as trustees to hold the funds that may be subscribed: Medford B. Wilson, President Capital National Bank; Charles Latham, Cashier Fletcher National Bank; John Perrin, President American National Bank; A. A. Barnes, Director Columbia National Bank, and Judge Frank E. Gavin, President Commercial Club.'

"The committee named in said resolutions is the same committee that is referred to in finding No. 3.

"Fifth. Said solicitors with the knowledge and approval of said canvassing committee prepared a blank form for those who made donations to sign, which form is as follows, to-wit:

" 'Winona Agricultural and Technical Institute.
Indianapolis, Indiana, ————, 1902.

" 'In consideration of the promise of the proposed organizers of the Winona Agricultural and Technical Institute to duly incorporate said institute under the laws of Indiana and to establish the technical department of said institute upon the United States Arsenal Site at Indianapolis, Indiana, if the amount hereinafter mentioned, my subscription included, shall

be subscribed thereto and said arsenal site can be purchased, I promise upon demand to pay to Medford B. Wilson, John Perrin, Charles Latham, A. A. Barnes, and Frank E. Gavin, Trustees, or their successors or order, the sum of ————————— dollars, to be used in the purchase of said arsenal site for said Winona Institute's technical department and the establishment of said department, provide that and this subscription is subject to the condition that, valid bona fide subscriptions of like purport with this subscription to the amount of $150,000.00 shall have been made, and provided further that the sum by me hereby subscribed shall not be demanded or payable until such aggregate amount shall have been subscribed.

"The trustees whose names appear in said subscription blank were selected pursuant to the resolution set forth in finding No. 4 at one of the public meetings held at the inception of the movement to raise said funds and the fact of their selection as said trustees was at the time published in the Indianapolis News and a copy of said blank was published daily in said paper for a long period of time with a request to its readers to make their subscriptions on such blank and forward the same to the Indianapolis News or, to the soliciting committee.

"And a number of subscriptions were made in that way without any other solicitation than that appearing in the columns of the News. Other subscriptions were taken on a blank in the following form, to-wit:

" 'Technical Institute Fund.

Indianapolis, Ind., ————, 1903.

" 'I promise to pay upon demand to Medford B. Wilson, John Perrin, Charles Latham, A. A. Barnes, and Frank E. Gavin, Trustees, or their successors or order the sum of———— dollars for the purpose of the purchase of the Arsenal Site for the Technical Institute (the

amount paid hereon to said trustees to be returned to the undersigned in case the said Technical Institute shall not be located on said Arsenal Site.'

"About four thousand different persons whose names were at the time known to the solicitors made contribution to the fund in sums ranging from five cents to fifteen thousand dollars. Many of those who made the smaller donations and whose names were then known are now unknown and the Court is unable to ascertain their names. Of the sum thus donated by parties whose names were known about three-fourths thereof was donated by parties who signed one or the other of the foregoing forms of subscription blanks, only a comparative small number of them signing the second form it being used near the close of the canvass. About one-fourth of said sum was paid in by donors who did not sign any form of subscription blank. In addition to those whose names were known a great number of individuals donated small sums by contributing to collections taken in large manufacturing establishments and business houses employing large numbers of men and women, in which cases the total collection for each house or manufacturing establishment was turned in to the soliciting committee in the name of some one of the contributors and the names of the others so contributing were never known to the soliciting committee or any one connected with the collection of said fund or the promotion of said enterprise.

"About three thousand dollars was subscribed and paid in in this manner from fifteen or twenty different institutions and establishments.

"Of said four thousand persons contributing to said fund of $154,000 the names of about twenty-six hundred of them are in evidence in this case and the amount contributed by said last number, including fifteen thousand dollars paid in by the Winona Assembly and Summer School Association amounted to about $150,000.

"The defendant and cross-complainant, Flecther S. Hines subscribed and paid the sum of Five Thousand Dollars to said fund; the defendant, Edward S. Fletcher, subscribed and paid to said fund the sum of Twenty-five Hundred Dollars; and the defendant, Addison H. Nordyke subscribed and paid to such fund the sum of One Thousand Dollars. Each of said contributors made his subscription on a blank of the form first above set out.

"The defendant Edward C. Fletcher clipped said form of subscription from the Indianapolis News and signed and mailed the same and had no other information concerning the effort and canvass to raise funds for said purpose than that obtained from the columns of said Indianapolis News.

"Said Hines, Fletcher and Nordyke each paid his subscription without any notice or knowledge of the resolution adopted Jan. 8, 1903, as set out in the eighth finding, and without any notice that any such meeting was held as is described in said finding No. 8.

"The defendant and cross-complainant, William E. Hayward subscribed $500.00 to said fund on the 22nd day of September, 1902, on a blank of the form first above set out, and paid the same on the 14th day of January, 1903; on March 4, 1903, he subscribed an additional $100.00 to said fund on the second form of blank above set out, and he paid the same on March 13, 1903, on or about March 12, 1903, he subscribed by letter to said fund the sum $3,400.00 which letter addressed to the trustees of said fund is as follows, to-wit:

" 'Dear Sirs—As the time draws near for the purchase or failure to purchase the Arsenal Site on the 16th inst., I feel it my duty to add to my subscription already amounting to six hundred ($600.00) dollars. I now do what the public has got to do, or a few benevolently disposed individuals, subscribe a sum, that in this day of cheap prices including the cheap

rent of money will cause me to go down into my resources to an extent that I feel the sacrifice. I feel that I would do almost anything to to assist the city to acquire the Technical Institute with all its advantages to the rising generations without considering the commercial advantages referred to in some of the appeals, as in my youth I had only the advantage of an education represented by the *Three R's* I now *want* to be instrumental in giving rising generations an opportunity for usefulness in the higher walks of life. I now want to clear my conscience and wash my hands of any responsibility of the failure of securing to our city so important and lasting a benefit to this community by subscribing the sum of $3,400.00, filling out my total subscription to $4,000 and I hereby bind myself for that amount. If this from a stranger in your midst, as it were, will not bring the Technical Institute, with all of its elevating effects on students and citizens of your city alike, I shall have the satisfaction of feeling that I did my best to secure the coveted institution.

" 'Yours truly,
WILLIAM E. HAYWARD.'

"Said Hayward paid said subscription of $3,400.00 on March 14, 1903, together with an additional one of $1,000.00 contributed by him that day by giving his check dated March 14, 1903, for $4,400.00 a copy of which check is as follows:

" 'No. 36175. Real Estate Office of W. E. Hayward. Established 1867.

Indianapolis, Indiana, Mar. 14, 1903.

'Pay to the order of G. W. Brown for technical fund Four Thousand Four Hundred Dollars, in current funds. $4,400.00 to Capital National Bank, Indianapolis, Indiana.

W. E. HAYWARD.'

"Endorsed: 'G. W. Brown for technical fd.'

"That all said several payments were made by said Hayward without any notice or knowledge

of the resolution adopted January 8, 1903, by said trustees and certain subscribers to said fund, as described in finding No. 8 herein.

"Sixth.    On the 6th day of August, 1902, Articles of Incorporation under the voluntary association law of the State of Indiana, attempting to incorporate 'The Winona Agricultural'and Technical Institute' were filed in the office of the Secretary of State of the State of Indiana. Said Articles of Incorporation provided and stipulated that, 'The principal place of business of said association or corporation where its head office will be located is in the city of Indianapolis, Indiana', and 'the amount of the capital stock of this association or corporation shall be and is One Hundred Thousand Dollars, and same shall be divided into shares of One Hundred Dollars each in amount.'

"And it is further provided in Articles 2, 3, 6 and 8 of said Articles of Incorporation and Association, and articles 2, 3, 6 and 8 of said Articles of Association, respectively, are as follows, to-wit:

" 'II.    Said association and corporation is organized for pecuniary profit, in the sense only that it will charge and receive money for tuition, board and like school fees and bills, but in the sense that the members of shareholders of said association and corporation shall be entitled to receive dividends or like distributive shares of surplus income, earnings issues and profits of said association it is not organized for pecuniary profit, inasmuch as said association is organized for philanthropic purposes and its stock shall be issued and accepted with the express agreement that all surplus of earnings income, issues and profits shall forever remain the property of said association and that no dividends or like distributive parts of any such surplus shall ever be given or paid to the holders of the stock of said association and that upon the expiration of the term of existence of said association as hereinafter provided, all of

the property of whatsoever kind, which said association shall then possess shall be given absolutely and in fee simple to another corporate body having similar objects, purposes and policies to those of this association as shall be decided by the Board of Trustees of this association then in office. The amount of the capital stock of this association or corporation shall be and is one hundred thousand dollars and the same shall be divided into shares of $100.00 each in amount.'

" 'III. The object of said association and corporation is to establish, maintain and conduct schools wherein, under Evangelical Christian influences, the arts and sciences shall be taught, in both practical and theoretic ways, and the proposed plan of doing business in carrying out said object is to procure financial endowment for said association.'

" 'VI. The term of existence of said association or corporation shall be fifty years.'

" 'VIII. The business and prudential concerns of said association and corporation shall be managed by a board of trustees consisting of twenty-one stockholders and by the executive officers of said association to be designated by said board of trustees annually. At the first election of trustees seven trustees shall be elected for one year, seven for two years, and seven for three years and thereafter all annual elections of trustees by the stockholders shall be for three years.'

"A copy of said articles of association was filed in the office of the County Recorder in Kosciusko County in the State of Indiana, but no copy of the same was filed in the office of the County Recorder of Marion County, in the State of Indiana, until about the time of the commencement of the trial of this cause. No certificates of capital stock were ever issued to any one in said corporation or pretended corporation, nor was any sum, whatever, ever paid to said corporation for capital stock. Nor was

any subscription for stock in said corporation ever made by any one.

"Seventh.   On the seventh day of April, 1904, articles of Association under the voluntary association law of the State of Indiana, attempting to incorporate 'The Winona Technical Institute at Indianapolis' were filed in the office of the Secretary of State of the State of Indiana, and a copy thereof was filed in the office of the County Recorder of Marion County, State of Indiana.   Said Articles of Association provided and stipulated that 'The principal place of business of said association or corporation, where its head office shall be located, is the city of Indianapolis, Indiana.'   And further 'The amount of the capital stock of this association and corporation shall be and is $100,000.00 and the same shall be divided into shares of $100.00 each in amount.'

"And it is further provided in articles 2, 3, 6, 8 and 10 of said articles of incorporation and association, and articles 2, 3, 6, 8 and 10 of said Articles of Association, respectively, are as follows:

" 'II.   Said association and corporation is organized for pecuniary profit in the sense only that it will charge for tuition, board and like school fees and bills, but in the sense that the members are share-holders of the association and corporation shall be entitled to receive dividends or like distributing shares of surplus income, earnings and profits of said association, it is not organized for pecuniary profit inasmuch as said association is organized for philanthropic purposes and its stock shall be issued and accepted with the express agreement that all surplus earnings, income and profits shall forever remain the property of said association and corporation, and that no dividends or distributive parts of any such surplus shall ever be given or paid to the holders of the stock of said association or corporation and that upon the expiration of the term of existence of said

association as hereinafter provided, all property of whatsoever kind which said association shall then possess, shall be given absolutely and in fee simple to another corporate body having similar objects, purposes and qualities to those of this association as shall be decided by the trustees of this association then in office. The amount of the capital stock of this association and corporation shall be and is $100,000.00 and the same shall be divided into shares of $100.00 each in amount.'

" 'III. The object of said association and corporation is to establish, maintain and conduct at Indianapolis, Indiana, a general school or like school wherein, under Evangelical Christian influences, the arts and sciences shall be taught in both practical and theoretical ways; and that the proposed plan of doing business in carrying out said objects is to procure financial endowment, for said association and corporation.'

" 'VI. The term of existence of said association or corporation shall be fifty years.'

" 'VIII. The business and prudential concerns of said association and corporation shall be named by a board of trustees, consisting of fifty stockholders. At the first election of trustees, seventeen shall be elected for one year, seventeen for two years and sixteen for three years, and thereafter all annual elections of trustees by the stockholders shall be for three years, provided, however, that the shareholders may by a by-law require that each trustee in addition to the qualification that he will be a stockholder shall have such other qualification or qualifications as may be expressed in and by said by-law, and no by-law so fixing the qualification of the trustees of said association or corporation shall ever be repealed, amended or modified except by the vote of persons holding the stock of said association or corporation to the aggregate amount

of at least ninety-five per cent of the stock of said association at such time, issued and outstanding.'

. " 'X. Inasmuch as the objects for which said association and corporation are formed are philanthropic and it is not the intent that its affairs shall be managed and conducted with a view to the pecuniary profit of any persons or person, but that they shall be managed and conducted in such a way that in *perpetuity* the best instruction shall be provided for the largest number of students that the financial ability of said association or corporation will warrant, to secure said objects it is hereby provided that all the stock issued shall be issued and accepted with the understanding and agreement that no share of any such stock shall ever be voted at the stockholders' meeting in favor of authorizing any incumbrances to be placed upon the real estate of said association, or any structure thereon, and all trustees elected and accepting the office of trustee shall accept the same with the understanding and agreement that no power shall be treated as being held by or vested in the Board of trustees of said association in any way, to place incumbrance upon the real estate of said association.'

"No certificates of capital stock in said corporation or association was ever issued to any one and no sum of money was ever paid to said corporation by any one for or on account of capital stock. And no subscription for capital stock in said corporation was ever made by any one.

"The said Articles of Association, of said Winona Agricultural and Technical Institute were signed by eight men and the Articles of Association of said Winona Technical Institute at Indianapolis were signed by twenty-one men, H. H. Hanna, Thos. Kane, W. J. Richards and Sol C. Dickey signed, and they are the only ones who did sign each of said Articles of Association.

"Eighth. About the first of the year 1903 it

was thought, by those soliciting the funds that a sum practically sufficient to purchase the land had been subscribed and it began to be talked among some of the parties who had contributed or agreed to contribute the larger sums, and the trustees of the fund and others that some definite understanding should be reached before the money was paid in, as to the exact nature of the trust to be created. Some of the donors who had promised to pay the larger sums were contending that there should be a more definite and substantial step taken by the parties who had proposed to establish and endow the school, toward the accomplishment of that purpose, before the contributors should be asked to pay their several pledges. And this talk resulted in a meeting held on the eighth day of January in the city of Indianapolis, which was attended by a majority of said trustees of the fund, Addison C. Harris, Chairman, and a majority of the members of the canvassing committee on behalf of the citizens of Indianapolis, Dr. Sol C. Dickey and his attorney representing the Winona people, and six or eight of the donors who had promised donations of sums ranging from one hundred dollars to ten thousand dollars and representing in the aggregate about forty or fifty thousand dollars of donations.

"At this meeting extended discussion was had and an agreement reached assented to by a majority, if not all, of those present and particularly by Dr. S. C. Dickey and the trustees of the fund, which was reduced in writing and is here set out in full as part of this finding, and is as follows, to-wit:

" 'Resolved, That it is the belief of the Board of Trustees that the deed of conveyance for the arsenal grounds to the Winona Agricultural and Technical Institute, should contain clauses limiting the property to educational uses, prohibiting its being mortgaged and providing that it might be sold should the Institute deem it wise only on condition that the proceeds

should form a trust fund to be forever invested in real estate in Indianapolis to be used for educational purposes in said city; with a provision of reversion to the city of Indianapolis should said real estate or the proceeds thereof at any time cease to be used for educational purposes in said city of Indianapolis.

" 'Resolved, further, that the deed should not be delivered to said Institute until it shall have obtained in cash or bona-fide collectible subscriptions, an amount equal to the purchase price of the real estate to be used for Institute at Indianapolis.

" 'Resolved, further that upon said Institute's having secured such sum for such purposes in cash or subscriptions as above it shall be deemed entitled to such conveyance and the same shall be accordingly made.'

"After the adoption of said resolution said McGowan and McCullough and others paid their subscriptions and said McCullough subsequently subscribed and paid an additional sum of $5,000.00.

"It was also agreed orally that said trustees should take title to said real estate in themselves and hold the same until said Winona Technical Institute at Indianapolis should comply with the provisions and conditions of said resolutions.

"Ninth. On the thirteenth day of January, 1903, by the procurement and with the consent of said Brown and Dickey the trustees of the fund prepared a circular letter and mailed a copy thereof to each person who had in any manner promised to make a donation whose name and address were known to them and this constituted practically all of those who had so promised to donate. A copy of said letter is here set out and made a part of this finding and is as follows, to-wit:

" 'Indianapolis, Ind., January 13, 1903.
" 'Dear Sir:
" 'The undersigned trustees for the Techni-

cal Institute fund hereby inform you that valid and bona fide subscriptions to the full amount of $150,000.00 have been secured for the purchase of the Arsenal Site from the Government for the purpose of establishment of the proposed Technical Institute thereon.

That the object may be certainly fulfilled it has been determined by your trustees and agreed to by the representatives of the Institute that the deed of conveyance to the Institute limit the property and all its proceeds to educational uses in the city of Indianapolis, and the deed to the Arsenal Site property shall not be delivered by the trustees to the Institute corporation until it shall have in cash or bona fide collectible subscriptions a sum at least equal to the purchase price of the real estate. In order, therefore, that the Trustees may be in position to promptly submit their offer for the property, you are kindly requested to co-operate by making immediate payment of your subscription at the bank designated in the enclosed notice.

" 'Yours truly,

MEDFORD B. WILSON,
JOHN PERRIN,
A. A. BARNES,
CHARLES LATHAM,
FRANK E. GAVIN,
Trustees.'

"The subscribers and donors of said fund were divided into four groups and a list of names and amounts subscribed by each person was made up on four separate books, and one of each of such books placed in a bank in the city of Indianapolis for the purpose of collecting said fund. And, a copy of the circular letter was sent to each of the several donors with a card informing each donor in what particular bank to pay his pledge, and in this way the collection of the pledges was made. At this time, however, about Fifteen Hundred Dollars from various sources had already been paid to

the soliciting committee and by them to the Trustees of the Fund.

"Tenth. The gentleman who were selected as members of the canvassing committee, the solicitors, and the trustees of the fund are men of high character and reputation and were generally known by the citizens of Indianapolis at the time the donations were being solicited as such, and as men of large experience in business affairs and who might be depended upon to successfully manage and safeguard the funds entrusted to them in the enterprise in hand.

"And at the time said donations were pledged, and at the time they were paid in, the donors understood and intended that said funds so donated and paid should and would be used by said trustees in purchasing said real estate to be held in trust by said trustees or some corporation or persons selected by them in perpetuity as a site for a National Technical School, and that the said real estate should be retained intact for such purpose. And said trustees when they accepted said trust and received said funds and said conveyance to said lands so understood the intentions of said donors. The principal object and purpose in the minds of the various donors in making their subscriptions, payments and donations to said fund, were the establishment and maintenance upon said Arsenal grounds of trade schools, the preservation of said tract intact and its permanent dedication to educational uses in said city of Indianapolis.

"Eleventh. On the 16th day of March, 1903, the real estate in controversy was offered for sale by the United States Government at public auction. On said date, they, the trustees of the fund in bank the sum of $133,000.00, which had been paid on subscriptions and donations, and they had collectible pledges unpaid amounting to approximately $6,000.00, and an additional pledge of $22,000.00 made by one Walter Smith with the condition that it should

be available only in the event that it was necessary to collect the same or some part thereof in order to have a sum sufficient to pay the purchase price of said real estate. Certain gentlemen connected with the Winona Assembly, and Summer School Association advanced of their own funds $6,000.00 and took over said unpaid pledges and subscriptions to reimburse themselves in so far as they would do so. And at the same time Winona Assembly and Summer School Association advanced the sum of $15,000.00 making in all, in the hands of said trustees of the fund $154,000.00 which they used in the purchase of said real estate, and received a deed therefor, which is as follows, to-wit:

" 'Whereas by an Act of Congress, approved June 30, 1902, entitled "An act asking appropriation for the support of the Army for the fiscal year ending June 30th, nineteen hundred and three" it was provided that whenever in the opinion of the President the lands and improvements or any portion of them of the military posts or reservations at Indianapolis, Indiana, Columbus, Ohio, and Buffalo, New York, have become undesirable for military purposes he may in his discretion cause the same to be appraised and sold at public sale at not less than the appraised value, either as a whole or in subdivisions, under such regulations as to public notice and terms and conditions of sale as he may prescribe.

" 'And whereas the lands and improvements of the Military Reservation of Indianapolis Arsenal, at Indianapolis, Indiana, hereinafter described having in the opinion of the President, become undesirable for military purposes, he did cause the same to be appraised and offered as a whole at public sale at not less than the appraised value, due notice of the terms and conditions of the sale having been given and did cause to be sold at said public sale at the office of the commanding officer Indianapolis

Arsenal, Indianapolis, Indiana, at 12 o'clock noon, March 16th, 1903, to Medford B. Wilson, Alfred A. Barnes, John Perrin, Charles Latham and Frank E. Gavin, as Trustees of the Winona Agricultural and Technical Institute Fund, at their bid of one hundred fifty-four thousand ($154,000.00) dollars being the appraised value of the premises no other bid having been received the following described premises to-wit:

"'All of the military reservation of Indianapolis Arsenal and improvements thereon in the city of Indianapolis, Marion county, Indiana, being the (east half of the northwest quarter of section six, township fifteen north, range four east, containing seventy-five acres and fourteen-hundredths of an acre more or less), as acquired by the United States of America by deed from Calvin Fletcher, Jr., and wife, dated December 15, 1862, and deed from Allen R. Benton and wife dated December 22, 1862, recorded respectively at pages (403) and (404) of Record No. 17 of the Recorder's Office of Marion County, Indiana.

"'Together with the former interest of the United States in the lands acquired for a roadway to and from said Indianapolis Arsenal by deed from Herman Sturm and wife dated November 2, 1863 and deed from Stoughton A. Fletcher and wife dated November 2, 1863, recorded respectively at pages 157 and 158 of Land Record MM of the Recorder's Office of Marion County, said roadway having been acquired for the purpose of a public highway forever.

"'Now, therefore, I Elihu Root, Secretary of War of the United States of America, in consideration of the said sum of one hundred fifty-four thousand dollars ($154,000.00) the receipt whereof is hereby acknowledged do by direction of the President hereby give, grant, sell and convey unto the said Medford B. Wilson, Alfred A. Barnes, John Perrin, Charles Latham and Frank E. Gavin, Trustees, as aforesaid and to

their successors as such Trustees all the right, title and interest of the United States in and to the premises sold as aforesaid with all the rights, privileges and appurtenances thereunto belonging.

" 'To have and to hold unto the said Medford B. Wilson, Alfred A. Barnes, John Perrin, Charles Latham and Frank E. Gavin and to their successors as such trustees, forever.

" 'In Witness Whereof, I, Elihu Root, Secretary of War of the United States, have hereunto subscribed my name and caused to be affixed the seal of the War Department this twenty-seventh day of March, 1903.

" 'Elihu Root (L. S.)

" 'Secretary of War.

" 'District of Columbia, ss.

" 'Before me, Jno. B. Randolph, a Notary Public in and for the District of Columbia, duly commissioned and qualified, this twenty-seventh day of March, 1903, personally appeared Elihu Root, Secretary of War of the United States, known to me to be the person whose name is subscribed to the foregoing deed and acknowledged that he executed the same as Secretary of War for the purposes and considation therein expressed.

" 'In Witness Whereof, I have hereunto set my hand and affixed my official seal this 27th day of March, 1903.

" 'Jno. B. Randolph, (L.S.)

" 'Notary Public'

"No obligation was undertaken by said trustees to repay to said Winona Assembly any part of said Fifteen Thousand Dollars, but the same was subsequently charged by said Assembly against the Winona Agricultural and Technical Institute and some adjustment of the claim was later made between said Assembly and said Institute.

"Twelfth. On the 15th day of April, 1903, the trustees named in said deed executed the following written agreement, to-wit:

" 'This Article of Agreement between Medford B. Wilson, John Perrin, A. A. Barnes, Chas. Latham, and Frank E. Gavin, Trustees, parties of the first part and the Winona Agricultural and Technical Institute, party of the second part, witnesseth, that

" 'Whereas, Said Trustees have purchased and paid for the land near Indianapolis, Marion County, Indiana, known as the Arsenal Grounds, being the east one-half of the Northwest quarter of section six (6) township fifteen, Range four and as such trustees now hold the title thereto, and

" 'Whereas, It is desired that said Technical Institute shall take possession of and care for said real estate.

" 'Now, Therefore, It is hereby agreed that said Technical Institute shall take possession of, care for and manage said property at its own expense and without any power to make or create any charge therefor, or open any account against said Trustees and shall hold the same until possession thereof may be demanded by said Trustees upon the order of the majority thereof. It is further expressly stipulated that upon such demand being at any time made, all right of said Technical Institutute under this contract, and all persons holding through or under them, shall at once cease and be at end, and said Institute shall deliver and surrender possession thereof to such trustees.

" 'It is further expressly understood and agreed that any possession of said property which said Institute may take and hold is under and by virtue of this contract, and not otherwise, and until it shall obtain a deed therefor from said trustees.

MEDFORD B. WILSON,
JOHN PERRIN,
A. A. BARNES,
CHARLES LATHAM,
FRANK E. GAVIN,
Trustees.

" 'Winona Agricultural and Technical Institute,
By S. C. Dickey, President.
" 'April 15, 1903.'

"And thereupon said S. C. Dickey, acting
for said Winona Agricultural and Technical
Institute, entered into possession of said real
estate under said contract and agreement.

"Said agreement has remained in full force
and effect and said Trustees have never au-
thorized any one to occupy or become possessed
of said real estate or any part thereof under
any other agreement or arrangement whatever.

"Thirteenth. In the fall of 1903 a school
consisting of two or three departments was
opened upon said premises and managed by
said Winona Agricultural and Technical In-
stitute until the incorporation or attempted
incorporation of the Winona Technical Institute
at Indianapolis, in April of 1904, at which time
said Winona Technical Institute at Indianapo-
lis, by S. C. Dickey, its president assumed the
control and management of said school and
conducted the same until a Receiver was ap-
pointed for said Institute and school on the
28th day of March, 1910.

"That in the fall of 1904, additional depart-
ments were added to said school; the faculty
enlarged, and repairs and improvements made
from time to time thereafter on the buildings
and equipments of said school, and the same
was kept open throughout the entire school
year, each year, and attended by a consider-
able body of students from all parts of the
country; and during the time from the opening
of said Institution until the appointment of
said Receiver there were about 2,000 different
students in attendance at said school and about
1,000 graduated from the several departments in
courses covering from four weeks to two years.

"Fourteenth. The Winona Agricultural and
Technical Institute has had no connection with
said Technical Institute or said tract of land
since April, 1904, and has in no way exercised

any control or supervision over the same. Said Winona Agricultural and Technical Institute has had no assets or property of any kind since said date and has at all times since said date been and now is wholly insolvent and unable to establish and maintain a technical institute on said site.

"Said Winona Agricultural and Technical Institute never had any endowment subscribed and paid to it.

"Fifteenth. Said Winona Technical Institutute at Indianapolis is now and for more than five years has been wholly insolvent and is now not financially able and will not be able to manage, conduct and support said Technical Institute nor any technical school on said site.

"Said Winona Technical Institute at Indianapolis never had any endowment subscribed or paid to it except as herein otherwise found.

"The tuition received by said Winona Technical Institute at Indianapolis has never equaled the amount paid to instructors in the conducting of the various departments of said school.

"Sixteenth. No request was made to the plaintiffs for a deed to said lands until in the Spring of 1908, when said Winona Technical Institute at Indianapolis through its President Dr. Sol. C. Dickey, informed said plaintiffs that the condition relating to the raising of said $154,000.00 had been complied with, and requested that steps be taken to execute a deed to said Institute.

"A deed was then prepared by plaintiffs conveying said real estate to said Institute, in trust to be held with all its proceeds for educational uses in the city of Indianapolis and plaintiffs were willing and ready at that time to execute said deed upon a proper showing that the conditions of the agreement of January 8th, 1903, had been complied with. At the request of the plaintiffs an audit of the books of the Winona Technical Institute was had and it was then

learned by plaintiffs that said Winona Technical Institute was insolvent and plaintiffs being in doubt as to whether said conditions as to said $154,000.00 had been complied with, declined at that time to execute said deed and the matter of making such deed remained in abeyance until during the fall of 1909, at which time a form of deed was agreed upon between plaintiffs and said Winona Technical Institute at Indianapolis, whereby said real estate was to be conveyed to said Winona Technical Institute at Indianapolis as a trustee, in trust for educational purposes in the city of Indianapolis and providing that in the event said trustee or any successor or assign should fail to use said lands as a site for educational purposes such trustee should convey said lands to the School City of Indianapolis as trustee to be held upon the same terms and conditions as were imposed by said deed upon said Institute as Trustee. Before said deed was finally executed some of the donors made objection to said plaintiffs executing said deed and while the matter of executing said deed was under consideration a Receiver was appointed to take charge of said Winona Technical Institute and said school and property.

"Seventeenth. Prior to the appointment of the Receiver for said Winona Technical Institute at Indianapolis and prior to the preparation of the deed last referred to in finding number sixteen, said Winona Technical Institute had, out of funds received by way of donations and by loans negotiated by said Institute, invested $62,000.00 in permanent improvements on said lands in the way of buildings, steam engines, boilers, pumps, air compressors, electric generators, large motor, stoker and firing grates, radiators, water pipes, electric wiring, underground mains, water tank, fire escape, well, and remodeling buildings.

"Said Winona Technical Institute also paid out on Barrett Law improvement assessments

for street improvements the sum of $2,685.19, and for insurance on buildings and equipments the sum of $8,234.86. Of said sum so paid for insurance about $6,176.13 was paid for insurance on buildings and about $2,258.73 was paid for insurance on equipments.

"Eighteenth. Prior to August 31, 1909, said Winona Technical Institute' had received in cash donations from various parties for use in maintaining said Technical School the sum of $73,892.47.

"It had also received as donations in the nature of equipments, supplies suitable for use and which were used in equipping said technical school, certain machinery and supplies valued at the time by the parties in the aggregate at the sum of $48,869.48.

"It had also received cash as scholarship donations the sum of $33,722.12, which was paid in to be used in paying the tuition of boys who could not pay their own tuition. When a student who could not pay his own tuition was allowed his tuition out of said fund he was required to execute a note to the Institute to be paid out of his earnings after graduation. The donors of this fund reserved the right to name students who should receive the benefit of such fund. These donations were mostly made by manufacturer's associations and were for a period of years to be paid in annual payments, and on the above date there were a number of such pledges running which if they had been paid in full for the full time for which the donors agreed to pay would have amounted to $53,-557.24 additional, but only a small amount thereof was collected or collectible by the Receiver.

"Nineteenth. Prior to the commencement of this action two actions were begun in the Superior Court of Marion County for the appointment of a Receiver for the Winona Technical Institute and upon proper proceedings said causes were consolidated and on the 28th day

of March, 1910, Charles A. Bookwalter was appointed Receiver of said concern and duly qualified as such Receiver and ever since said date has been and now is acting as such Receiver and has been and now is in full control of the affairs and property of said Winona Technical Institute and as such Receiver succeeded to all rights of said Institute to the possession of the real estate involved herein.

"On the 4th day of April, 1910, said Receiver filed in said cause in which he was appointed a petition showing that said Winona Technical Institute at Indianapolis had personal property of the value of more than Forty-five Thousand Dollars and that a necessity existed for raising funds for immediate use in the management of the affairs of said Institute and thereupon said Marion Superior Court entered an order to said Receiver to issue and sell, Receivers' certificates to the amount of $20,000.00 and that said certificates when sold should be a first lien on said personal property of said Winona Technical Institute at Indianapolis.

"And said Receiver did issue and sell certificates to the amount of $11,000.00 bearing six per cent. interest which are still outstanding and unpaid.

"On the 13th day of December, 1910, and while this cause was yet pending in the Marion Superior Court said Charles A. Bookwalter, Receiver as aforesaid, filed in this cause his petition for an order to issue and sell Receivers' certificates for the purpose of defraying the expenses of said Technical Institute and said Court found that Addison C. Harris appeared to said petition for himself, Baker, and Daniels, appeared for the Winona Assembly and Summer School Association, The Winona Agricultural and Technical Institute, and the Winona Technical Institute at Indianapolis, Lewis C. Walker appeared for 'certain creditors' and Ferdinand Winter appeared for Hugh McGowan, and that due and reasonable notice of said petition

had been served upon William Bosson, attorney for the defendant Robert C. Light.

"And said Court entered an order in this cause on said petition to said Receiver, to issue receivers' certificates to the amount of Ten Thousand Dollars, bearing interest at the rate of six per cent. per annum, and that the same should be a first and prior lien ahead of all other claims of any character whatsoever, upon all personal property of said defendant, the Winona Technical Institute at Indianapolis, except the lien of Receivers' certificates issued April 4th, 1910, and also a first and prior lien upon the real estate involved in this suit. Said order has not been appealed from, modified or set aside, and acting under said order said Receiver issued Receivers' certificates to the amount of $10,000. and sold the same and used the funds arising from the same in operating said Technical Institute and preserving said real and personal property. Said certificates are still outstanding and unpaid.

"Said Receiver has ever since his appointment been in possession of said school and premises and has conducted and is now conducting said school and premises and had conducted and is now conducting said school and has cared for and is now caring for said property and under the orders and directions of said court. And said Receiver was by permission of said Court made a party defendant to this action and has appeared in person and by attorney and filed pleadings and participated in the trial of this cause.

"Twentieth. The Court further finds that the defendant The Winona Technical Institute at Indianapolis is indebted to the cross-complainant, The Union National Bank of Indianapolis, upon the notes described in its cross-complaint in the sum of Forty-eight Thousand Two Hundred Twenty-three Dollars and Ten Cents ($48,223.10) principal and interest, and Four Thousand Eight Hundred

Twenty-two Dollars and Thirty-one Cents ($4,822.31) attorney's fees.

"That said defendant is indebted to the cross-complainant William J. Richards, upon claims described in his cross-complaint in the sum of Ten Thousand Seventy-six Dollars and Forty Cents ($10,076.40) principal and interest, and Seven Hundred Eleven Dollars and Sixty-five Cents ($711.65) attorney's fees.

"That said defendant is indebted to the cross complainants, William J. Richards and Solomon C. Dickey, upon the claims described in their joint cross-complaint, in the sum of Thirty Seven Thousand Four Hundred Forty-three Dollars and Eleven Cents ($37,443.11) principal and interest, and One Thousand One Hundred Eighty-five Dollars and Sixty-nine cents ($1,185.69) attorney's fees, and that said Richards and Dickey are liable as endorsers for said Winona Technical Institute at Indianapolis, in the further sum of Fifteen Thousand Eight Hundred Two Dollars and Forty-six Cents ($15,802.46).

"That said defendant is indebted to the cross-complainant, John H. Holliday, Trustee, upon the debts described in his cross-complaint in the sum of Five Thousand Three Hundred Four Dollars and Twenty-two Cents ($5,304.22) principal and interest.

That said defendant is indebted to the cross-complainant, William H. Hubbard, upon the claims described in his cross-complaint in the sum of Two Thousand Three Hundred Forty six Dollars and Eleven Cents ($2,346.11) principal and interest, and that said Hubbard is liable as endorser for said Winona Technical Institute at Indianapolis in the further sum of Two Thousand Three Hundred Thirteen Dollars and Thirty-four Cents ($2,313.34).

"That said defendant is indebted to the cross-complainant, Solomon C. Dickey, upon the claims described in his cross-complaint, in

the sum of One Thousand Five Hundred Fifty Four Dollars and Thirty-three Cents ($1,554.33) principal and interest, and that said Dickey is liable as endorser for said Winona Technical Institute at Indianapolis in the further sum of Four Thousand Nine Hundred Eighty-two Dollars and Twenty-seven Cents ($4,982.27).

"That said defendant is indebted to the cross-complainant, William H. Hubbard and Charles W. Hubbard, Trustees, upon 'the claims described in their cross-complaint, in the sum of Eight Thousand Nine Hundred Ten Dollars ($8,910.00) principal and interest, and Five Hundred Twenty-five Dollars ($525) attorney's fees.

"That said defendant is indebted to the cross-complainant, Thomas C. Day, upon the claims desceibed in his cross-complaint, in the Sum of Five Thousand Six Hundred Seventy-five Dollars anb Forty Cents ($5,675.40) principal and interest, and Two Hundred Thirty-two Dollars and Eighty-three Cents ($232.83) attorney's fees.

"That said defendant is indebted to said cross-complainant, The Indianapolis Home for Friendless Women, upon the claims described in its cross-complaint, in the sum of One Thousand Seven Hundred Twelve Dollars and Fifty Cents ($1,712.50) principal and interest, and One Hundred Seventy-one Dollars and Twenty-five Cents ($171.25) attorney's fees.

"That said defendant is indebted to said cross-complainant, John H. Holliday, upon the claims described in his cross-complaint, in the sum of Two Thousand Nine Hundred Seventy-One Dollars and Twenty-three Cents ($2,971.-23) principal and interest, and Fifty-nine Dollars ($59.00) attorney's fees, and that he is liable as endorser for said Winona Technical Institute at Indianapolis in the further sum of Three Thousand One Hundred Fifty Dollars and Twenty-five Cents ($3,150.25).

"That said defendant is indebted to said

cross-complainant, Shelby National Bank of Shelbyville, Indiana, upon the note described in its cross-complaint, in the sum of Two Thousand Three Hundred Twelve Dollars and Sixty-six Cents ($2,312.66) principal and interest, and Two Hundred Thirty-One Dollars and Twenty-six Cents ($231.26) attorney's fees.

"That said defendant is indebted to the cross-complainant, Dauner Coal Company, upon the notes described in its cross-complaint, in the sum of Six Hundred Fifty-four Dollars and Ninety-three Cents ($654.93) principal and interest, and Sixty-Five Dollars and Forty-nine Cents ($65.49) attorney's fees.

"That said defendant is indebted to the cross-complainant, Winona Assembly Summer School Association, in the sum of Thirty-Three Thousand Three Hundred Twenty-five Dollars ($33,325.00) exclusive of interest upon the notes described in its cross-complaint.

"That the defendant is indebted to the cross-complainant, Frank E. Bell, upon the claim described in his cross-complaint, in the sum of Sixty-one Dollars and Sixty. Cents ($61.60) principal and interest.

"That said defendant is indebted to the German American Building Association in the sum of Six Thousand Six Dollars and Sixty-seven Cents ($6,006.67) principal and interest, and Six Hundred Dollars and Sixty-six Cents ($600.66) attorney's fees.

That said defendant is indebted to the cross-complainant, Milton A. Woolen, in the sum of One Thousand Five Hundred Thirty-three Dollars and Seventeen Cents ($1,533.17) which debt was incurred for heating plant installed on said premises.

"All of said indebtedness above described is past due and wholly unpaid. The said several items of indebtedness as found include interest computed to Dec. 2nd, 1911.

"The Court further finds that each and all of the debts above described were created by

said defendant, Winona Technical Institute at Indianapolis, in the proper establishment and maintenance of a technical or trade school upon what is known as the Arsenal site in the city of Indianapolis, Indiana, which said school is now in the hands and control of said Receiver.

"That said indebtedness and each and every item thereof is for money furnished and loaned, or goods and merchandise supplied to said defendant, The Winona Technical Institute at Indianapolis, at its special instance and request; that the same was reasonably necessary for the establishment, maintenance and equipment of said technical or trade school and was used for said purposes.

"Twenty-first. That there is due the cross-complainant, William H. Hubbard, the sum of $1,174.01 for premiums for insurance on the buildings on said real estate.

"Twenty-second. The School City of Indianapolis is ready and willing to accept the real estate in controversy in trust and establish and maintain a technical school thereon, open to all students residing in such School City and as students are admitted to other schools in said city."

Upon the facts found specially the court stated its conclusions of law as follows:

(1) The real estate described in the complaint and the findings herein and known as the arsenal grounds in Indianapolis, Indiana, is held by the plaintiffs as trustees of a public charitable trust, in trust to be forever kept intact and dedicated to educational uses in the city of Indianapolis and to be forever used as a site for the purpose of the maintenance thereon of an industrial or trade school or schools for education and instruction and training of both males and females in the various mechanical and manual trades, arts and sciences, and of such other educational institutions as may be established and maintained thereon, together

with all the machinery, buildings and appliances which may be used in connection therewith, and for the furnishing of places of residence for the instructors and students in such schools and as a campus or yard to be used in connection therewith, the right of attendance not to be limited to pupils residing in Indianapolis but to be open to pupils resident elsewhere under proper rules and regulations to be made by the trustees from time to time to effectuate the purposes of this trust.

(2) That the Winona Agricultural and Technical Institute and the Winona Technical Institute at Indianapolis are each insolvent and incapable of executing such trust or of maintaining a technical or trade school thereon, and are not entitled to have said real estate conveyed to them, or either of them, as trustees, or otherwise.

(3) That neither the said Winona Agricultural and Technical Institute, nor the said Winona Technical Institute at Indianapolis, has any right, title or interest in or to said real estate, or any claim or lien thereon.

(4) That neither of the defendants and cross-complainants, Winona Assembly and Summer School Association, William J. Richards, Solomon C. Dickey, The Union National Bank of Indianapolis, Winona Interurban Railway Company, Thomas C. Day, John H. Holliday, trustee, Central Supply Company, Dauner Coal Company, State Bank of Walkerton, Indiana, Indianapolis Coal Company, Woolen & Callen Company, Milton A. Woolen, W. A. Harbison, George W. Brown, John H. Vajen, J. M. Dalrymple, John H. Holliday, James W. Lilly, William H. Hubbard and Charles W. Hubbard, trustees, The Indianapolis Home for Friendless Women, Shelby National Bank of Shelbyville, Indiana, Frank E. Bell, German-American Building Association, nor any other person similarly situated, whether such person be specifically named in any of the pleadings

herein or not, has any right or title to, or any interest, claim or lien upon the said real estate, or any part thereof.

(5)   That the trust under which the plaintiffs hold said real estate has not failed so as to create a resulting trust in favor of the donors to the said Winona Technical Institute Fund, and that neither of the defendants and cross-complainants, Fletcher S. Hines, George F. McCullough, William E. Hayward, Edward C. Fletcher, Addison H. Nordyke, Robert E. Light, Kate F. McGowan, and Kate F. McGowan, trustee under the last will of Hugh J. McGowan, Delavan Smith, John J. Appel, Hilton U. Brown, Harold B. Hibben, William C. Bobbs, Fred M. Ayres, John H. Vajen, George A. Gay, Charles R. Williams, Joseph K. Lilly, Charles Mayer, Gustave A. Schnull, Arthur Jordan, Crawford Fairbanks, Andrew M. Sweeney, Frank VanCamp, Thomas Taggart, M. O'Connor & Company, Frank Fauvre, Henry Kahn, Louis Newberger, Charles W. Moore, E. Rach & Sons, W. J. Holliday & Co., Charles E. Coffin, Solomon C. Dickey, William J. Richards, William D. Allison, Andrew J. Brunt, Nicholas McCarty, Henry Severin, George B. Yandes, Raphael Kirschbaum, Joseph A. Rink, Joseph K. Sharp, Henry Lawrence, William H. Block, George W. Stout, Clarence A. Kenyon, Guedelhoefer Wagon Company, Fremont Alford, Fred Fuehring, Winona Assembly and Summer School Association, Winona Interurban Railway Company, Thomas C. Day, John H. Holliday, trustee, Central Supply Company, Dauner Coal Company, Indianapolis Coal Company, State Bank of Walkerton, Indiana, Milton A. Woolen, Woolen & Callen Company, W. A. Harbison, George W. Brown, J. M. Dalrymple, James W. Lilly, John H. Holliday, Harry J. Milligan, Addison C. Harris, nor any of the other donors or contributors to said fund, whether named as defendants or cross-

complainants in this cause, and whether spe-
cifically mentioned in the pleadings herein or
not, has any interest in said real estate, nor
are they, nor any of them, entitled to have the
same partitioned or sold, or any interest therein
conveyed to them, or any of them.

(6) That the said real estate is subject to a
charge and lien for so much of the receiver's
certificates aggregating $10,000 issued under
the order of the Marion Superior Court, room
No. 3, in this cause, as may remain unpaid
after the application thereto of the personal
property in the hands of such receiver, in ac-
cordance with the terms of such order, but no
resort shall be had to such real estate for the
payment of such certificates until said personal
property shall have been exhausted and so
applied. And in the event that said $10,000 of
receivers' certificates are paid out of personal
property of said Winona Technical Institute
at Indianapolis in the hands of said Receiver
then said real estate shall be subject to a charge
and lien for $2,350.28 in favor of said Charles
A. Bookwalter, Receiver, to reimburse him for
money by him as such receiver paid out for
insurance on the buildings on said real estate.

(7) That said real estate is further subject
to a charge in favor of the defendant and
cross-complainant Charles A. Bookwalter, re-
ceiver of the Winona Technical Institute at
Indianapolis, for the further sum of $4,792.74
expended in the care and preservation thereof,
as the same have been determined by the said
Marion Superior Court, room No. 3; and said
Bookwalter, receiver, is further entitled to a
charge and lien upon said real estate for the sum
of $2,685.19 paid out by said Winona Technical
Institute at Indianapolis in the payment of
street and other municipal assessments which
were a lien upon said real estate. Said real
estate is further subject to a lien and charge
in favor of said Charles A. Bookwalter, receiver,
for the sum of $6,176.13 paid out by said

Winona Technical Institute at Indianapolis for insurance on the buildings on said real estate prior to the appointment of said receiver. Said sum of $4,792.74 above is made up of the following items, towit: Salaries of watchmen, $2,067; proportion of power plant expense, $2,625.24; repairs, $100. Said real estate is subject to a further lien in favor of said receiver for $4,400 for his services and the sum of $3,000 for his attorneys, Thompson & Hayes.

(8) That said defendant and cross-complainant Charles A. Bookwalter, receiver of the Winona Technical Institute at Indianapolis, has no other right, title, or interest in, or any claim or lien upon said real estate, except as herein stated.

(9) That the cross-complainant William H. Hubbard is entitled to a lien and charge upon said real estate in the sum of $1,174.01 due to him for premiums for insurance upon the buildings thereon.

(10) That said real estate is further subject to a charge and lien for the attorneys' fees and expenses and services of the plaintiffs, as trustees, in this litigation and in the maintenance of the trust as the same may be hereafter allowed by the court.

(11) That the plaintiffs are entitled to an order and judgment of this court ascertaining and determining the character and scope of said trust and directing them as to the disposition of such trust property and to be exempted from any personal liability of any kind in connection with the property, or said trust, or with the administration of said trust.

(12) That the board of school commissioners of the city of Indianapolis is a proper trustee to execute said trust and is willing and able to do so.

(13) That the several sums herein declared liens upon and charges against said real estate shall be payable on or before August 1, 1915, with six (6) per cent. interest payable annually

thereon, but the same shall not be enforceable against said real estate by any process or writ or proceeding in law or equity until after said August 1, 1915.

(14) No party defendant or cross-complainant, nor any person similarly situated, has any right or title to, or any interest or claim or lien upon, the said real estate or any part thereof except as in these conclusions stated.

(15) That no person similarly situated to any of the persons by name made parties to this action in any of the classes mentioned in the complaint in this cause, whether he has been specifically mentioned in any of the pleadings in this cause or not, and whether he has appeared in this cause or not, has any right, title or interest in, or any lien or claims upon said real estate and all such persons shall be as fully and effectually barred and concluded by the judgment herein as they would be if they had been by name made parties to this action.

(16) That the plaintiffs should convey the said real estate to the board of school commissioners of the city of Indianapolis, as trustee, to be held in trust by it to be kept forever intact and dedicated to educational uses in the city of Indianapolis and to be forever used as a site for the purpose of maintaining, or causing to be maintained thereon such school, or schools, for the education, training and instruction of both males and females in the various manual and mechanical trades, arts and sciences, and such other educational institutions as such trustee may establish or cause to be established and maintained thereon to effectuate the trust, together with all the machinery, buildings and appliances which may be used in connection therewith, and for the furnishing of places of residence for the instructors and students in such schools and as a campus or yard, to be used in connection therewith, with a provision in said deed that the said grantee shall have no power in any manner to a lien or incumber or

creat any debt, charge or lien against said real estate, and with the further provision that in the event the said grantee should, for a period of five years from this date, fail to put in operation upon said real estate; such a school for such instruction in the mechanical trades or arts, and sciences, or in case it should at any time thereafter, for a period of twelve consecutive months, fail to maintain or cause to be maintained, thereon such a school, then its right in such real estate and its services as trustee thereof shall cease and terminate upon the decree of any court having jurisdiction of the proper parties and the subject-matter of the trust, said conveyance to said board of school commissioners to be made subject to the liens and charges herein declared against said real estate.

Appellee trustees, in their complaint, allege substantially the facts as set out in the findings of the trial court, with the exceptions hereinafter negatived, and also specifically allege "that according to the announcements made by the promoters and managers of the said Institute, both through the public press in the city of Indianapolis, and at various public meetings held in such city, the principal purpose of said institute was to be the establishment and maintenance of that branch of technical education, known as trade schools, wherein the pupils and students might be taught both theoretically and practically various trades; that the principal and main purpose in the minds of the subscribers to said fund in creating the same, and the principal inducement leading to the creation of that fund was the establishment and maintenance of such trade schools in the City of Indianapolis. * * * That these plaintiffs as such trustees are advised that they cannot with safety to themselves make any conveyance or disposition of said lands and premises, until some

court having jurisdiction of the subject-matter and of the parties, shall adjudicate the rights of the several classes of claimants, and define the duties of these plaintiffs as such trustees; that they now are and at all times have been ready and willing to fully perform all their duties as such trustees. That for their protection it is necessary that a plenary suit shall be brought to which all classes of claimants shall be made parties, to the end that they may be bound and concluded by the judgment rendered therein, in which the court can properly adjudge and determine the rights of all and singular the persons claiming or who might claim any interest in said lands and premises, or the proceeds thereof." There is no allegation that the contributors to said fund or the creditors of said institute have no right to or claim against said trust, or that appellees held said real estate as trustees of a public charitable trust, or that any other parties claimed that they so held said real estate.

The answer and cross-complaint of appellees Addison C. Harris and Robert C. Light and of Hugh J. McGowan and Delavan Smith alleged in substance the facts heretofore set out and that "a committee was appointed (being the plaintiffs in this action and called trustees), who were to have said fund when accumulated and to make the purchase of the government and take the title to the lands as the *committee and trustees of the donors.*" (Italics ours.) That "while and as the subscriptions were being taken and howsoever taken, that is to say whether upon subscription books, or upon subscription papers, prepared and used by the aforesaid subscription committee and others engaged in obtaining subscriptions, it came to be mutually understood and agreed that when the arsenal site should be purchased by the contribu-

tions made by the subscribers or donors and the title taken in the name of *their said agents or trustees*, that said land should be held by said trustees as follows: If the Winona Agricultural and Technical Institute and its officers, agents, members and friends raised the sum of $154,000.00, being a sum equal to the well known purchase price for the endowment purposes, then the trustees should convey said lands to the said Institute; but if said Institute should not become entitled to have the title to said land then the same should by said trustees be conveyed to the City of Indianapolis for educational purposes forever." This answer and cross-complaint did not allege that there was a public charitable trust created, nor that said Winona Agricultural and Technical Institute was to be trustee of said trust, but that under certain conditions "the trustees should convey said lands to said institute."

Appellants Edward C. Fletcher, Fletcher S. Hines and William E. Hayward, by their answer and cross-complaint, as subscribers and donors to the fund, for themselves and others similarly situated, set out the facts as heretofore stated, and in addition thereto allege that: "The conditions upon which the plaintiff trustees might or could have exercised the power to convey said lands to the Winona Agricultural and Technical Institute *never existed* for the reason that the organizers of said Winona Agricultural and Technical Institute *never existed* and for the reason that the organizers of said Winona Agricultural Institute never complied with the conditions upon which said Institute was entitled to receive a deed from the plaintiffs as such trustees for the purpose of maintaining such school or Institute, that each and all of the conditions upon which the plaintiffs might or could have exercised the power to convey said lands to any corporate

organization by the said promotors of said Winona
Agricultural and Technical Institute for the purpose
of establishing and maintaining a Technical Institute
or Trade School under Evangelical Christian influ-
ences or otherwise, upon said real estate, has *wholly
and utterly failed* and said power and authority, if it
ever existed, *has ended and ceased* before the be-
ginning of this action; said trustees, the plaintiffs,
now hold the legal title to said real estate and every
part thereof for the use and benefit of the several
subscribers to the fund aforesaid in the proportion
of their several and respective subscriptions and
payments to said fund, and as a trust created by
said subscriptions and payments resulting in equity
and arising by implication of law from the facts
aforesaid; and said implied or resulting trust should
be enforced and executed by a conveyance to or for
the benefit of said several subscribers in such pro-
portions, free and discharged from all claims and
demands of all the defendants other than the sub-
scribers, contributors and donors to said funds"
(Italics ours.)    That "the City of Indianapolis or
the school city of Indianapolis, has no right, title
and interest in and to said real estate; that the act
of the General Assembly of Indiana, approved Mar.
1, 1911 (Acts 1911, page 96) is void and in violation
of the Constitution of Indiana."    It is then asked
that said real estate be ordered sold by the appellee
trustees or by a commissioner to be appointed by
the court for that purpose and that the proceeds of
said sale be distributed to the contributors and
donors to said fund in proportion to their contribu-
tions and donations.

The Union National Bank, Wm. J. Richards and
other creditors of Winona Technical Institute by
their pleading contend, after a partial statement of
facts as heretofore set out, that the Winona Tech-

nical Institute was indebted to them in various sums for money loaned to it which had been used by said institute in the operation of the same, to make improvements on said real estate, to purchase equipment, and to pay the salaries of the teachers of said institute.

The board of school commissioners of the city of Indianapolis by its pleadings asserts "that as to the other facts averred   *   *   *   this defendant has not sufficient knowledge to admit or deny the same; that this defendant is the only common school corporation within the city of Indianapolis and that for common school purposes it has exclusive jurisdiction throughout the corporate limits of said city; that on the ———— of May, 1911, this defendant in a regularly and duly held meeting of its members and by the unanimous vote of all the members present, being more than a legal majority, adopted a resolution reading as follows:

" 'WHEREAS, it has come to the knowledge of the Board of School Commissioners of the City of Indianapolis that there is a desire on the part of the persons who have the right to control the disposition of the real estate, improvements, machinery, plant and all other property of the Winona Technical Institute of Indianapolis, such real estate being the east half of the northwest quarter of section number six (6) in township number fifteen (15) north, of range number four (4) east in the city of Indianapolis, in Marion County, Indiana, and being what was formerly the United States Arsenal ground, to cause all of the same to be transferred to the Board of School Commissioners of the City of Indianapolis for educational purposes; primarily for conducting thereon a trade school or schools;

" 'Now, THEREFORE, Be it Resolved that the Board of School Commissioners of the City of Indianapolis hereby expresses its willingness to

accept as a donation all of said property, subject to such just charges as shall rest thereon at the time of such donation, not exceeding Three Hundred Fifty Thousand Dollars ($350,000) but without personal covenants for payment on the part of this Board, and subject to this Board's carrying out the conditions of such donation, in respect of the conduct on said property of trade schools, to the extent that this Board is authorized by law to accept such donation and to perform such conditions; that the Board of School Commissioners is willing and offers to do as in said Resolution expressed.' ''

The appellants, contributors and donors, by their brief and oral argument herein earnestly contend that there was no public charitable trust created; that the trustees held the real estate purchased with the funds by them donated and contributed upon an incomplete and imperfectly declared executory trust for a particular object and use, which has failed; that the intended gift or trust was for a particular corporation and for a particular use and upon failure of the specific object or use for which the gift or trust was intended, whether private or charitable, the fund or property is held as a resulting trust for and reverts to the donors; that the identical rule would apply and the same results follow if the gift or trust had been fully executed and the real estate transferred to the particular corporation for the particular use on the incapacity to take, dissolution or abandonment of use, even though no provision for reversion was contained in the deed; that in such case there is no general charitable intent, and the gift or trust would be restricted to the particular corporation to be benefited as well as to the particular use; that it is a settled rule of equity that when the objects or purpose of a trust fail, or

become ineffective, a resulting trust will arise for the benefit of the grantor or devisor and his heirs; that the funds with which the trustees purchased the arsenal grounds were given for the specific purpose and use to found and endow the institute with such real estate as a site and campus and for no other purpose; that the same was an endowment and as such is protected and controlled by the provisions of §4179 Burns 1914, Acts 1891 p. 296, hereinafter set out.

It is further contended that the real estate in question could not be used to pay debts; that the decree of the lower court, as written herein, diverts the trust from its intended purpose; that the school contemplated by the donors to the fund was to be private and not public, a pay school and not free, to be supported by private endowment and not by taxation; that there were to be no free tuition or charity students; that on the facts properly or well found appellants are entitled to a reversal of the judgment with instructions to the court below to restate its conclusions of law and establish the right, title and interest of the donors or contributors in and to the trust property.

Appellant creditors insist that on the facts well found the case should be reversed and a new trial ordered or that the conclusions of law be restated to the end that their claims be established as equitable liens upon such real estate; that their rights are in no way affected whether there was or was not a public charitable trust created.

Appellees contend that the decree of the lower court is correct; that a public charitable trust was created of which the Winona Agricultural and Technical Institute was only trustee; that it is insolvent and that the board of school commissioners of the city of Indianapolis should be appointed and

is qualified to act as trustee of such public charitable trust. We have not been favored with briefs or a presentation in oral argument on behalf of the Winona Agricultural and Technical Institute or the Winona Technical Institute of Indianapolis.

The one principal question here presented for determination by this extraordinary record, as I see it, is the nature and character of the trust, if any, or the character in which appellees hold the real estate. To solve this question it is necessary to consider and determine from the evidence what facts are well found. All parties are content, as no question is raised or presented, as to the correctness of all the special findings except the eighth, tenth and twelfth. As to these it is insisted by appellants that they are not supported by the evidence and are not well found.

The fifth finding shows there were about 4,000 donors or contributors to the fund which, it is agreed, amounted to $154,000. It appears from the eighth finding that at a meeting held on January 8, 1903, when there were present a majority of appellee trustees, a majority of the members of the canvassing committee "and six or eight of the donors who had promised donations of sums ranging from 100 to 10,000 dollars and representing in the aggregate about forty or fifty thousand dollars of donations" (less than one-third of the entire amount), the resolution providing for a reversion to the city of Indianapolis of said real estate as set out in said eighth finding was adopted. The letter addressed to the subscribers, bearing date of January 13, 1903, and known as the "blue letter," requesting payment of subscriptions, did not refer to the resolution of January 8, 1903, or to any understanding that would bind the donors or sub-

scribers to the fund by which the real estate was to revert to the city of Indianapolis in any event. The fifth finding specifically shows that some of the appellants, viz., Hines, Fletcher and others, paid their subscriptions without any notice or knowledge of the resolution adopted January 8, 1903, and without any notice that such meeting was held. I am at a loss to understand upon what evidence the eighth finding of facts was based.

As to the tenth finding the first paragraph is an encomium on the probity, honesty, uprightness and business capacity of the canvassing committee, solicitors and trustees. This is not within the issues under the pleadings. The "character and reputation" of these citizens of Indianapolis is presumptively good, at least until attacked, and we find no attack in the record. As to the latter part of said finding, the record fails to disclose any evidence that the donors intended to vest the trustees with the power to select some corporation or persons to hold said real estate as a site for a national technical school, or that such trustees so understood the intention of the donors, or that the principal object and purpose in the minds of the various donors in making their subscriptions, payments and donations to said fund was the establishment and maintenance on said arsenal grounds of trade schools or the preservation of said tract intact and its permanent dedication to educational uses in the said city of Indianapolis. The form of subscriptions as set out in the fifth finding clearly shows that the subscribers made their own selection; that the fund was to be for the use and benefit of Winona Agricultural and Technical Institute. There is nothing in the evidence that refers to any power in the trustees to make any selection of "some corporation or persons" and there is nothing in any of

the subscription forms that warrants such finding. On the other hand one of such forms, as set out in the fifth finding, provides that the amount paid to said trustees was to be returned to the subscriber in case the said "technical Institute shall not be located on said arsenal site." It seems to me that the evidence clearly demonstrates that the contributors paid in money for a particular purpose and use, to purchase said real estate to be used as a site and campus of said Winona Agricultural and Technical Institute and for no other purpose, the contributors to such fund to be known as founders of the institute and a bronze tablet was to be erected with the names of some of the largest contributors. All this was in keeping with the idea that the people of Indianapolis and Indiana were to raise the money, give the foundation, and endow the school with land while the directors were to endow and manage the school thereafter. I find no evidence of a general charitable intent on the part of the contributors to dedicate the arsenal grounds and preserve the same intact for educational purposes on the failure of the Winona Agricultural and Technical Institute. It seems to me under the evidence that the contributions were made for a special purpose and a particular school or institute, and not for educational purposes generally.

The twenty-second special finding is that: "The School City of Indianapolis is ready and willing to accept the real estate in controversy in trust and establish and maintain a technical school thereon, open to all students residing in such School City and as students are admitted to other schools in said city."

The only evidence I find that in any sense would even tend to support this finding was a stipulation that the board of school commissioners is a common

school corporation of the State of Indiana and a verified copy of the proceedings of said board which is set out in the answer of said board to the cross-complaint of appellee Harris. This was in substance a resolution on the part of the board agreeing to be willing to accept all of the property in question as a donation, subject to certain conditions. This evidence does not show that said school board is ready and willing to accept said real estate in trust as a trustee, but rather tends to show the willingness of said board to accept the property as a beneficiary. Said board is authorized only to conduct common schools and there is certainly no evidence in the record before us to show that the contributors to the fund for the purchase of said real estate intended to establish or maintain a common public school. On the contrary, the evidence does show that it was the intention of such contributors to establish a national technical institute, national as to its officers, as to its instructors and as to the territory from which it should draw its students. There were to be no free tuition or charity students and the institute was to be supported by private endowment rather than by public taxation.

For the reasons above indicated I am firmly of the opinion that the eighth, tenth and twenty-second special findings are not sustained by the evidence and are in conflict with other findings which are thus supported. Under the record before us, the right and duty of this court being to ascertain and declare the justice of the case and to direct such judgment as will secure to each party his just rights, I believe the cause should be remanded with instructions. §702 Burns 1914, §660 R. S. 1881; *Bells' Admrx.* v. *Golding* (1866), 27 Ind. 173, 184; *Buchanan* v. *Milligan* (1886), 108 Ind. 433, 435, 9

N. E. 385; *McAfee* v. *Reynolds* (1891), 130 Ind. 33, 39, 28 N. E. 423, 18 L. R, A. 211, 30 Am. St. 194; *Parkison* v. *Thompson* (1904), 164 Ind. 609, 73 N. E. 109, 3 Ann. Cas. 677.

It is further contended by appellants that the court erred in its conclusions of law, separate exceptions to which were taken by each appellant, and errors thereof duly assigned to this court. While what I have heretofore said as to the findings of fact might suffice for my final conclusions, yet at the expense of being charged with repetition, because of the insistence of the very able counsel for appellees, I am inclined to go over some of the conclusions of law and compare them with the findings, if for no other purpose than to make my viewpoint clear. The first conclusion of law, in substance, is that the real estate in question is held by appellee trustees as trustees of a *public charitable trust*, the same to be forever kept intact and dedicated to educational purposes in the city of Indianapolis and to be forever used as a site for an industrial or trade school, etc. The determination of the question raised by the exceptions to this conclusion of law is the cycle around which revolve all the other questions presented, and its solution is decisive of the whole case. The question is, What was the nature of the trust, if any, intended by the contributors, not by the committee, canvassers and solicitors? Was there a *public* charitable trust created in said fund or in the real estate purchased with said fund? It should be remembered that there is no allegation in any of the pleadings to the effect that the contributors to the fund with which appellees trustees purchased said real estate created or intended to create a public charitable trust. Appellee Harris, in his answer, does allege that: "Said trustees took title

to said lands as the committee and trustees of the *donors*, and that it came to be mutually understood and agreed that when the arsenal site should be purchased by the contributions made by the subscribers or *donors* and the title taken in the name of their said *agents* and trustees, that said land should be held by said trustees as follows: If the Winona Agricultural and Technical Institute and its officers and *agents*, members and friends, raised the sum of $154,000.00 being a sum equal to the well known purchase price, for the endowment purposes, then the trustees should *convey said lands to said Institute.*" It appears from the pleadings, evidence and finding that the fund was raised for the specific purpose of purchasing said arsenal grounds as a site, campus and foundation of a great national technical institute, to be duly incorporated under the laws of Indiana. Its promotors resolved in Pittsburgh that: "We will endow and manage a technical institute in Indianapolis provided the citizens of Indianapolis and vicinity will secure for us United States Arsenal Grounds and buildings free of cost or incumbrance or provided they will secure grounds and buildings of equal suitability or value and our executive committee is empowered to make all contracts in the matter." It is found by the third special finding that, at a meeting held in Indianapolis on April 23, 1902, one Dr. Dickey appeared on behalf of said Winona Agricultural and Technical Institute and presented such resolution and the plans of the promotors to establish the proposed technical school, and there represented that men of great wealth were ready to and would establish and endow such a school if the citizens of Indianapolis would, by donations, purchase said tract of land as a site on which to establish such a school. It was then determined by those

present at the meeting *to abandon all other efforts to purchase said tract of land for other purposes,* and to unite in an effort to raise a fund with which to purchase said tract of land as a site on which such technical school might be permanently located. According to the fourth finding, the prospectus prepared for use in the canvass for subscriptions and approved by Dr. Dickey, was presented by the solicitors to each person canvassed for contribution. This prospectus was a detailed statement of plans and purposes and contained this sentence: "One thing we may assure—the men who compose the board of the Winona Agricultural and Technical Institute will be satisfied with nothing less than the best faculty that can be secured, and that we will not rely upon tuition of the students for means with which to meet the salaries of the teachers. Men who are heart and soul in this movement will provide such expenses by generous contributions. They have already taken up the work and signified their intentions, so we are not building a fabric of plans on a foundation lacking substantial qualities." This prospectus also contained the names of the gentlemen constituting the officers and directors of the Winona Agricultural and Technical Institute, and a copy of the resolution passed by those interested in raising the fund, which provided that said ground when purchased with said fund would be deeded to said institute. As will appear from the subscription forms set out in the fifth finding, some of the contributions to the trust fund were made, "in consideration of the promise of the proposed organizers of the Winona Agricultural and Technical Institute to duly incorporate the said institute under the laws of Indiana and to establish the technical department of said institute upon the United States Arsenal site at

Indianapolis, Indiana." Other subscription blanks provided that "the amount paid hereon to said trustees to be returned to the undersigned in case the said Technical Institute shall not be located on said Arsenal Site." It seems clear to me that it was the intention of all the parties that the the arsenal ground should be purchased for use as a site, campus and foundation of a great national technical institute, which was to be established thereon and richly endowed; that there was no intention of using the said fund or the real estate to be purchased therewith for any other purpose. This fact is further evidenced in the various statements and representations in the newspapers of Indianapolis and quoted by the trial court in its fourth finding of facts. It is also alleged in the answer of one of the appellees that: "It was determined to locate said technical school at Indianapolis and endow the same with a large sum, to wit, $2,000,000 and provide an annual income of at least $50,000.00 for the maintenance of the school, providing the citizens of Indianapolis would secure the said Arsenal grounds and buildings therefor free of cost or encumbrance."

The first intimation found in the record as to the creation of a public charitable trust is contained in the first conclusion of law as announced by the lower court. I find nothing in the pleadings, the evidence, or special findings that refers to a public charitable trust, in the sense that the same can be said to be affirmatively pleaded or proved. Wherever one turns—to the "Pittsburg resolutions," the statements and representations made in the course of organizing the effort to raise the funds, to the resolution adopted by those in charge of the canvass, to the prospectus used by the solicitors and given to each subscriber, to the "blue letter," to the deed

to appellee trustees, or to the agreement as to possession of the arsenal grounds—he finds it to be the intention and purpose to raise the money and place it in the hands of the trustees or agents (which was done) to purchase said arsenal grounds (which was done) for a site, campus and foundation for the Winona Agricultural and Technical Institute, upon the express understanding that said institute or the directors thereof would richly endow and forever maintain the same by private endowment (which was not done), so that it would be able to accommodate thousands of students each year from all parts of the United States without taxation to the public. Nowhere can be found an expression of any other intention or purpose. It might be proper to inquire wherein a public charitable trust is created if the institute in question was to receive no charity students or to grant no free tuition, and where the basic principle of the institution was that a student would lose his manhood or self-respect if he accepted something for nothing. There is nothing in the record that tends to support the conclusion of law that a public charitable trust was created. I have with painstaking care and attention gone over the many authorities cited by the different appellees in support of their contention that such a trust was created, but, from my viewpoint, they can have no application to the case here made. The language used by this court in *Winona Technical Institute* v. *Stolte, supra,* where it was insisted that appellant was a charitable institution and therefore not liable for the tortious acts of its servants, is applicable here. It is there said: "We cannot sanction the contention that appellant is strictly a charitable institution. As disclosed by its articles of association, the term of its existence is fixed at fifty years.

The amount of its capital stock is $100,000 divided into shares of $100 each. It charges persons who become students therein tuition, board and school fees. As said by the court in respect to Thiel College, in the case of *Thiel College* v. *County of Mercer* (1882), 101 Pa. St. 530, 533: 'What kind of a charity is that in which every one pays, either in money or work, for what he gets, whether it be food or education?' "

I believe, therefore, that it was the intention of the contributors to give a fund for the special use and benefit of the Winona Agricultural and Technical Institute; that said institute was to be duly incorporated under the laws of Indiana (which was not done); that said funds were given as and for an endowment to be used in the purchase of said arsenal grounds as a site, campus and foundation for said institute and for no other purpose.

It is shown by the fourth finding of facts that: "as ample security to the subscribers, the trustees will not only hold the collected funds but also a deed to the property until they and the subscribers are thoroughly satisfied that the school can have a sufficient inauguration and maintenance through a fixed and ample endowment." Said fund was duly raised and the arsenal property purchased therewith from the United States government, appellee trustees receiving a deed therefor in fee simple as "Trustees of the Winona Agricultural and Technical Institute Fund." Appellee trustees have never conveyed said real estate and still hold legal title to the same. On April 15, 1903, said trustees and Winona Agricultural and Technical Institute executed a certain written instrument, as set out in the twelfth finding, by virtue of which agreement said institute was put in possession of said real estate. Such agreement has remained in force and

said trustees have never authorized anyone to occupy said real estate or any part thereof under any other agreements or arrangements.

From the facts set out in the thirteenth, fourteenth and fifteenth findings of fact, it is clear that said Winona Agricultural and Technical Institute has never had any endowment subscribed and paid to it; that the school which was conducted on the arsenal ground by the said Winona Technical Institute was operated with some money collected for that purpose, but eventually with borrowed funds which now constitute a part of the debt against said Winona Technical Institute; that both the Winona Agricultural and Technical Institute and the Winona Technical Institute are, and long since have been, wholly insolvent.

The next question to be determined is, What are the rights at this time of the contributors to the original purchase fund, and what are the rights, if any, of the creditors of the Winona Technical Institute? From what has been said heretofore it is clear that the school or institute, which it was the intention to create, should receive its site or location from the contributors to the purchase fund and should then receive from the Winona Agricultural and Technical Institute a further endowment of not less than $2,000,000. The contributors or donors to the original fund fully performed their part and supplied the amount necessary to purchase the arsenal grounds and acquire the title thereto. The Winona Agricultural and Technical Institute, on the other hand, failed to furnish any endowment, or otherwise to fulfill the promises which constituted the inducement for the subscription of the original purchase fund. I am of the opinion that the intended endowment for the use and benefit of the Winona Agricultural and Tech-

nical Institute was never perfected and that it was never entitled to receive a deed from the trustees to said real estate. I believe also that a trust in said real estate arises by implication of law in favor of the contributors and donors in proportion to their several contributions and donations.

The decree appealed from attempts to divert the real estate purchased with the contributed funds to another and different purpose on failure of the Winona Agricultural and Technical Institute, that is, from a private institute to a public school, from a national private educational institution, supported by private endowment, to a local common public school supported by taxation. To test the soundness of this decree it might be well to reverse the proposition, as was done in an inquiry propounded to appellees' counsel by a member of this court during the oral argument herein. Suppose the contributors had failed to raise the original purchase fund of $154,000 and the Winona Agricultural and Technical Institute had raised the $2,000,000 endowment, could a court of equity reasonably decree that there was a public charitable trust created and order the $2,000,000 turned over to the board of school commissioners of the city of Indianapolis? The answer must be, as made by appellees' learned counsel, in the negative. I can find no reasonable basis for the decree as written.

It is a settled rule in equity that when the object or purpose of a trust fails, or does not become effective, a resulting trust will arise for the benefit of the donor or his heirs, and the property will revert to them. Such property cannot be diverted to a similar use when the original grant or gift was made to an express and specific use which has failed. Appellees insist that no provision for a reversion was made in this case; that there were "no strings

attached to said subscriptions"; that "the contributors gave their money freely and never expected to have it returned," and, therefore, on failure of the original purpose or intention, the property will not revert to the contributors but may be used and controlled by the court for a similar purpose. The very reasons advanced by appellees to prevent the property from reverting to the contributors and donors are good and valid reasons why it should revert to them on failure of the purpose for which it was given, namely, to purchase the arsenal grounds as a site, campus and foundation for a national institute of education. This was the ambition of the donors, the hope and expectation that such institute would succeed. There was no thought that their contributions would be returned because it was expected that the institute would have a large and ample endowment, sufficient always to maintain it. In this, these generous public-spirited donors were disappointed, but through no fault of theirs. Now some disposition of the property must be made and equity— because of the generosity and liberality of the contributors and because no other person, or persons, has any right to take or have such property— raises a resulting trust in their favor, in proportion to their contributions and donations. It might be well to say in this connection that if property which is given to an institution for a specific purpose may, by judicial decree, be diverted to a different use and purpose, not intended by the donors, then no foundation or endowment would be secure, but might be directed to a use which would contravene and defeat the very purpose for which it was given.

In *Hopkins* v. *Grimshaw* (1897), 165 U. S. 342, 353, 17 Sup. Ct. 401, 405, 41 L. Ed. 739, the court said: "If it be assumed, however, as most favorable

to the defendant, that this deed created a charitable trust, it was not a grant indicating a general charitable purpose and pointing out the mode of carrying that purpose into effect, thus coming within,the class of cases in which courts of chancery, when the particular mode had failed, have carried out the general purpose. (Citing authorities.) But the trust was restricted, in plain and unequivocal terms, *to the particular society to be benefited*, as well as to the purpose of a burial ground, adding (as if to put the matter beyond doubt) 'and for no other purpose whatever.' The trust would end, therefore, at the latest, when the land ceased to be used as a burial ground and the society was dissolved." (Our italics.)

In *Jenkins* v. *Jenkins University, supra*, the court says: "Here was an entire abandonment of the purposes of the trust, and apparently of the property, by the appellant, and the respondent's inquiry is a pertinent one, that if the land does not revert, what is to become of it? It cannot be taken to satisfy the debts contracted, with the exception of that part which was authorized to be mortgaged, and *it could not be devoted to another like charitable purpose, the specific one having failed,* as is sometimes done in the case of a devise. If the plaintiff is not entitled to a reversion of the property under such circumstances, who is to have it? The authorities generally agree that it is not essential that such a deed shall contain a clause providing for a reversion, and, while it is to be construed against the grantor, it must not be construed so strongly as to make it impossible to have a reversion where none is expressly provided for in terms. It seems to us, considering all the facts and the terms of the gift, that the plaintiff is entitled to a reversion, and, even if the deed had contained an express

-condition to that effect, it could have made the case little, if any, stronger." (Our italics.)

The decision in the case of *Heiskell* v. *Trout* (1888), 31 W. Va. 810, 8 S. E. 557, is thus clearly expressed in the syllabus: "Where real estate purchased with money contributed by individuals is by their direction conveyed by the vendor to trustees, to be held upon trust for a parsonage for the use of the ministers of a church, and after the property has been so used for many years the trust is declared inoperative and void for uncertainty—Held—(1) The property does not revert to the grantor; nor can the grantees hold it for their own personal use and benefit. (2) The individuals, who contributed the purchase-money, are by resulting trust in their favor the beneficial owners of the property and have a right in equity to have the property sold, and the proceeds paid to them in proportion to the sum contributed by each to the purchase-money. (3) The property having been held by the trustees not for the use of themselves but for the use of the church, which is incapable of taking or acquiring title to it, no lapse of time however long continued will bar the right of the beneficial owners to said property." Other cases which sustain the same conclusion are as follows: *Teele, Trustee*, v. *Bishop of Derry* (1897), 168 Mass. 341, 47 N. E. 422; *Bowden* v. *Brown* (1908), 200 Mass. 269, 86 N. E. 351, 128 Am. St. 419; *Allen* v. *Nasson Institute* (1910), 107 Me. 120, 77 Atl. 638; *Grundy, Trustee*, v. *Neal* (1912), 147 Ky. 729, 145 S. W. 401; *Printing House* v. *Trustees* (1881), 104 U. S. 711, 727, 26 L. Ed. 902.

In Indiana this general rule of equity has been made statutory and applies where property, real or personal, is given as an endowment. Section 4179 Burns 1914, *supra*, provides that "If any university, college or seminary of learning owning

property, real or personal, which it may have obtained by gift, devise or grant for an endowment, shall be abandoned and cease to exist as such university, college or seminary of learning, such property shall revert to the donor or donors or to his, her, or their heirs."

This being the rule in cases where the endowment has actually been paid to the school or college in question, there could be no different rule where the property intended to be given as an endowment was still in the hands of agents and had not been delivered for the reason that the beneficiary was not entitled to receive it. Appellees contend that the above statute has no application to institutions of learning of the character contemplated by the Winona Agricultural and Technical Institute, not organized under the act of which §4179, *supra,* is a part. I deem it unnecessary to pass on this point for the reason that, as has already been seen, that statute merely incorporates within its provisions a proposition, general and well established, which is broad enough to cover the case at bar.

For whom were appellees acting when they received the funds and transferred them to the United States, receiving therefore a deed to the arsenal property? Clearly they were acting as agents for the contributors and donors whose purpose it was to endow the Winona Agricultural and Technical Institute with the arsenal grounds as a site for the proposed school. Said institute never complied with the conditions demanded of it as prerequisite to a transfer of the property to it and the so-called trustees must necessarily hold the property at the present time as agents for the original contributors and donors. Even if properly incorporated, the Winona Agricultural and Technical Institute, on its failure, would have no right

to transfer and deliver to another school or corporation property which it had received for a specific use or purpose. On its failure to exist the property in question would revert to the donors or heirs.

However, it must be borne in mind that the donors and contributors of the original purchase fund did not seek to avail themselves of their right to prevent the use of the arsenal property by the Agricultural and Technical Institute before it was properly entitled thereto and the record discloses that possession of such real estate was delivered to representatives of said institute on April 15, 1903, under the agreement set out in the twelfth special finding. The record further discloses that in the fall of 1903 a school consisting of two or three departments was opened on the premises and there operated by the so-called Winona Agricultural and Technical Institute until April, 1904, when the so-called Winona Technical Institute at Indianapolis, by Dr. S. C. Dickey, its president, assumed control and management of said school and conducted the same until a receiver was appointed for said institute and school on March 28, 1910. At the beginning of the school year in 1904, additional departments were added to the school, the faculty was enlarged and certain repairs and improvements on the buildings and equipment were made thereafter from time to time. The twentieth finding of fact sets out the several amounts due appellant creditors and finds that said amounts are due for "money furnished and loaned or goods and merchandise supplied to said defendant the Winona Technical Institute at Indianapolis, at its special instance and request; that the same was reasonably necessary for the establishment, maintenance and equipment of said technical or trade school and

used for that purpose." It does not appear that any of the contributors made any objection or protest to the use of the arsenal grounds by the Winona Technical Institute, while, on the other hand, it does appear that many of the contributors to the fund with which the site was purchased actively supported the school and contributed to its running expenses; that some one or more of such contributors were trustees of the Winona Technical Institute. Under these facts appellant creditors seriously contend that the contributors and donors are estopped in equity to deny the equitable rights of the creditors to a lien on the real estate for the money and material furnished and used in the operation of said school; that the rights of said creditors are superior to those of the donors. Appellant contributors deny the correctness of this contention. We have already seen that, had the contributors been diligent and availed themselves of their right to prevent the use and improvement of said arsenal site by the Technical Institute, they might have done so, and a different question would then have been presented. It is agreed that the property is now of a value of $500,000, more than sufficient to pay all of the claims of creditors in full, amounting with interest to about $300,000, and also return to the contributors the full amount of their subscriptions. Under the facts as above stated, I believe that, the contributors having stood by and permitted the use of said property by the Winona Technical Institute and its improvement thereof, they are now estopped from asserting that appellant creditors have no right in and to said property. As is said in *Anderson* v. *Hubble* (1884), 93 Ind. 570, 576, 47 Am. Rep. 394: "It is not necessary in order to the existence of an equitable estoppel that there should exist a design to deceive or de-

fraud. The person against whom the estoppel is asserted must, by his silence or his representations, have created a belief of the existence of a state of facts which it would be unconscionable to deny; but it is not essential that he should have been guilty of positive fraud in his previous conduct." In *Farmers' Bank* v. *Orr* (1900), 25 Ind. App. 71, 86, 55 N. E. 35, 40, this language is used: "Admissions, in this connection, are but representations, and as silence, where it is the duty of the party to speak, is equivalent to concealment, and these constitute the first element of estoppel, it follows, both by reason and analogy, that a party may be estopped by conduct where such conduct leads another to act or to refrain from acting, to his detriment. * * * It has been held that a party may be concluded by inferences which naturally arise from his conduct as well as express words." Speaking of the doctrine of estoppel *in pais* in the case of *Morgan* v. *Railroad Co.* (1877), 96 U. S. 716, 720, 74 L. Ed. 743, the United States Supreme Court uses this language: "The principle is an important one in the administration of the law. It not unfrequently gives triumph to right and justice where nothing else could save them from defeat. It proceeds upon the ground that he who has been silent as to his alleged rights when he ought in good faith to have spoken, shall not be heard to speak when he ought to be silent."

It seems to me that it would be fair and equitable to return to the donors or their heirs the full amount of their contributions and then to pay to the creditors their just claims created in the conduct of said school. Such balance as remains should then be distributed among the original contributors or their heirs in proportion to the amounts of such

original subscriptions, except as to the $6,000 of subscriptions which were assigned.

Appellant contributors admit that the facts stated in the nineteenth finding are correctly found, but insist that the sixth and seventh conclusions of law are not justified by the facts; that the receiver's certificates and the allowances made to such receiver and to his atorneys do not create a charge on the real estate in question for the reasons that such receiver was appointed in another and different cause, and would have no right to ask for and obtain an order in this cause authorizing the issuance of receiver's certificates for the purpose of raising funds with which to carry on said school. The finding shows that there was in the hands of the receiver personal property of the Technical Institute of the value of $45,000; that at the time the order was made directing the issuance and sale of receiver's certificates the only notice given was to one of the appellees herein; that only six of the thousands of persons who contributed to the original purchase fund entered any appearance to the petition asking for such order; that there is no pleading or evidence in this case to justify the decree that the receiver be allowed $4,400 for his services as receiver and $3,000 as fees for his attorneys; that, if said receiver and his attorneys are entitled to the compensation named for services rendered, such allowances should be made in the cause in which such receiver was appointed and by the court wherein such receivership is pending, and therein that such allowances should be declared a first lien on the property in the hands of the receiver. In this contention appellants are correct.

The same appellants contend further that the allowances made to appellees' so-called trustees and to their attorneys for their expenses and services in the

maintenance of the trust "was made without any warrant or authority in the pleadings, evidence or findings, and was made after the findings of fact and conclusions of law had been made and filed and therefore said allowance and the judgment and decree in accordance therewith are wholly unauthorized and erroneous." I cannot subscribe to this view. The so-called trustees were the agents of the contributors. They received the deed to the real estate as such and held the title thereto from 1903 until the present time. They maintained the so-called trust and brought this action to have their trusteeship judicially determined. They have prepared and presented able and exhaustive briefs and arguments which have been of great aid to this court in its effort to determine the rights of all the parties, and we should conclude that it was not only within the power of the court to make an allowance for the services rendered, but it was its duty so to do. If such allowance was not made before the special findings of fact and conclusions of law were filed, then it was right and proper that it should be made thereafter on proper presentation before final disposition of the cause.

It should be kept in mind all through this case that this is an action in equity in which the will of the chancellor should be guided solely by the considerations of conscience. If great numbers of philanthropic citizens who have subscribed their funds for a specific purpose are to have the same diverted by judicial decree, and are to have the benefits thereof gratuitously conferred on the school city of Indianapolis—a result which could not have been within contemplation of the wildest speculative imagination when the gifts were made—and if the use of such valuable properties as the grounds herein mentioned and the improvements which have

been made and maintained thereon with the money of the creditors, all of which is admitted to be worth more than a million dollars at this time, is to be freely given for another purpose under the doctrine of *cy pres*, newly invoked in Indiana as to contracts, in the majority opinion herein, then justice is blind indeed, and the conscience of the chancellor is so sordidly dulled as to fail to conceive and respond to the prayer of equity.

In my opinion the judgment of the Hendricks Circuit Court should be reversed with instructions to restate its conclusions of law and to render such judgment thereon as should secure to the several appellants herein their respective rights.

## DISSENTING OPINION.

ERWIN, J.—I find myself unable to agree with the majority opinion in this cause. In the first place, the findings of the court fall far short of finding that any trust for a charitable use was ever created. The statutes of this State provide how a trust in real estate may be created, and is as follows: "No trust concerning lands, except such as may arise by implication of law, shall be created, unless in writing, signed by the party creating the same, or by his attorney thereto lawfully authorized in writing." §4012 Burns 1914, §2969 R. S. 1881. There is also a provision of the statute that, "Nothing contained in any law of this state shall be construed to prevent any trust from arising or being extinguished by implication of law." §7466 Burns 1914, §4907 R. S. 1881. If, therefore, a trust in the real estate in question has been created in favor of appellees, it is by reason of the section of the statute first quoted, *supra*, or else it is one which arises by implication of law.

The only parties to this transaction who could

create an express trust in this land are the subscribers to the fund with which it was purchased, or their authorized attorney, and then only in writing signed by the parties. The only writings to which the donors of the fund ever subscribed are the two subscription papers and the "blue letter," if that can be said to be a part of the writings of the donors.

This court is in error in holding that it is now too late to object to parol testimony in support of the court's findings. In the opinion of the writer, where a statute makes provision as to how a trust shall be created, it is immaterial what evidence may have been introduced by any or all of the parties to the litigation; unless there be some evidence of the creation of the trust in the manner provided by statute, none was, in fact, created.

The writings on which the trust for a charitable use was created, if at all, are the following:

"Winona Agricultural and Technical Institute,
Indianapolis, Indiana,————————1902.

"In consideration of the promise of the proposed organizers of the Winona Agricultural and Technical Institute to duly incorporate said institute under the laws of Indiana and to establish the technical department of said institute upon the United States Arsenal site at Indianapolis, Indiana, if the amount hereinafter mentioned, by subscription included, shall be subscribed thereto and said arsenal site can be purchased, I promise upon demand to pay to Medford B. Wilson, John Perrin, Charles Latham, A. A. Barnes and Frank E. Gavin, Trustees, or their successors or order, the sum of ————— dollars, to be used in the purchase of said arsenal site for said Winona Institute's technical department and the establishment of said department, provided that this subscription is subject to the condition that, valid bona fide

subscriptions of like purport with this sub-
scription to the amount of $150,000.00 shall have
been made, and provided further that the sum
by me hereby subscribed shall not be demanded
or payable until such aggregate amount shall
have been subscribed.

————————————————,"

"Technical Institute Fund.
Indianapolis, Indiana,——————, 1903.
"I promise to pay upon demand to Medford
B. Wilson, John Perrin, Charles Latham, A. A.
Barnes and Frank E. Gavin, Trustees, or their
successors or order the sum of ——————————
dollars for the purpose of the purchase of the
Arsenal site for the Technical Institute (the
amount paid hereon to said trustees to be re-
turned to the undersigned in case the said
Technical Institute shall not be located on said
Arsenal Site.

————————————————.)

"Indianapolis, Indiana, January 13, 1903.
"Dear Sir—
The undersigned trustees for the Technical
Institute fund hereby inform you that valid and
bona fide subscriptions to the full amount of
$150,000.00 has been secured for the purpose
of the Arsenal Site from the Government for
the purpose of establishment of the proposed
Technical Institute thereon.
"That the object may be certainly fulfilled it
has been determined by your trustees and agreed
to by the representatives of the Institute that
the deed of conveyance to the Institute limit
the property and all its proceeds to educational
uses in the City of Indianapolis, and the deed to
the Arsenal Site property shall not be delivered
by the Trustees to the Institute corporation
until it shall have in cash or bona fide collectible
subscriptions a sum at least equal to the pur-
chase price of the real estate. In order, there-
fore, that the Trustees may be in possession to
promptly submit their offer for the property,
you are kindly requested to co-operate by mak-

ing immediate payment of your subscription at the bank designated in the enclosed notice.
"Yours truly,

MEDFORD B. WILSON,
JOHN PERRIN,
A. A. BARNES,
CHARLES LATHAM,
FRANK E. GAVIN,
Trustees."

On these instruments of writing signed by those creating the trust, the donors, this trust must have been created, or not at all. The authorities cited in the majority opinion authorizing the admission of parol evidence to ascertain the intent and purpose of making a subscription never held that it could be shown by parol that a trust was created in lands, when a positive statute prohibited it being so created. This court, in an opinion by Mitchell, J., has said how a trust is created. The language of the court is as follows: "A trust may be said to be executed when it has been perfectly and explicitly declared *in a writing duly signed*, in which the terms and conditions upon which the legal title to the trust estate has been conveyed, or is held, and the final intention of the creator of the trust in respect thereto, appear with such certainty that nothing remains to be done, except that the trustee, without any further act or appointment from the settlor, carry into effect the intention of the donor as declared." *Gaylord* v. *City of Lafayette* (1888), 115 Ind. 423, 429, 17 N. E. 899, 902. Quoting further from the same decision as to the question whether the deed under consideration was sufficient and effectual as the declaration of a perfectly created trust, Mitchell, J., says: "Pertinent to the first point, it may be said, if the transaction created a trust, since the subject-matter thereof was land, it was essential to its validity that it should have been

created or declared in conformity with section 2969 R. S. 1881 * * * ." This is §4012 Burns 1914, *supra*. In the case of *Ransdel* v. *Moore, supra*, cited in the majority opinion, the trust was created by a written agreement and the court there holds that the same may be established by any *writing containing the necessary facts*, but does not hold that it may be established by parol. All that it does hold is that the *consideration* of an express trust need not be set forth in writing, but may be proven by oral testimony.

Considering these two subscriptions, the "blue letter" and the deed from the government, which contain all the writings signed by any of the parties to the controversy, yet in none of these is there even a hint at the creation of a trust for a charitable use. It is immaterial what may have been said or done in relation to the subscription to the fund, or what their intentions were in paying the money. The question here is, Was there an express trust created according to law in the lands in controversy? To create an express trust various combinations of elements have been held to be essential, the most common being: sufficient words to create it; a definite subject; and a certain and ascertained object. Considered from the standpoint of parties, an express trust implies a co-operation of three persons: A settlor, or a person who creates or establishes the trust; a trustee, or person who holds the legal title to the trust property for the benefit of another; and a *cestui que* trust, or person for whose benefit the trust is created. 39 Cyc 34, 35.

As said in the majority opinion, "If there is any competent *written evidence* that the person holding the legal title is only a trustee that will open the door for the admission of parol evidence to explain the position of the parties," citing 1 Perry, Trusts

(6th ed.) §82. This authority requires that there first be evidence in *writing* of the trust.

It has been repeatedly held by this and the Appellate Court that a trust in real estate cannot be created by parol testimony.

The title to the lands in controversy is either in the contributors to the fund or in appellees as trustees for the contributors upon a resulting or constructive trust. The subscribers were not bound to complete the gift by transfer of the money, or the land purchased therewith, and the trustees had no power to do so after the failure of the Winona people to incorporate, establish and endow the institute, and after they had abandoned the object for which the subscriptions were made, even if that object was held to be charitable. *Commercial Travelers' Home Assn., etc.* v. *McNamara, supra; Larrimer* v. *Murphy* (1904), 72 Ark. 552, 82 S. W. 168; *Heiskell* v. *Trout, supra; Printing House* v. *Trustees, supra; First Church, etc.* v. *Schreck* (1911), 70 Misc. Rep. 645, 127 N. Y. Sup. 174; *Bowden* v. *Brown, supra*.

If a trust was created it would imply a settlor, the subscribers; a trustee, Gavin, *et al.*; and a *cestui que trust*—who? This latter element was to be the Winona people, on condition that they complied with certain terms and conditions which they failed to fulfill; hence, we have an absence of an essential element to constitute a trust at all, either charitable or otherwise. That a trust in the lands in question was created is not to be measured by evidence, although admitted without objection, that does not create, according to the requirements of the statute governing the subject. Suppose a suit to compel the execution of a deed was instituted against a wife who had contracted to convey, without her husband joining in the deed,

and it was proven by parol that the husband had given his consent to the wife's conveyance, and this evidence had been introduced without objection? Could this be said to be binding on either when an express statute provides that a conveyance by the wife without the husband joining therein is void? This question has been expressly settled by this court, and held that an interest in lands can only be conveyed according to the terms of the statute. *Knepper* v. *Eggiman* (1911), 177 Ind. 56, 63, 97 N. E. 161. The failure to object to parol testimony does not and can not waive the requirements of the statute. That the subscribers contemplated the creation of a trust and not a gift, not being shown by the writings, it could not be shown by parol, and hence what their intentions were at the time of signing the subscription papers, not expressed therein, could have no force or effect in creating the trust. The majority opinion answers its own argument when it says, "No particular formality is required, or is necessary in the creation of a trust. Any agreement or contract in *writing* made by the person having the power of disposal over property, whereby such person agrees, or directs that a certain fund or particular parcel of property shall be held or dealt with for the benefit of others, in a court of equity, raises a trust in favor of such others against the person making such agreement."

In my humble opinion the tenth finding is unsupported by any legitimate evidence showing the creation of an express trust in conformity with §4012 Burns 1914, *supra.* In all the exhibits introduced there are none which provided for an absolute transfer of the property to the Winona people until they had complied with certain specified conditions. They failed to meet these condi-

tions; hence, the subscribers or their ,agents, appellees, the so-called trustees, were justified in not placing the legal title in them. As no other *cestui que trust* was provided for, no other could claim an interest in the land. In all trusts the trustees hold the legal title and the *cestui que trust* hold the equitable title. On this principle must the question of whether a trust was created be decided. If there be no *cestui que trust* to take the equitable title no trust was, or could be created. The majority opinion says that: "There is no doubt from all this (statements of Dickey) and other evidence that the donors * * * had it in mind that, when the legal title to the land in question should be bestowed on the proposed corporation, it should be coupled with a limitation of the use for educational purposes." It is immaterial what the donors had in mind so long as it was not reduced to writing. The majority opinion admits that the writings are insufficient to create a trust in favor of any person or persons by the statement, "From these circumstances in connection with the incompleteness and indefiniteness of the subscription paper the court properly found the inferential fact involved in the tenth finding." This indefiniteness in the writing, as held by the majority opinion, leaves the trust incomplete and uncertain, but it holds that it is certain that none was created in favor of the Winona people. If none was created in their favor, none was created in favor of any one, and the best that can be said is that they were making an effort to create one, but it remained incomplete and executory and a court of equity has no power to complete it. As was said by Mitchell, J., in *Gaylord* v. *City of Lafayette*, *supra*, on page 429: "Where, however, property has been conveyed upon a trust, the precise nature of which is imperfectly declared, or where the donor

reserves the right to define or appoint the trust
estate more particularly, although it may be ap-
parent that the creator of the trust has, in a general
way, manifested his purpose ultimately, at a time
and in a manner thereafter to be determined, either
by himself or by the trustee, to bestow the property
upon a person named, the trust is incomplete and
executory, and not within the jurisdiction of a court
of chancery, the rule being that courts of equity
will not aid a volunteer to carry into effect an im-
perfect gift or an executory trust. *Adamson* v.
*Lamb*, 3 Blackf. 446; *Harman* v. *James*, 7 Ind. 263;
*Dillon* v. *Coppin*, 4 Mylne & C. 647; *Colyear* v.
*Mulgrave*, 2 Keen, 81 (97); *Edwards* v. *Jones*, 1
Mylne & C. 226; 2 Story Eq. Jur. 793b; 2 Pom. Eq.
Jur., section 1001." See, also, 2 Pomeroy, Eq. Jur.
§1009, note 1; *Heiskell* v. *Trout*, *supra; Christian* v.
*Highland, Admr.* (1903), 32 Ind. App. 104, 109, 69 N.
E. 266. In the case last cited the court, on page
109 says: "It is not enough for the deed of con-
veyance by which it is proposed to create a trust
that it shall merely indicate an intention of the
parties thereto to create some sort of a trust. The
trust must be expressed in the instrument, or by
reference therein to some other *writing*, so that the
court which is called upon to enforce it as an express
trust may ascertain, *without resort to parol evidence*
the character of the trust. To this end a beneficiary
should be named or indicated." (Our italics.)
Quoting further: "It may be claimed, plausibly,
that there is indication in the writing that the
grantee was not to hold absolutely for his own
benefit alone, for in such case the words "in trust"
would be wholly superflous; yet there can not be
said to have been more than the ineffectual expres-
sion of a desire to create a trust, inasmuch as the
writing by which an express trust is created must

contain a proper and sufficient declaration of the trust, and not stop short with the designation of a trustee.   See *Dillaye* v. *Greenough*, 45 N. Y. 438."

The donors in this case never completed the trust.  ·They manifested a purpose ultimately, at a time and in a manner thereafter to be determined, either by themselves or by their agents, appellees, to bestow the property upon the Winona Agricultural and Technical Institute; therefore, the trust was executory and incomplete and not within the jurisdiction of a court of chancery, and equity will not aid in carrying it into effect whether the intended gift or trust was for private or charitable use.  *Gaylord* v. *City of Lafayette, supra; Wright, Gdn.,* v. *Moody* (1888), 116 Ind. 175, and cases cited on page 179, 18 N. E. 608; *Stone* v. *Hackett* (1858), 12 Gray (Mass.) 227, 230; *Welsh* v. *Henshaw* (1898), 170 Mass. 409, 413; *Milroy* v. *Lord* (1862), 4 DeGex, F. & J. 263, 274; *Dipple* v. *Corles* (1853), 11 Hare 183; *Richards* v. *Delbridge* (1874), L. R. 18 Eq. 11; *Young* v. *Young* (1880), 80 N. Y. 422, 437, 438, 36 Am. Rep. 634; *Cowan* v. *Wheeler* (1845), 25 Me. 267, 43 Am. Dec. 283; *Steere* v. *Steere* (1820), 5 Johns, Ch. (N. Y.) 1, 9 Am. Dec. 256; *Orth* v. *Orth* (1896), 145 Ind. 184, 42 N. E. 277, 44 N. E. 17, 32 L. R. A. 298, 57 Am. St. 185; *Bennett* v. *Littlefield* (1901), 177 Mass. 294, 58 N. E. 1011; *Ould* v. *Washington Hospital, supra;* 1 Perry, Trusts §§357, 359.

In the case of *Wright, Gdn.,* v. *Moody, supra,* Mitchell, J., on page 179 says:  "Where, however, the owner of real estate, without contemporaneously declaring a valid trust, makes a voluntary conveyance to another in pursuance of an *oral or imperfect* agreement that the later shall reconvey to the owner, who orally agrees to hold for the benefit of, or convey to, some third person, upon whom the

owner desires to confer the property as a gift, there arises no resulting trust enforceable by the proposed donee. In such a case, *until the gift is fully executed and the possession surrendered, the property remains within the direction and under the dominion and control of the beneficial owner.*" (Our italics.)

If the trust were created as claimed by appellees why appeal to a court of chancery to ascertain their rights and duties? The fact that they held the legal title to the property (and they took it by virtue of an election by the subscribers of them as agents) without any definite directions in any of the writings as to their duties, except to turn it over to the Winona people, is evidence sufficient to establish the fact that no express trust was created. "A trust and a trustee of real property may be created by any *writing* which passes the legal title to the trustees, and contains a proper declaration of the trust, (Hill on Trustees p. 63-4). But the writing must declare what the trust is." *Dillaye* v. *Greenough, supra.* Quoting further from this same opinion, "A trust must be manifested and proved by *writing*, and the nature of the trust, and the terms and conditions of it must sufficiently appear, so that the court may not be called upon to execute the trust in a manner different from that intended. * * * But it is sufficient to say that the terms and conditions of the trust must be expressed in *writing*." It is not enough to say that the trust was created in the money when paid to appellees and that it continued into the real estate. The purpose of the subscriptions was to buy the real estate, and the question here is the title to the same.

It is not contended that appellees own the land in question in fee. These men are but the agents of the subscribers and hold title for them in carrying into effect the proposed purchase of the arsenal

grounds and giving the same to the Winona Agricultural and Technical Institute. They were not the trustees of an express trust for none was expressed. The nearest any of the writings come to creating the trust, and the only one designated, is that appellees were authorized to buy the lands with the funds subscribed and to turn it over to the Winona people. There is a wide distinction between "trustee" and "agent." An agent represents and acts for his principal. A trustee is defined generally as a person in whom some estate, interest or power in or affecting property is vested for the benefit of another. Mechem, Agency §42; *Taylor* v. *Davis* (1883), 110 U. S. 330, 334, 4 Sup. Ct. 147, 28 L. Ed. 163. Agency is often said to be a relation of trust and confidence, and that property in the hands of an agent is often held to be impressed with a trust for the benefit of the principal, yet the two relations are not identical. A trustee holds a legal title; the agent has usually no title at all. The trustee acts in his own name; the agent acts regularly in the name of his principal. A trust does not necessarily, or even usually, involve any authority to enter into contracts which shall bind another; the authority to make such contracts is the distinguishing characteristic of agency. Trusts are usually not revocable; agency usually is revocable. Mechem, Agency §42; *Flaherty* v. *O'Connor* (1903), 24 R. I. 587, 54 Atl. 376; *Lyle* v. *Burke* (1879), 40 Mich. 499; *Kraft* v. *Neuffer* (1902), 202 Pa. St. 558, 52 Atl. 100; *Sessions* v. *Moseley* (1849), 4 Cush. (Mass.) 87, 92; *Grover* v. *Grover* (1837), 24 Pick. (Mass.) 261, 35 Am. Dec. 319; *Thompson* v. *Dorsey* (1853), 4 Md. Ch. 149; *Wells* v. *Collins* (1889), 5 L. R. A. 531, 74 Wis. 341, 43 N. W. 160, and notes.

If appellees were trustees, their powers and duties

were determined by the writings creating them trustees, and they needed no direction from a court of chancery. The fact that they went into court asking that their duties be declared was an admission that they were vested with no power as trustees. Courts of chancery do not create trusts. It is their duty to enforce them.

It is conceded by the majority opinion that, if it had been impossible to purchase the arsenal grounds from the government, the donors would have been entitled to a return of the money. I am unable to distinguish between the right to a return of the money and a restoration to the donors of that represented by the money which purchased it, viz., the real estate. But I take it that this is an argument in favor of the proposition that, if from any cause the trust failed of consummation, the donors were entitled to the money or land purchased with the money. It seems to me that a court of chancery would have the same right to direct that the money paid by the donors should be taken and applied to educational purposes in Indianapolis as it would to take the real estate.

The *cy pres* doctrine has no application to this case. This doctrine has only to do with trusts that are created and need only to be administered, and does not authorize a court of chancery to create a trust in conformity with what the chancellor may gather from oral testimony was the intention of the donors, when they signed the subscription. But nevertheless it is conceded that, if another trustee could not be found to administer the trust in accordance with the trust instrument, the money should revert to the donors. It is contended by the majority opinion that the *cy pres* doctrine is in effect and authorizes a court of equity to supply what is lacking in this contract to effectuate a trust. *Cy*

*pres* is defined as follows: "The rule of construction applied to a will (but not to a deed) by which, where the testator evinces a *general intention* to be carried into effect in a particular mode which cannot be followed, the words shall be so construed as to give effect to the general intention." 1 Bouvier, Law Dictionary 489 (Rawle's [3d ed.] 745) and authorities cited. In this state this doctrine can be used only to construe a will for the purpose of effectuating the *express intent* of the devisor. *Grimes' Executors* v. *Harmon* (1871), 35 Ind. 198, 9 Am. Rep. 690; *Erskine* v. *Whitehead, supra.* In this case there was in none of the writings any express intent to create a public charitable use, but, on the other hand, there was expressed an intent to purchase the land in question for a certain and definite purpose, and that to found a national school of technology, to which should be admitted scholars from the whole world. This expressed intent having failed the property reverts to the original donors. *Teele, Trustee* v. *Bishop of Derry, supra; Hopkins* v. *Grimshaw, supra; Bowden* v. *Brown, supra; Harris* v. *Neal* (1906), 61 W. Va. 1, 55 S. E. 740; *Brown* v. *Condit* (1908), 70 N. J. Eq. 440, 61 Atl. 1055; *Allen* v. *Nasson Institute, supra; Jenkins* v. *Jenkins University, supra; Provost, etc., of Dumfries* v. *Abercrombie* (1876), 46 Md. 172; *Board of Education, etc.* v. *Edson* (1868), 18 Ohio 221, 98 Am. Dec. 114. *Cy pres* has no application to gifts or trusts *inter vivos* and is applicable, if at all, in this State to wills. This is because, if a person be living and has not sufficiently expressed his intention, or the object of his bounty (as in this case the Winona people) fails, he may re-express his intention or select a new object. No application of the doctrine of *cy pres* as a rule of construction, were it not limited to wills, could be made to the subscription papers,

and including the "blue letter," which would justify a finding of facts which would support conclusions of law Nos. 1 and 16. None of the objects, features and conditions expressed in these conclusions are in ·equivalent terms expressed in the subscription papers or in the "blue letter." *Teele, Trustee v. Bishop of Derry, supra; Hopkins v. Grimshaw, supra; Brown v. Condit, supra.* And no application of the doctrine of *cy pres*, even as a prerogative power, could be made to the subscription papers, including the "blue letter," which would justify a finding of fact that would support conclusions of law Nos. 1 and 16, in so far as they relate to the mode for obtaining the particular object intended by the donors as expressed in the subscription papers and the "blue letter." The mode intended was through the particular institution organized by the men of great wealth and influence, to be endowed with millions of dollars, and thereby established with a secured income from endowment, the school to be of a specific character and administered as had been outlined by the proposed incorporators, etc. The contributors contemplated a specific mode of administration. The mode of obtaining the object was of the substance of the gift, and in such case the doctrine of *cy pres*, even as a prerogative power, did not apply. 2 Perry, Trusts (6th ed.) §728, note 1200, citing many English cases; *Brown v. Condit, supra; MacKenzie v. Trustees of Presbytery, etc.* (1905), 67 N. J. Eq. 652, 61 Atl. 1027, 3 L. R. A. (N. S.) 227; *Teele, Trustee v. Bishop of Derry, supra; Bowden v. Brown, supra;* 2 Pomeroy, Eq. Jurisp. (1st. ed.) §1027 and English cases cited. It is the duty of the court to construe and enforce a trust according to the intent of the creator. It is not the duty of the court to create a trust. *Allen v. Nasson Institute, supra.* It was clearly the in-

tention of the subscribers to the fund that they would furnish the site or foundation, if the Winona Agricultural and Technical Institute would provide the large endowment which had been promised. The endowment was never waived by the contributors. Those who paid upon receipt of the "blue letter" only waived their right to insist, concurrently with the delivery of the deed, upon the large endowment; as to them, the effect of the "blue letter" was to require a certain portion of the endowment to be furnished, before the deed was to be delivered. The trust which would be created under the order of the court has no endowment feature whatever. There is no evidence or finding that any endowment has been or will be provided. If the school commissioners as trustees are to establish and maintain any kind of school upon the site, it must necessarily be done from public revenues raised by taxation. It cannot be gathered from the subscription papers that the donors intended to contribute the fund for a site for a school or schools to be established and maintained by taxation of themselves and others. The evidence and finding are to the contrary. Nor can it be gathered from the subscription papers that the land was to be held in trust and forever dedicated "to educational uses in the city of Indianapolis" in the broad sense expressed in conclusion of law No. 16, including "a school or schools for the education, training and instruction of both males and females in the various manual and mechanical trades, arts and sciences, and such other educational institutions, as the trustees may establish or cause to be established and maintained thereon," etc. This would include any kind of a school. The school clearly indicated by the subscription papers, contrued by the court when it places itself in the position of the subscribers, was

of the character outlined in the "Pittsburg resolution" and the platform adopted at Winona and other authorized statements. It was to be a National School of Technology, and was not to duplicate school or college work, etc. The other provisions in conclusion of law No. 16 are none of them found in the subscription papers.

The carrying into effect by the judgment of the court of conclusion of law No. 16 would violate the express conditions in the subscription papers and the "blue letter." By the terms of these papers, construed by their terms and from the circumstances and surroundings of the subscribers and contributors, as shown by the previous findings, the gift or donation or intended trust was not to take effect until (1) the institution had been duly incorporated, (2) had established its technical department by endowment, (3) the amount of $150,000 had been subscribed, the subscriptions to be of like purport with the first subscription papers; (4) and the subscriptions were to be returned to the subscribers, if the institute should not be located (in the sense in which this term was used) on said arsenal site, and (5) the deed was not to be delivered (see "blue letter") until the institute corporation should have in cash or bona fide collectible subscriptions (evidently a part of the endowment) a sum at least equal to the purchase price of the real estate. All these conditions were either concurrent or precedent to the vesting of any interest in the intended donee or beneficiary, and concurrent or precedent to the impressing of either the fund or the land with any kind of a trust, other than for the subscribers and contributors. It was clearly the intention of the subscribers and contributors that those conditions should be complied with. None of them have been complied with. No provision is made in conclusion

of law No. 16 or any other conclusion, nor in the judgment of the court for any of these conditions to be complied with.   There did not exist at the time of the trial, or at any time, a trust such as is declared in said conclusion, or any trust except for the subscribers and contributors.   The question is not whether the trust may fail for the want of a trustee, but whether the trust described in the conclusion itself exists.   It cannot be declared to exist without the violation of the plain intent of the subscribers and contributors.

The trust which would be so created would be in conflict with the intent of the contributors to the fund as found by the court in the tenth finding. The court expressly finds that: "The donors understood and intended that said funds so donated and paid should and would be used by said trustees (the plaintiffs) appellees in purchasing said real estate to be held in trust by said trustees or some corporation or persons selected by them in perpetuity as a site for a national technical school, and that said real estate would be retained intact for such purpose," etc.   If the creators of the trust expressed the intention that the plaintiff appellees, or some corporation or persons selected by them, should hold the land in perpetuity as a site for a national technical institute, etc., it was not competent for the court to select a trustee when there was no vacancy and the plaintiffs were offering to execute the trust.

There is no evidence to support the twenty-second finding that the school city of Indianapolis is ready and willing to accept the real estate upon the trusts in said finding declared.   The trusts therein declared were not declared by the subscribers and contributors.   All the evidence is to the effect that the school city was willing to become the

donee under the act of 1911. If the act is valid, it provides for the support of the school by taxation. Acts 1911 p. 96, §6549a Burns 1914. The constitutionality of the act of 1911 is attacked by the pleadings. It is clearly unconstitutional.

In the case of *Bullock* v. *Robison* (1911), 176 Ind. 198, 93 N. E. 998, this court held in an opinion, written by a member of this court at this time, involving the legality of a similar act (Acts 1909 ch. 38, p. 89, §6539 Burns 1914) that a law providing for contributions to the art institute of the city was void as contravening §22, Art. 4, of the Constitution, it being class legislation. This decision was handed down by this court on February 14, 1911, and a rehearing denied June 23, 1911. The act of 1911 in relation to the maintenance of trust estates by taxation, being the act under consideration was approved, with an emergency clause on March 1, 1911. If the act of March 1, 1909, is unconstitutional, and it certainly is, for the reasons assigned in *Bullock* v. *Robison, supra,* then the act of 1911 is also unconstitutional for the same reason.

Section 22, Art. 4, of the Constitution is as follows: "The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * Providing for supporting common schools and for the preservation of school funds." This same question was decided by a member of this court while sitting as a judge of the circuit court, and held that a statute concerning common schools which apply to cities or towns having a designated population only is violative of this clause of the constitution. The decision of the lower court was upheld by this Court in *School City of Rushville* v. *Hayes* (1903), 162 Ind. 193, 70 N. E. 134. In the act of 1911 it is provided that it shall apply to

cities having a population of 200,000 or over. Is this any different from providing that it shall apply to cities having a population of "not more than 4,545 and not less than 4,540"? We know that the act of 1911 applies to Indianapolis alone. For the reasons stated in the last two cases cited, the act of 1911 is unconstitutional and void, and the city of Indianapolis under that act could not maintain the institution in the manner as contemplated by the subscription papers, or in the manner, as found by the trial court, in which it was to be maintained. This law being class legislation is void and as this is the only authority under which appellee claims to have the right to take the lands in question, as trustee, it must follow that the court's conclusion to turn it over to said city is erroneous.

The institution and school which was to be established and maintained and which is contemplated by the express terms of the subscription papers was not such an institution or school as the city of Indianapolis has power to establish and maintain, and, therefore, it cannot raise money by taxation for either endowment or maintenance. It is, therefore, impossible for it to comply with the conditions. *Maxcy* v. *City of Oshkosh, supra; Allen* v. *Nasson Institute, supra; Board* v. *Dinwiddie, supra; Skinner* v. *Harrison Tp., supra.* The board of school commissioners of the city of Indianapolis has no power to levy a tax to support a trust of which it is merely a trustee.

The eighth, tenth, and twenty-second findings of fact, or at least the material parts thereof, are not sustained by sufficient evidence, and there is not sufficient evidence upon which a finding could have been made upon the subject-matter of the twenty-second finding or that would have supported conclusion of law No. 16. If said findings, or the ma-

terial parts thereof, are not supported by sufficient evidence, there are no findings or evidence to support the conclusions of law.

The court erroneously applied those principles which it believed applicable to a perfectly declared executed express public or charitable trust. The evidence and facts proven did not show that such a trust had been created. Upon a correct application of principles, the findings of fact mentioned in No. 1, *supra*, could not have been made. The errors in the application of the principles to the evidence, facts and cause are carried into all said conclusions of law and the judgment thereon. The facts found do not support conclusions of law Nos. 1, 5, 6, 7, 9, 10, 12, 13, 14, 15 and 16, or either thereof. The subscription papers set out in finding No. 5, even including the "blue letter" set out in the ninth finding, together with all other facts relating to each thereof set out in other findings, are not sufficient to support conclusion of law No. 1, that the real estate is held by the plaintiffs as trustees of a public charitable trust as set out in said conclusion. The tenth finding in which it is found that "the donors understood and intended that said fund so donated and paid should and would be used by said trustees in purchasing certain real estate to be held in trust by said trustees or some corporation or person selected by them in perpetuity as a site for a national technical school," etc., and the twenty-second finding, that the school city of Indianapolis is willing to accept the real estate in trust and establish and maintain a technical school thereon, open to all students in such school city and as students are admitted to other schools in said city, taken together, and with other facts found, do not support conclusion of law No. 16, that the plaintiffs, who so held as trustees with the right to select

other trustees, should convey said real estate to the
board of school commissioners of the city of In-
dianapolis, as trustee, to be by it held in trust for
the uses and subject to the terms and conditions set
forth in said conclusion. The uses, terms and con-
ditions set forth in the conclusion are not included
in the object expressed by the subscribers. The
conclusions of law Nos. 1 and 16 made by the court
and the judgment and decree in accordance there-
with are as plain and clear a diversion and change
of purpose from that intended by the contributors
to the fund as it would be possible to make: A
change from national to purely local; a change from
a school of technology that was to be unique among
the educational institutions of the United States
and the world to an Indianapolis common school;
a change from a school to be supported and main-
tained forever by private endowment to one that
can only be supported by public taxation; a change
from one in which all students, rich and poor alike
were to pay for their tuition, the intention being
that there were to be no charity students, and no
free tuition, to a school where the tuition must be
absolutely free. The twenty-second finding and
conclusion of law No. 16 are in conflict. The
twenty-second finding is to the effect that the school
city of Indianapolis is ready and willing to accept the
real estate in controversy in trust, and establish and
maintain a technical school thereon, open to all
students residing in such school city and as students
are admitted to other schools in said city, while
conclusion of law No. 16 and the decree rendered
thereon provides that the right of attendance in
any such school shall not be limited to pupils re-
siding in Indianapolis but shall be open to pupils
residing elsewhere.

In conclusion I am of the opinion that: (1) No

express trust was ever created according to law in the lands in controversy in favor of any person or corporation, but that all that was done was nothing more than an unsuccessful attempt to create such a trust for a single and definite purpose, viz., a national school of technology.   (2) The purpose or intention of the donors as expressed in the writings was not to establish a *public* charitable trust, but to be a gift to the Winona people with an endowment.   (3) That the trust intended to have been consummated, having failed, appellees hold the title to the land as trustees of a constructive trust in favor of the donors.   (4) That the doctrine *cy pres* has no application here for the reason that it is never exercised in relation to deeds or contracts. (5) That the act of March 1, 1911, authorizing the school city of Indianapolis to take and control the property as trustees of an express trust and maintain it with taxation, is void as being in conflict with clause 13, §22, Art. 4, of the Constitution of Indiana.   (6) The majority opinion has the effect of saying to the people of Indiana that, when you put your name to a subscription paper, for whatever purpose, if that purpose should fail of consummation, for any reason, your money may be taken and applied to whatever purpose may be suggested to a court of chancery.   The majority opinion leaves no rule of law which will allow men to make their own contracts or protect those already made.   It says in effect that you may subscribe to the building of a Young Men's Christian Association building, but, if enough has not been subscribed for that purpose, a court of chancery may apply it to the building of a church; if you subscribe to a fund to build a church it may be taken to build an old people's home; if you subscribe to a hospital fund it may be taken to buy ambulances or pay nurses;

if you pay money to your agent for the purpose of buying an automobile it may be used to buy a horse and wagon; you may direct your agent to buy a piano, he may fulfill the command by buying an organ—so it is a musical instrument of some kind you must be satisfied. The majority opinion cannot be sustained on any authority of law or principle of equity. (7) That the property should be sold, the creditors paid and the balance of the proceeds distributed to the original donors after paying costs and expenses.

NOTE.—Reported in 112 N. E. 780.